# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

### EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY

**This is a motion for relief from the automatic stay. If it is granted, the movant may act outside of the bankruptcy process. If you do not want the stay lifted, immediately contact the moving party to settle. If you cannot settle, you must file a response and send a copy to the moving party at least 7 days before the hearing. If you cannot settle, you must attend the hearing. Evidence may be offered at the hearing and the Court may rule.**

**Represented parties should act through their attorney.**

**Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

**Relief is requested no later than Friday, August 5, 2022 at 12:00 p.m.**

David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the Connecticut Families) hereby file this *Emergency Motion for Relief from the Automatic Stay* (the Emergency Motion) requesting entry of an order granting them relief from the automatic stay, for cause, under 11 U.S.C. § 362(d)(1) and Rule 4001 of the Federal Rules of Bankruptcy Procedure, and on an emergency basis under 11 U.S.C. § 105(a), Rule 9006 of the Federal Rules of Bankruptcy Procedure, and Local Rule

9013-1(i).  For nearly five years, Alex Jones has sought in every conceivable way to deny and delay the Connecticut Families' right to have a jury hear the evidence against Alex Jones and the Debtor, and to assess damages against them for intentional infliction of emotional distress, defamation, and additional torts against him and the Debtor. Liquidation of those claims in the Connecticut Superior Court, where these actions have been pending since 2018, is imminent.  Jury selection for the trial is scheduled to commence August 2, 2022.  The Connecticut Families respectfully state as follows:

## I.    INTRODUCTION

1.    The Connecticut Families are immediate family members of children and educators killed in the Sandy Hook Elementary School shooting on December 14, 2012 and one first responder to the shooting.  They are also victims of Jones's lies, which aired via his InfoWars media empire and through social media to an audience of millions. Jones told that audience that the Sandy Hook shooting was "a synthetic completely fake with actors," a "hologram," an "illusion" and "the fakest thing since the three-dollar bill," "staged" to take away their guns, and that the Sandy Hook families were "paid ... totally disingenuous" "crisis actors" who faked their loved ones' deaths.  He urged the audience to "investigate," knowing his audience would respond by cyberstalking, harassing, and threatening the plaintiffs. *See* Exs. A-C, Complaints in the three consolidated cases currently pending in Connecticut (the Connecticut Action).[1]

2.    For the second time in the past several months, the Jones Defendants seek to use the bankruptcy process to delay trial in the Connecticut Action against Jones and Free Speech Systems, LLC, the debtor and debtor- in-possession in this chapter 11 case

---

[1] Due to subsequent rulings in the Connecticut Action, and as further set forth below, these facts are now admitted by the Debtor and by Alex Jones.

(the Debtor or FSS). The Jones Defendants' liability has been established in the Connecticut Action due to litigation tactics over the last several years so egregious that the court entered orders against Jones and the Debtor resulting in conclusive and binding determinations in favor of the plaintiffs as to the Jones Defendants' liability.[2] *See* Exs. D-E, Connecticut Default Ruling; Connecticut Ruling Striking Notice of Defenses.[3] The Connecticut Families respectfully ask this Court to prevent Jones from, on nearly the literal eve of trial, once again delaying the adjudication of the Connecticut Action with the clear purpose of stopping that trial and the liquidation of the claims pending there. These claims cannot be liquidated in this Court. To waste the significant resources invested in the preparation for the Connecticut trial by both the Connecticut Families and the Debtor would be both imprudent and inefficient.

## II.   REQUEST FOR EMERGENCY CONSIDERATION

3.    Emergency consideration of this Motion is sought to prevent the Debtor and Jones from once again using the bankruptcy process to evade and derail the trial in the Connecticut Action—an action that has been pending for more than four years now—when

---

[2] Other family members of Sandy Hook families have filed state court actions in Texas that arose out of similar conduct by the Debtor and Jones (the Texas Actions). *See Heslin, et al. v. Jones, et al.*, Cause No. D-1-GN-18-001835, in the 53rd District Court of Travis County, Texas; *Pozner, et al. v. Jones, et al.*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; and *Fontaine v. Jones, et al.*, Cause No. D-1-GN-18-001605, in the 459th District Court of Travis County, Texas. Liability has been established in these actions and a damages trial started in one on Monday, July 25, 2022.

[3] The disciplinary default rulings in this case establish the liability of both Alex Jones and the Debtor. *See, e.g., Smith v. Snyder*, 267 Conn. 456, 471 (2004) (effect of default is "the conclusive establishment of liability"); *Marcus v. DuPerry*, 223 Conn. 484, 488 (1992) ("the defendant's liability had already been conclusively established by the rendering of the default"); *Abbott Terrace Health Ctr., Inc. v. Parawich*, 120 Conn. App. 78, 85 (2010) ("[E]ntry of default, when appropriately made, *conclusively determines the liability of a defendant*.") (emphasis in original). These rulings determine that the defendants admit the facts alleged in the complaint. *See, e.g., Smith*, 267 Conn. at 464 ("[T]he entry of a default constitutes an admission by the defendant of the truth of the facts alleged in the complaint."); *DeBlasio v. Aetna Life & Cas. Co.*, 186 Conn. 398, 401 (1982) (same); *Dziedzic v. Pine Island Marina, LLC*, 143 Conn. App. 644, 645 (2013) ("As our Supreme Court has explained, the entry of a default judgment conclusively establishes the facts alleged in the plaintiff's complaint.").

the far better course is to liquidate these claims in the presently scheduled trial. The Connecticut Action is pending in Connecticut Superior Court in the Judicial District of Waterbury, Connecticut, before the Honorable Barbara Bellis. Judge Bellis has presided over the Connecticut Action since its inception. Jury selection is scheduled to commence on August 2, 2022, with evidence following on September 6, 2022. Due to great efforts by the Connecticut Families, this setting was maintained even when other entities owned and controlled by Jones recently filed bankruptcy. Due to these efforts and those of the families in the Texas Actions, that bankruptcy was dismissed within two months of the date of its filing.[4] Debtor's filing here, after years of litigation and timed on the eve of trial, is Alex Jones's latest effort to delay the Connecticut Families' case and necessitates emergency relief permitting the adjudication of this action to proceed.

4. Notably, a similar emergency motion has been filed by the Debtor in regard to one of the pending Texas Actions [Dkt. No. 2]. The parties there are currently in trial, which commenced on July 25, 2022. As Debtor recognizes with the Texas Action, relief is warranted for the Connecticut Action. The Connecticut Families similarly seek emergency consideration of this Motion on or before 12:00 p.m. on August 5, 2022, or as soon thereafter as the Court's schedule will allow.

5. Under 11 U.S.C. § 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under Rule 9006(c)(1) of the Federal Rules of Bankruptcy Procedure, "the court for cause shown may in its discretion with or without motion or notice order the [time required by the Bankruptcy Rules] reduced." And, under Local Rule 9013-1(i), the Court may consider

---

[4] *See In re InfoW, LLC, et al.*, Case No. 22-60020, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division

this motion on an emergency basis. The Connecticut Families seek relief from the automatic stay on an emergency basis to permit the jury trials in the Connecticut Action to proceed in order to determine damages and enter final judgment in a fixed amount. Enforcement of any judgment entered would be stayed as to the Debtor. Further, the Connecticut Families respectfully request that the 14-day stay imposed by Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure be waived to allow the Connecticut Families to immediately proceed in the Connecticut Action. The Connecticut Families request this emergency relief (1) to prevent the Jones Defendants' abuse of the bankruptcy process; (2) to preserve the Connecticut Families' trial setting and protect against prejudicial delay; and (3) to promote judicial efficiency.

### III.    BACKGROUND

6.    Almost immediately after the Sandy Hook Elementary School shooting on December 14, 2012, Alex Jones (Jones) began a series of broadcasts in which he asserted that the shooting was a hoax and the Connecticut Families were crisis actors–that is, that the family members of these murdered children and educators were actors misleading the public by pretending to play the parts of grieving parents. The Connecticut Families asserted claims against Jones and his entities in the Connecticut Action based on these actions by Jones. In other words, the Connecticut Families are not creditors in the traditional sense to which this Court is accustomed. They did not loan Jones money or become the victim of some fraudulent scheme designed to take their money. Rather, they are victims of Jones's repeated falsehoods regarding them and the school shooting in which their loved ones were killed.

7.    For more than five years, Jones, through his media empire, targeted the Connecticut Families and their loved ones that were killed. Jones and his InfoWars

"contributors" told an audience of millions that the Sandy Hook shooting was "a synthetic completely fake with actors," a "hologram," an "illusion" and "the fakest thing since the three-dollar bill," "staged" to take away their guns, and that the Sandy Hook families were "paid . . . totally disingenuous" "crisis actors" who faked their loved ones' deaths. Jones urged the audience to "investigate," knowing his audience would respond by cyberstalking, harassing, and threatening the families.[5]

8.     The Connecticut Action has proceeded in Connecticut Superior Court for nearly four years. From the very beginning, the Jones Defendants resisted the authority of the Connecticut Superior Court by every conceivable means. They removed twice to the United States District Court and were remanded twice. The Jones Defendants were sanctioned in June 2019 for repeated violations of the court's discovery orders and threatening the plaintiffs' counsel, a sanction affirmed by the Connecticut Supreme Court in *Lafferty v. Jones*, 336 Conn. 332, 374, 377 (2020) (describing Jones' course of conduct as "a whole picture of bad faith litigation misconduct"). *See* Ex. F, Connecticut Supreme Court decision. On remand, Jones and the Debtor continued to flaunt court orders and his discovery obligations by falsely denying the existence of certain financial records, producing fabricated financial records, and simply refusing to produce analytics data concerning revenue and content distribution. In October 2021, knowing a sanction of default was likely imminent as a result of their continued misconduct, the Jones Defendants attempted to avoid it by moving to recuse the Connecticut Superior Court

---

[5] The citations to the quotations, in the order they appear, are: Ex. A, Complaint ¶ 185 (Jones on his radio show); ¶ 223 (Jones on his radio show); ¶¶ 140-41 (non-debtor defendants Wolfgang Halbig and Jones on Jones's radio show); ¶¶ 117, 273 (Jones on his channel and at a press conference), ¶¶ 138, 149, 223 (Jones on his channel and on his radio show); ¶ 295 (statement by an InfoWars "contributor" on Jones's radio show); ¶¶ 112, 120-21, 185, 197 (Jones on his channel and on his radio show). Identical allegations appear in the complaints in the consolidated actions brought by Sherlach and Parker. *See* Exs. B-C.

judge who presided over the case since its inception.  Ex. G, Jones Defendants' Motion to Recuse.  The state court denied the motion, finding that the Jones Defendants had not shown any "judicial bias, partiality, or impropriety."  Ex. H, Order Denying Motion to Recuse.   On November 15, 2021, the state court entered a default against the Jones Defendants, finding that the sanction was necessary "given the scope and extent of the discovery material that the defendants have failed to produce."  Ex. D, Default Ruling. The state court further ruled that because of the extensive misconduct, the default would be binding.  Ex. E, Connecticut Ruling Striking Notice of Defenses.

9.       In both the Connecticut Action and the Texas Actions, Jones and the Debtor (which again is both wholly owned by Jones and completely subject to his control)[6]

---

[6] "The court notes Mr. Jones is sole controlling authority of all the defendants."  Ex. D, Default Ruling at 16. Mr. Jones's sworn interrogatories also establish his exclusive control:

> 1. Identify: a. All business organizations and/or other entities in which you have ownership and/or control
>
> b. The officers or members of all organizations and/or entities responsive to part (a)
>
> c. The shareholders or other owners of all organizations and/or entities responsive to part (a)...
>
> ANSWER:
>
> a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other entities: Free Speech Systems LLC. . .
>
> b. I am the sole officer and member of all the organizations and/or entities responsive to part (a).
>
> c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

Ex. I, Sworn Interrogatories of Alex Jones; *see also id.* Sworn Interrogatories of FSS signed by Alex Jones. In addition, the sworn testimony of FSS's corporate representative establishes Jones's exclusive control:

> Q  Okay. All right. So, Mr. Zimmerman Free Speech Systems is owned and operated by Alex Jones, correct?
>
> A  That's correct.
>
> Q  And does he have authority over all Free Speech Systems operations?
>
> A  That's correct.
>
> Q  Okay. He is the CEO and owner?
>
> A  That's correct.
>
> Q  And does he have the authority to hire and fire anybody of his choosing?

engaged in pervasive discovery misconduct so egregious that both state courts resolved liability against Jones and the Debtor and precluded them from introducing any evidence in support of any purported defense.[7]

10.    In August 2021, the Connecticut Superior Court set the Connecticut trial date on the issue of damages only.  The first of the Texas Actions was set to commence on April 25, 2022, with others to proceed throughout the spring.  The Connecticut Action was then scheduled to commence with jury selection on August 2, 2022.

11.    Faced with imminent trials, Jones attempted to use the bankruptcy process to stall or evade the Connecticut Action and Texas Actions.  On April 17 and 18, 2022—at Jones's direction—three shell companies that Jones also wholly controls, InfoW, LLC (fka Infowars, LLC); IWHealth, LLC (fka Infowars Health, LLC); and Prison Planet TV, LLC (the IW Shell Companies)—all of which were defendants in the Connecticut Action—filed for relief under chapter 11, subchapter v, of the Bankruptcy Code.  *See In re InfoW, LLC, et al.*, No. 22-60020 (Bankr. S.D. Tex). Within hours of these chapter 11 filings, pleadings were filed to remove the Connecticut Action and Texas Actions to the United States Bankruptcy Courts for Connecticut and Texas, respectively, on the basis of "related to" jurisdiction.  The sole basis for each removal was the pending bankruptcy.

---

A    That's correct.

Q    And does he have authority to overrule any decision made by a subordinate?

A    That's correct.

Q    And he has ultimate authority over Free Speech finances?

A    That's correct.

Q    And he is not accountable to a board of directors or governing authority, correct?

A    Correct

Ex. J, FSS Dep. Jun, 24, 2021 at 89-90.

[7] *See* Exs. D-E.

The bankruptcy-based removals effectively stayed the Connecticut Action and Texas Actions in their entirety against all defendants, whether or not they were debtors in the chapter 11 case.

12.     The IW Shell Companies held no operating assets or financial assets. They had no businesses to reorganize or liquidate.  The U.S. Trustee immediately filed a motion to dismiss the case, arguing that "[t]he strategy employed here—filing bankruptcy for three non-operating members of a larger enterprise to channel and cap liability against the other, revenue-generating members of that enterprise and its owner using a bankruptcy subchapter designed to aid small, struggling businesses—is a novel and dangerous tactic that is abusive and undermines the integrity of the bankruptcy system." *In re InfoW, LLC*, Case No. 22-60020, ECF No. 50, at 2 (Bankr. S.D. Tex. Apr. 29, 2022). The U.S. Trustee also argued that "Jones and FSS hand-picked . . . three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability."  *Id.* at 16.

13.     The Connecticut Families also promptly moved to dismiss the bankruptcy case as a bad faith filing.  *See In re InfoW, LLC*, Case No. 22-60020, ECF No. 36. A briefing schedule was set which would have resulted in delay and could have affected the Movants' state-court trial date.  In order to obtain immediate remand and retain their trial date, the Connecticut Families obtained dismissal of their state-court causes of action against the IW Shell Companies and were remanded from the Connecticut Bankruptcy Court to which they had been removed back to Connecticut Superior Court.

14.    Because the dismissal of the IW Shell Companies from the Connecticut Action ended the Connecticut Families' interest in the IW Shell Companies' bankruptcy, the Connecticut Families withdrew their motion to dismiss the bankruptcy.

15.    The Texas plaintiffs exited the IW Shell Companies' bankruptcy in slightly different way.  They stipulated with IW Shell Companies to a withdrawal against them in the Texas Actions and based on that stipulation obtained remand.

16.    The United States Trustee and IW Shell Companies then agreed to dismissal of the chapter 11 cases, which the bankruptcy court Judge Christopher M. Lopez ordered on June 10, 2022.

17.    Jones and FSS are now the only remaining defendants in the Connecticut Action and Texas Actions.  *Id.*

18.    Following remand, the Connecticut Superior Court confirmed the August 2 trial date was firm.  Jury selection is scheduled to commence on that date with evidence following on September 6, 2022.  In Connecticut, the state constitution guarantees the right to individual voir dire.  *See* Conn. Const. art. I, § 19 ("The right to question each juror individually by counsel shall be inviolate.").  Unlike in Texas where a jury is impaneled in a single day, it is common for voir dire in Connecticut to span several weeks with individual jurors selected over the course of days.   Given the nature of the Connecticut Action, the trial judge allotted four weeks for jury selection.  While that time span for jury selection may be curtailed by a few days, to curtail it further risks losing the Connecticut trial date.

19.    The Texas state court, in which some original trial dates had passed, re-set the trial dates with the earliest set for July 25, 2022.

20.     With the first Texas Action currently pending and the Connecticut Action set to begin jury selection on August 2, 2022, Jones caused FSS to commence this chapter 11 case on July 29, 2022.  With its filing, FSS sought emergency relief from the automatic stay to allow the first Texas Action to continue to final judgment [Dkt. No. 2].

21.     Unless the relief requested in this Emergency Motion is granted, Jones will again have used the bankruptcy system to disrupt the Connecticut Action, frustrating a process that is ripe to proceed and needs to proceed.  The Connecticut Families' claims need to be liquidated for this bankruptcy case to progress.  That liquidation is excluded from this bankruptcy case and reserved for jury trial.  The Connecticut state court is the forum in which the Connecticut Action must proceed.

## IV.     JURISDICTION AND VENUE

22.     The Court has jurisdiction over this Emergency Motion under 28 U.S.C. §§ 157 and 1334.  This Emergency Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (G).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## V.     ARGUMENT AND ANALYSIS

23.     The Connecticut Families seek relief from the automatic stay on an emergency basis to permit the jury trial in the Connecticut Action to adjudicate their claims to final judgment; pursue collection against non-debtor defendants; and establish their rights to recover from the Debtor within the bankruptcy case.  This relief is both necessary and warranted (1) to prevent the Jones Defendants' self-serving manipulation of trial schedules through the bankruptcy process; (2) to preserve the Connecticut Families' trial setting and protect against prejudicial delay; and (3) to promote judicial efficiency.

24.     As a general rule, the filing of a bankruptcy petition operates to stay litigation involving pre-petition claims against a debtor.  *See* 11 U.S.C. § 362(a)(1) (automatically staying "any action or proceeding against the debtor that was or could have been commenced" before the filing of the petition).  However, the automatic stay can be modified, so long as an interested party can demonstrate "cause."  *See* 11 U.S.C § 362(d)(1) (stating "the court shall grant relief from the stay . . . for cause[.]").  The Bankruptcy Code does not define "cause" for lifting the stay, leaving courts to consider whether cause exists on a case-by-case basis.  *See In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998). "Cause" as used in this section "is an intentionally broad and flexible concept that permits the Bankruptcy Court, as a court of equity, to respond to inherently fact-sensitive situations."  *In re Tex. State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995). Significantly, "[t]he Fifth Circuit has recognized cause as 'any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process.'"  *In re Northbelt, LLC*, 630 B.R. 228, 284 (Bankr. S.D. Tex. 2020) (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)); *see also In re JCP Properties, LLC*, 540 B.R. 596, 614-16 (Bankr. S.D. Tex. 2015).  Given the timing of Debtor's filing and ongoing abuse of the judicial process, this factor weighs heavily in favor of lifting the stay.

25.     Further, bankruptcy courts have given meaning to the term based on a three-prong test for determining when a stay should be lifted, including: (1) whether any great prejudice to either the bankruptcy estate or the debtor will result in prosecution of the lawsuit; (2) whether the hardship to the non-debtor party by the continuation of the automatic stay outweighs the hardship of the debtor; and (3) whether the creditor has a probability of success on the merits of his or her case.  *In re Fernstrom Storage and Van*

*Co.*, 938 F.2d 731, 735 (7th Cir. 1991); *In re Robertson*, 244 B.R. 880, 882 (Bankr. N.D. Ga. 2000); *In re Bock Laundry Machine Co.*, 37 B.R. 564, 566 (Bankr. N.D. Ohio 1984). Courts in this district have utilized this method. *See In re Kao*, No. 15-31193-H3-13, 2015 WL 9412744, at *2 (Bankr. S.D. Tex., December 21, 2015) (citing *In re Namazi*, 106 B.R. 93 (Bankr. E.D. Va. 1989)). Here, all three prongs weigh in favor of modifying the automatic stay to allow the Connecticut Action to proceed.

**A.** ***No great prejudice will result to the bankruptcy estate or the Debtor from prosecution of the Connecticut Action.***

26. The Connecticut Families are personal injury tort claimants. *See* Exs. A-C, Connecticut Families' Complaints. Their claims require adjudication for purposes of distribution in the bankruptcy case. That adjudication is excluded from the bankruptcy case.[8] *See* 28 U.S.C. § 157(b)(2)(B); *see also In re Schepps Food Stores, Inc.*, 169 B.R. 374, 377 and n.3-4 (Bankr. S.D. Tex. 1994) (analyzing the exclusion of personal injury claims and scope of bankruptcy court power). The Connecticut Families have also preserved their rights to a jury trial outside the bankruptcy case with jury selection scheduled for August 2, 2022.[9] *See* 28 U.S.C. § 1411. These claims exist and must be resolved. As such, the issue before the Court is when these claims should move forward. *See In re Fuchs*, No. 05-3595-BJH, 2006 WL 6543977, at *2-3 (Bankr. N.D. Tex. 2006) (unpublished) (finding adjudication of personal injury claims sufficient to establish cause for granting relief from the automatic stay). Although the automatic stay currently prevents adjudication of these pending claims, the stay was not intended to indefinitely prevent

---

[8] The Connecticut Families do not consent to a final order in the bankruptcy case. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944 (2015).

[9] The Connecticut Families do not consent to a jury trial in the bankruptcy case. *In re Clay*, 35 F.3d 190, 191 & 198 (5th Cir. 1994)

such adjudication. *See In re Bock Laundry Machine Co.*, 37 B.R. at 567 ("The automatic stay was never intended to preclude a determination of tort liability and the attendant damages"). Instead, "[c]ourts often grant creditors relief from the automatic stay so they can adjudicate their unliquidated claims against a debtor outside of bankruptcy court, particularly when the claims are already the subject of pending litigation." *Kipp Flores Architects, L.L.C. v. Mid-Continent Cas. Co.*, 852 F.3d 405, 414 (5th Cir. 2017).

27.    The Connecticut Families' claims have been pending in the Connecticut Action for four years. *See* Exs. A-C, Connecticut Families' Complaints. These claims have been substantially investigated, litigated, and prepared for trial. Debtor's liability has been established. And the remaining issues to be decided are damages. Substantial costs for litigation have already been borne, and the Jones Defendants have actively sought and received contributions from supporters to defray the costs of defending the Connecticut Action and Texas Actions. *See* Ex. K, Dep. Jones Apr. 5, 2022 at 17:06-11; Ex. L, Dep, Jones Apr. 6, 2022 at 460:17-462:20. There is no prejudice to the Debtor in adjudicating these claims to final judgment in the Connecticut Action, especially as the Connecticut Families' requested relief limits collection of any judgment outside the bankruptcy case to non-debtor codefendants and third parties, while reserving collection against Debtor to this bankruptcy case. *See In re Fowler*, 259 B.R. 856, 859 (Bankr. E.D. Tex. 2001). Rather, judicial efficiency and conservation of party resources are best served by permitting adjudication in the Connecticut Action to proceed.

**B.      *The Connecticut Families' hardship under the automatic stay substantially outweighs any hardship Debtor would experience under the requested modification.***

28.    The Connecticut Families' adjudication of their claims against Debtor is dependent upon lifting the automatic stay. *See* 28 U.S.C. § 157(b)(2)(B); 28 U.S.C. § 1411.

The harm the Connecticut Families have endured is inherent in the nature of their claims. They are the immediate family members of children and educators killed in the Sandy Hook Elementary School shooting on December 14, 2012 and one first responder to the shooting. They are the victims of the Debtor and Jones's lies surrounding that event. As personal injury claimants, the Connecticut Families look to a jury trial to hold the Jones Defendants accountable for their actions in the eyes of the public; to find personal closure for the harms done them, to the extent that is possible; and to liquidate their damages. Movants have waited years for that relief and closure, delayed and frustrated by the Debtor and Jones's obstruction. Movants and their counsel have expended considerable time and expense preparing for the August 2 voir dire and September 6 trial date described above. Pretrial motions have been drafted based on current record. Witnesses have been and are being prepared. Travel arrangements have been made and parties and expert and fact witnesses' schedules have been coordinated. And these families have prepared themselves mentally for the trial. To impose the burden and cost of delay on these families is a great hardship, one that substantially outweighs any hardship of the Debtor. Bankruptcy does not relieve the Debtor of the burden of liquidating existing claims. That burden is limited given the procedural posture of the Connecticut Action. Delay will not lessen that burden. Rather, delay will increase it.

**C.** *Movants have a probability of success on the merits of their claims.*

29.     Even a slight probability of success on the merits may be sufficient to support lifting the automatic stay. *See In re The SCO Group, Inc.*, 395 B.R. 852, 859 (Bankr. D. Del. 2007). Here, liability against the Debtor is already established. All that remains is a determination of damages, which the Connecticut Families are assured to

obtain, especially as they are represented by experienced, capable attorneys in the Connecticut Action.

**D.    *Alternative factors weigh in favor of modifying the automatic stay.***

30.    Bankruptcy courts have also considered other factors[10] in determining whether to lift the automatic stay to allow litigation to proceed in another forum, including:

i.    whether relief will result in a partial or complete resolution of the issues;

ii.    lack of any connection with or interference with the bankruptcy case;

iii.    whether the other proceeding involves the debtor as a fiduciary;

iv.    whether a specialized tribunal has been established to hear the particular cause of action;

v.    whether the debtor's insurer has assumed full responsibility;

vi.    whether the action primarily involves third parties;

vii.    whether litigation in the other forum would prejudice the interests of the other creditors;

viii.    whether the judgment claim arising from the other action is subject to equitable subordination;

ix.    whether the movant's success would result in a judicial lien avoidable by the debtor;

x.    interests of judicial economy and the expeditious and economical resolution of litigation;

xi.    whether the proceedings have progressed to the point that the parties are ready for trial; and

xii.    impact of the stay on the parties and the balance of harm.

---

[10] These same factors go into the various tests used by the courts in the Fifth Circuit to determine abstention and remand.  *In re Viper Prods. & Servs., LLC*, 2022 WL 2707879, at *2.

*See In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984); *In re U.S. Brass Corp.*, 176 B.R. 11, 13 (Bankr. E.D. Texas 1994). These factors need not be assigned equal weight, and only those factors relevant to the particular case need to be considered. *Id.* (citing *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994)). Courts have recognized that a decision to lift stay may be upheld on the ground of judicial economy alone. *See In re Kao*, 2015 WL 9412744, at *2 (citing *In re U.S. Brass Corp.*, 176 B.R. at 13 and *In re Kemble*, 776 F.2d 802, 807 (9th Cir. 1985)).

31.     With regard to the above factors that are applicable here, liability has been determined and lifting the stay will allow the Connecticut Families to promptly liquidate their claims. The liquidation of the Connecticut Families' damages claims in the Connecticut Action is essential to the efficient resolution of this bankruptcy case. Based on the filings made in this Court, the Connecticut Families and the plaintiffs in the Texas Actions will be the largest creditors in this case.[11] Having an early and final determination of these claims against the Debtor will best allow this case to progress forward.

32.     Proceeding with the Connecticut Action should not interfere with the bankruptcy case, whereas denial will result in substantial harm to the Connecticut Families. Specifically, the Connecticut Action is ready for jury trial in the state court of Connecticut on the limited issue of damages. Lifting the stay here will not prejudice other creditors as it merely allows the Connecticut Families to liquidate claims that already exist. Further, the Connecticut Families have reserved collection against the

---

[11] The only other material claim, FSS's alleged PQPR Note [Dkt. 6], is subject to pending claims for fraudulent transfer in *Heslin v. Jones*, No. D-1-GN-22-001610, In the 200th Judicial District Court, Travis County, Texas. *See* Ex. M, The Connecticut Families maintain that this supposed liability is fraudulent and made for the purpose of transferring money from the Debtor to other entities controlled by Jones.

Debtor to a claim within the administration of the bankruptcy case. As such, a judgment in the Connecticut Action will only be enforced against the Debtor in the bankruptcy case.

33.     In contrast, ongoing delay would work great prejudice against the Connecticut Families, who have waited four years to have their claims heard by a jury only to encounter yet another effort at delay by the Jones Defendants. *See In re Fernstrom Storage & Van Co.)*, 938 F.2d at 736–37 ("A decision continuing application of the stay to IBM's action would cause it great prejudice by forcing it, in effect, to write off the expenses it incurred in litigating its case against Fernstrom to the eve of trial. Where the stayed non-bankruptcy litigation has reached an advanced stage, courts have shown a willingness to lift the stay to allow the litigation to proceed."). The Connecticut Families' claims are both in form and substance personal injury tort claims, as to which a jury trial right exists. All of the issues in the Connecticut Action are based on issues of state law. The issues involve interpretation of complex Connecticut statutes and tort law developed in Connecticut case law. As set forth above, they are entitled to adjudication outside of the bankruptcy cases and will not burden that bankruptcy court's docket.

34.     Further, judicial economy favors lifting the stay given the trial posture of the Connecticut Families' claims against the Debtor in the Connecticut Action as well as their pending claims against the non-debtor defendants. The experienced Connecticut trial judge who has presided over this case for four years scheduled this jury trial date a year ago and is fully prepared to proceed with the trial, as are the parties. The most efficient use of judicial resources is to allow the Connecticut Action to proceed.

35.     Finally, the Court should be mindful of comity considerations with the Connecticut state court. In that Court, the Debtor and Jones were sanctioned for their misconduct in the litigation. The matter should be adjudicated in the Connecticut court

for that reason alone.  The court in *In re Xenon Anesthesia of Texas, PLLC,* 510 B.R. 106 (Bankr. S.D. Tex. 2014), cited with approval by the Fifth Circuit in *Kipp Flores Architects, L.L.C., supra,* granted relief from the stay for the claimant to proceed with a contempt citation in state court, stating:

> The state court has been involved in the litigation between these parties since its inception more than two years ago.  The state court case has been set for trial twice and both sides are ready to proceed to have the matter resolved.  The state court is familiar with the causes of action alleged, the parties involved, and the facts of the state court litigation.  The state court has rendered numerous rulings and orders in connection with the state court litigation.  The state court is entitled to consummate the exercise of its inherent power to punish a contemnor for improper past acts that affronted the state court's dignity and authority.

*Id.* at 110.  The Court should lift the automatic stay for cause to permit the Connecticut Families to proceed.

## VI.    PRAYER

36.    For the reasons stated above, the Connecticut Families respectfully request that the Court enter an order: (a) granting relief from the automatic stay to allow the Connecticut Families to pursue their claims to judgement in the Connecticut Action; (b) limiting collection to non-debtor third parties outside of the bankruptcy case; (c) reserving collection against the Debtor as a claim asserted within the bankruptcy administration; and (d) allowing the relief from the automatic stay to take effect immediately under Bankruptcy Rule 4001(a)(3) upon the entry of an order approving this Emergency Motion.  The Connecticut Families also request any and all other general relief to which they may be entitled.

Respectfully submitted this 31st day of July 2022.

<div style="margin-left: 40%;">

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple
State Bar No. 24036354
rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
**ATTORNEYS FOR WHEELER, ET AL.**

</div>

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

<div style="margin-left: 40%;">

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple

</div>

## CERTIFICATE OF CONFERENCE

I hereby certify, as counsel for Connecticut Families, my firm has conferred with Debtor's counsel, and as of the filing of this Motion, Debtor's counsel has not responded to our request regarding the relief requested herein.

<div style="margin-left: 40%;">

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Emergency Motion for Relief from the Automatic Stay has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 31st day of July 2022.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

IN RE:                                      §                    Case No. 22-60043
                                            §
FREE SPEECH SYSTEMS, LLC,                   §                    Chapter 11 (Subchapter V)
                                            §
        Debtor.                             §

# EXHIBIT A

| RETURN DATE: JUNE 26, 2018 | : | JUDICIAL DISTRICT |
| | : | |
| ERICA LAFFERTY, ET AL, | : | OF FAIRFIELD |
| | : | |
| v. | : | AT BRIDGEPORT |
| | : | |
| ALEX JONES, ET AL. | : | MAY 23, 2018 |

## COMPLAINT

### INTRODUCTION

1.    This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.    Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.    In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.    That tragic day left behind 26 families that will never be whole again.

5.    Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.    Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.    Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.    Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.    Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

10.    Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.    Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.    Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.    As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14.    On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.    They have confronted strange individuals videotaping them and their children.

16.    Some of them have moved to undisclosed locations to avoid this harassment.

17.    The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.    Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.    The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

2

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31.    Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32.    Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33.    Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34.    Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35.    All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36.    Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37.    Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38.    Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39.    Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45.     His followers have shown themselves ready to comply.

46.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48.     Jones's followers came running to his call, as he knew they would.

49.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

51.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

62.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72.     Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73.     Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74.     In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75.     In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] See, e.g., https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324;
https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252.
https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

8

76. For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77. The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78. Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79. On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80. Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81. On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83. Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84. Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85. Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

86. Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87. Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88. Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89. Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90. The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91. The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92. The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93. Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

94. Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95.     According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96.     In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97.     In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98.     News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99.     Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars' Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

## THE CAMPAIGN OF ABUSE

101.     Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102.     On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103.     That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104.     An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105.     At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106.     On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107.     The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108.     In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109.     The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110.     A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

### January 27, 2013

111. On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114. Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115. Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### March 2013

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

13

120.    On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121.    He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122.    The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

### May 27, 2013

123.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

128.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### May 13, 2014

129.    On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130.    That day, Jones hosted Wolfgang Halbig.

131.    During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

132. Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133. Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134. Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135. Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136. Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137. He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138. Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139. Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140. Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141. During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143. On information and belief, this episode was also broadcast through Jones's radio affiliates.

144. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## September 25, 2014

145.    On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146.    This assertion was a complete fabrication: the FBI had made no such statement.

147.    During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148.    This was a false statement. FBI crime statistics showed no such thing.

149.    Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150.    Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151.    Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152.    Jones asserted that the school was "a cut-out" used as a stage for the event.

153.    Jones and Halbig both stated "I wish it was real instead of fake."

154.    Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155.    Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156.    Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158.    On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

159. The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160. The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161. The article quoted Halbig as saying that there was "a 'script' followed during the event."

162. It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164. On information and belief, the article has been viewed by hundreds of thousands of persons.

## December 12, 2014

165. On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166. The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167. During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168. Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

179.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## January 2, 2015

180.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183.    The pictures used were images of Noah Pozner.

184.    Upon information and belief, hundreds of thousands of people have viewed this article.

## January 13, 2015

185.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

188.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

## March 4, 2015

189.    On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190.    Jones hosted Halbig on that episode.

191.    During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192.    Halbig stated the school was not in operation at the time of the shooting.

193.    Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194.    Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195.    Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196.    Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197.    Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

198.    Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199.    Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200.    A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

202.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

**May 28, 2015**

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

216.     Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217.     During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218.     Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219.     On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

220.     On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222.     "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223.     He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224.     Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1cWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

225.     Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 17, 2016

229.     On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230.     These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231.     Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232.     Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 18, 2016

236.     On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.
[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

237.    During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238.    He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239.    He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240.    Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241.    In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242.    The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

24

## November 28, 2016

245.     On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.     In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.     Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.     Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.     Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.     These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.     Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.     This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.     Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.     He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.     The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.     Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.

[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

## March 8, 2017

257.    On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258.    During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259.    Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260.    A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

262.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## April 22, 2017

263.    On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264.    During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265.    Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

26

266.    As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267.    During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268.    In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269.    The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270.    Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271.    The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

**April 28, 2017**

273.    On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

274.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

**June 13, 2017**

275. On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

## The Megyn Kelly Interview

### *The Preview*

277. On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278. NBC released a preview of the interview on the internet on the following day.

279. In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280. Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281. In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282. Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283. Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284. The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285. These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

*June 15, 2017 – Infowars*

286.    During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

*Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming*

289.    The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290.    Before the interview aired that day, Jones published several pre-show videos on Infowars.

291.    During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

        A.  In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

        B.  Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

        C.  He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

        D.  He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

        E.  While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293.    As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298.    These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299.    During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300.    At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301.    In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302.    Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303.    In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

304.    Later, Kelly stated, "But Alex, the parents—one after the other—devastated.  The dead bodies that the coroner autopsied."

305.    In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306.    Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307.    Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real.  But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308.    Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309.    Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310.    Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311.    Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312.    Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313.    In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314.    It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315.    There is no evidence "on the other side."

316.    A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317.    More than three million people saw and heard these statements by Jones.

## Alex Jones's June 18, 2017 Counter-Programming

318.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.    Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.    This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.    On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.    Hundreds of thousands, if not millions, of people heard these statements.

### June 26, 2017

326.    During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.    On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.    Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

329. Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330. Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331. Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332. In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334. These statements were heard by at least tens of thousands, if not millions, of people.

335. On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

### COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336. All previous allegations in this complaint are incorporated as if fully set forth herein.

337. The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338. The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339. The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

would be placed.

340.    These false publications have caused the plaintiffs actual and substantial damages.

341.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342.    The plaintiffs are private individuals and are neither public officials nor public figures.

343.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346.    These acts of the defendants resulted in damage to the plaintiffs.

## COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347.    All previous allegations in this complaint are incorporated as if fully set forth herein.

348.    In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349.    These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350.    The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

351.    The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352.    The defendants' defamatory publications were broadcast to millions of people.

353.    The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355.    The plaintiffs are private individuals and are neither public officials nor public figures.

356.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359.    These acts of the defendants resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360.    All previous allegations in this complaint are incorporated as if fully set forth herein.

361.    In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362.    The defendants' conduct was extreme and outrageous.

363.    The defendants' conduct was the cause of the plaintiffs' distress.

364.    The emotional distress sustained by the plaintiffs was severe.

365.     The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366.     In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367.     The plaintiffs have suffered actual and substantial damages.

368.     The plaintiffs are private individuals and are neither public officials nor public figures.

369.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373.     All previous allegations in this complaint are incorporated as if fully set forth herein.

374.     The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375.     The plaintiffs' distress was foreseeable.

376.     The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377.     The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378.     The plaintiffs have suffered actual and substantial damages.

379.   In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380.   The plaintiffs are private individuals and are neither public officials nor public figures.

381.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384.   These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*
### (Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)

385.   All previous allegations in this complaint are incorporated as if fully set forth herein.

386.   The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387.   This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388.   The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389.   The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390.   The plaintiffs are private individuals and are neither public officials nor public figures.

391.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

or not they were true.

392.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394.    These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.    Monetary damages;

B.    Punitive damages;

C.    Attorneys' fees;

D.    Costs;

E.    Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

THE PLAINTIFFS,

By _____

WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
PHONE: (203) 336-4421
FAX:   (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT B

| | | |
|---|---|---|
| **RETURN DATE: JULY 24, 2018** | : | **JUDICIAL DISTRICT** |
| | : | |
| **WILLIAM SHERLACH** | : | **OF FAIRFIELD** |
| | : | |
| **v.** | : | **AT BRIDGEPORT** |
| | : | |
| **ALEX JONES, ET AL.** | : | **JULY 2, 2018** |

## COMPLAINT

### INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

10. Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11. Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12. Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13. As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14. On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15. They have confronted strange individuals videotaping them and their children.

16. Some of them have moved to undisclosed locations to avoid this harassment.

17. The plaintiff brings this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18. Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19. The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiff's claims in this case.

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiff, William Sherlach, is the spouse of Mary Sherlach, who was a 56 year old school psychologist killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012. He resides in Fairfield County, Connecticut.

22.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

23.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

24.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

25.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

26.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

27.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

28.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

29.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

30.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

31.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

32.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

### THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

33.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

34.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

35.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

36.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

37.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

38.     His followers have shown themselves ready to comply.

39.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

40.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ; Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010) https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

41.     Jones's followers came running to his call, as he knew they would.

42.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

43.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

44.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

45.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

46.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

47.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

48.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

49.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

50.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

51.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

52.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

53.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

54.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

55.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

56.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

57.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

58.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

59.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

60.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

61.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

62.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

63.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

64.     Halbig's website made numerous false, outrageous, and defamatory statements about the Sandy Hook families.

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

6

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the children.[7]

D. It also published images, text, and video asserting that William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

65.    Halbig has also published Facebook posts containing images and text asserting that William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

66.    Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com /wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

67.     In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

68.     In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiff.

69.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

70.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

71.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

72.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

73.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

74.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

75.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

76.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgvFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

8

77. Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

78. Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

79. Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

80. Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

81. Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

82. Defendants Genesis Communications and Midas Resources both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

83. The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

84. The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

85. The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

86. Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

87.     Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

88.     According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

89.     In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

90.     In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, [they] liberately stoke social anxiety and political discord in their listeners, because distrust in govt [gover]nent and cultural tribalism motivate those listeners to buy their products.

91.     News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

92.     Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

93.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, *Alex Jones Will Never Stop Being Alex Jones*, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars'Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

## THE CAMPAIGN OF ABUSE

94.     Jones's and Infowars's campaign of abuse began only days after the plaintiff lost his wife to Adam Lanza's murderous rampage.

95.     On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

96.     That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

97.     An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

98.     At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

99.     On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

100.     The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

101.     In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

102.     The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

103. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

## January 27, 2013

104. On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook Is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

105. Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

106. Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robbie Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

107. Jones then played a video of Robbie Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

108. Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

109. As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

110. Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

111. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

112. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

## March 2013

113. On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

114. He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

115. The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

116. On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

117. During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

118. In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

119. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

120. On information and belief, this episode was also broadcast through Jones's radio affiliates.

121. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

122. On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

123. That day, Jones hosted Wolfgang Halbig.

124. During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

125.  Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

126.  Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

127.  Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

128.  Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

129.  Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

130.  He continued, "The whole thing, you've got 'em jumping the gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

131.  Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

132.  Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

133.  Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

134.  During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

135.  A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

136.  On information and belief, this episode was also broadcast through Jones's radio affiliates.

137.  The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**September 25, 2014**

138.    On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

139.    This assertion was a complete fabrication: the FBI had made no such statement.

140.    During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

141.    This was a false statement. FBI crime statistics showed no such thing.

142.    Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

143.    Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

144.    Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

145.    Jones asserted that the school was "a cut-out" used as a stage for the event.

146.    Jones and Halbig both stated "I wish it was real instead of fake."

147.    Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

148.    Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

149.    Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

150.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

151.    On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RIzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

152.     The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

153.     The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

154.     The article quoted Halbig as saying that there was "a 'script' followed during the event."

155.     It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

156.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

157.     On information and belief, the article has been viewed by hundreds of thousands of persons.

## December 12, 2014

158.     On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

159.     The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

160.     During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

161.     Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one of her

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

162. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

163. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

164. On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

165. Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

166. Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

167. Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

168. Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

169. Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

170. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

171. On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

172.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## January 2, 2015

173.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

174.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

175.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

176.    The pictures used were images of Noah Pozner.

177.    Upon information and belief, hundreds of thousands of people have viewed this article.

## January 13, 2015

178.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

179.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

180.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

181.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## March 4, 2015

182.    On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

183.   Jones hosted Halbig on that episode.

184.   During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

185.   Halbig stated the school was not in operation at the time of the shooting.

186.   Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

187.   Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

188.   Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

189.   Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

190.   Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

191.   Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

192.   Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

193.   A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

194.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

195.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### May 28, 2015

196.   On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

197.   David Knight hosted Halbig on Infowars Nightly News.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.

19

198. Halbig accused Newtown police chief Mike Kehoe of committing perjury.

199. Halbig once again appeared, and stated that the school was unsanitary and unsafe.

200. Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

201. A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

202. On information and belief, this episode was also broadcast through Jones's radio affiliates.

203. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

204. On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

205. The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

206. The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

207. Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

208. On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

209. Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

210. During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

---

[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

[32] https://www.youtube.com/watch?v=5cl179t7Mrw.

20

211.    Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook families are lying about their loved ones' deaths.

212.    On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

**July 7, 2015**

213.    On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

214.    Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

215.    "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

216.    He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

217.    Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

218.    Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

219.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

220.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

221.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

## November 17, 2016

222.    On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

223.    These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

224.    Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

225.    Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

226.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

227.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 18, 2016

229.    On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

230.    During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

231.    He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.

[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

232.    He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

233.    Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

234.    In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

235.    The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiff lost his wife in the shooting—is false, and that the plaintiff has fabricated his wife's death.

236.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

237.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 28, 2016

238.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

239.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.
[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

240.     Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

241.     Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

242.     Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

243.     These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

244.     Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

245.     This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

246.     Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

247.     He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

248.     The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

249.     Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

**March 8, 2017**

250.     On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

251.     During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

252.     Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

253.     A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiff participated in a fraud that was based on lying about the death of his wife.

254. On information and belief, this episode was also broadcast through Jones's radio affiliates.

255. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### April 22, 2017

256. On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

257. During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

258. Jones told his audience that they should not "believe any of it."

259. As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiff was an actor who faked his wife's death.

260. During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

261. In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

262. The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

263.    Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

264.    The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

265.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife. A reasonable person would also understand the defendants to be stating that the plaintiff was one of the "Sandy Hook Vampires."

### April 28, 2017

266.    On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

267.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

### June 13, 2017

268.    On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

269.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

### The Megyn Kelly Interview

### *The Preview*

270.    On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.
[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

271.    NBC released a preview of the interview on the internet on the following day.

272.    In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

273.    Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

274.    In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the families faked their loved ones' deaths.

275.    Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

276.    Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

277.    The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that family members were actors, and that no one was killed—was more reliable than the established media account, and true.

278.    These statements were heard by millions of people.

### June 15, 2017 – Infowars

279.    During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

280.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

281.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

*Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming*

282.    The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

283.    Before the interview aired that day, Jones published several pre-show videos on Infowars.

284.    During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiff's wife did not die there.

> A. In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."
>
> B. Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."
>
> C. He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."
>
> D. He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."
>
> E. While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the plaintiff lost his wife there—is untrue, and that the plaintiff fabricated the death of his beloved spouse. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

285.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

286.    As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

287.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

288.     During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

289.     In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

290.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

291.     These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

292.     During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

293.     At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

294.     In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

295.     Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

296.     In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

297.     Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

298.     In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

299.     Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

300.     Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

301. Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

302. Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

303. Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

304. Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

305. Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

306. In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

307. It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

308. There is no evidence "on the other side."

309. A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

310. More than three million people saw and heard these statements by Jones.

### Alex Jones's June 18, 2017 Counter-Programming

311. Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

312. The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

313. As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

314. This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

315.     Later, as his statement that he "looked at all the angles of Newtown" in the NBC
interview played in the background, Jones said, "I said I thought it happened before they were
picked up. They never showed my final analysis."

316.     This statement appears to be an admission that Jones never actually believed that
Sandy Hook was a hoax, even as he maintained unequivocally that it was.

317.     On information and belief, these statements were also broadcast on Alex Jones's
radio affiliates.

318.     Hundreds of thousands, if not millions, of people heard these statements.

### *June 26, 2017*

319.     During the June 18, 2017 profile of Jones for her NBC show Sunday Night with
Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims
made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's
lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through
his head."

320.     On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen
Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr.
Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support
the underlying lie that the Sandy Hook parents are fakes.[42]

321.     Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said
cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is
his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

322.     Shroyer's support for this statement was video footage in which the local medical
examiner informed reporters that the slain students were initially identified using photographs
rather than in person. However, the Sandy Hook parents were permitted to see and hold their
children soon thereafter.

323.     Shroyer stated: "You would remember if you held your dead kid in your hands with
a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin
was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his
dead child."

324.     Shroyer then stated: "The conspiracy theorists on the internet out there have a lot
of questions that are yet to be answered. You say whatever you want about the event, that's just a
fact."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

325.    In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

326.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiff fabricated the death of his wife.

327.    These statements were heard by at least tens of thousands, if not millions, of people.

328.    On information and belief, the defendants have published other similar statements of which the plaintiff does not know at this time, but would obtain with reasonable discovery.

## COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy

329.    All previous allegations in this complaint are incorporated as if fully set forth herein.

330.    The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiff that represented such major misrepresentations of the plaintiff's character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

331.    The false light in which the defendants' statements placed the plaintiff would be highly offensive to a reasonable person.

332.    The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiff would be placed.

333.    These false publications have caused the plaintiff actual and substantial damages.

334.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiff to suffer harassment and potential violence.

335.    The plaintiff is a private individual and is neither a public official nor public figure.

336.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

337.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

338.    The defendants combined to perform these unlawful acts pursuant to their scheme

to harass and abuse the plaintiff and in furtherance of that scheme.

339.    These acts of the defendants resulted in damage to the plaintiff.

## COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy

340.    All previous allegations in this complaint are incorporated as if fully set forth herein.

341.    In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiff's wife did not die; and/or that the episode in which she was killed was staged or she was still alive; and/or the plaintiff was an actor who faked his wife's death; the defendants published numerous defamatory statements.

342.    These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiff faked his wife's death and/or was an actor lying about the death of his wife.

343.    The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the plaintiff in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

344.    The defendants' defamatory publications readily identified the plaintiff to millions of people.

345.    The defendants' defamatory publications were broadcast to millions of people.

346.    The defendants' defamatory publications have injured the plaintiff's reputation and image, and they have exposed the plaintiff to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiff actual and substantial damages.

347.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiff to suffer harassment and potential violence.

348.    The plaintiff is a private individual and is neither a public official nor public figure.

349.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

350.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

351. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiff and in furtherance of that scheme.

352. These acts of the defendants resulted in damage to the plaintiff.

## COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy

353. All previous allegations in this complaint are incorporated as if fully set forth herein.

354. In broadcasting their campaign of outrageous and false statements about the plaintiff, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

355. The defendants' conduct was extreme and outrageous.

356. The defendants' conduct was the cause of the plaintiff's distress.

357. The emotional distress sustained by the plaintiff was severe.

358. The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

359. In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiff to suffer harassment and potential violence.

360. The plaintiff has suffered actual and substantial damages.

361. The plaintiff is a private individual and is neither a public official nor public figure.

362. The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

363. The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

364. The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiff and in furtherance of that scheme.

365. These acts of the defendants resulted in damage to the plaintiff.

34

## COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy

366.    All previous allegations in this complaint are incorporated as if fully set forth herein.

367.    The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiff emotional distress.

368.    The plaintiff's distress was foreseeable.

369.    The plaintiff's emotional distress was severe enough that it might result in illness or bodily harm.

370.    The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

371.    The plaintiff has suffered actual and substantial damages.

372.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiff to suffer harassment and potential violence.

373.    The plaintiff is a private individuals and is neither a public official nor public figure.

374.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

375.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

376.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiff and in furtherance of that scheme.

377.    These acts of the defendants resulted in damage to the plaintiff.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

378.    All previous allegations in this complaint are incorporated as if fully set forth herein.

379.    The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiff, and they did so for profit.

380.    This campaign of lies, abuse, and harassment was a deceptive practice and offended

35

public policy.

381.    The defendants' reprehensible conduct caused substantial injury to the plaintiff and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiff himself could not have reasonably avoided.

382.    The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiff's injury.

383.    The plaintiff is a private individuals and is neither a public official nor public figure.

384.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiff with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

385.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

386.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiff and in furtherance of that scheme.

387.    These acts of the defendants resulted in damage to the plaintiff.

WHEREFORE, THE PLAINTIFF CLAIMS DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiff seeks relief as follows:

A.    Monetary damages;

B.    Punitive damages;

C.    Attorneys' fees;

D.    Costs;

E.    Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 2nd day of July, 2018.

THE PLAINTIFF,

By _____

WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
PHONE: (203) 336-4421
FAX: (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT C

| Return Date: December 11, 2018 | : | JUDICIAL DISTRICT |
| | : | |
| WILLIAM SHERLACH & | : | OF FAIRFIELD |
| ROBERT PARKER | : | |
| | : | |
| v. | : | AT BRIDGEPORT |
| | : | |
| ALEX JONES, ET AL. | : | NOVEMBER 15, 2018 |

## COMPLAINT

## INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

10. Nevertheless, time and again, Jones has accused the Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11. Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12. Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13. As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14. On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15. They have confronted strange individuals videotaping them and their children.

16. Some of them have moved to undisclosed locations to avoid this harassment.

17. The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18. Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19. The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

2

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of one child and one educator killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012.

22.     Plaintiff Robert "Robbie" Parker is the father of murdered first-grader Emilie Parker, who was six years old at her death on December 14, 2012. He resides in King County, Washington.

23.     The plaintiff, William Sherlach, is the spouse of Mary Sherlach, who was a 56-year-old school psychologist killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012. He resides in Fairfield County, Connecticut.

24.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, Florida, and Minnesota.

25.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations. Jones can be served at his place of business, Infowars, at 3019 Alvin Devane Blvd, Suite 300-350, Austin, Texas 78741.

26.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices is at 3019 Alvin Devane Blvd., Suite 300-350, Ausitn Texas 78741.

27.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal office is located at 910 West May Street, Austin, Texas 78704.

28.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal office is located at 509 West 18th Street, Austin, Texas 78701.

29.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices located at 910 West May Street, Austin, Texas 78704.

30.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

31.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

32.      Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

33.      Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

34.      Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

**THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE**

35.      Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

36.      Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

37.      For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

38.      Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

39.      Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

40.      His followers have shown themselves ready to comply.

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

41.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

42.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

43.     Jones's followers came running to his call, as he knew they would.

44.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

45.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

46.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

47.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

48.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

49.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

50.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

51.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

52.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

53.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

5

54.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

55.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

56.     On information and belief, Cory Slanka actively assisted in operating the websites MonteFrank.com and SandyHookJustice.com through at least September 2016.

57.     Cory Sklanka knew that Wolfgang Halbig's objective in his activities in Connecticut, on his websites, and in his broadcasts, was to publish Halbig's outrageous, hurtful, and defamatory statements about the plaintiffs, and to harass the plaintiffs, as alleged in this Complaint. In fact, he facilitated Halbig's activities, and agreed with Halbig to facilitate Halbig's activities, with the knowing purpose of achieving this objective, as well as the objective of giving Halbig's harassment and publications maximum reach.

58.     Sklanka knew that the websites' purpose was to publish defamatory and otherwise legally actionable false statements about the plaintiffs, including that: (1) the Sandy Hook shooting was a hoax; (2) children or educators did not die in the Sandy Hook shooting; (3) the families of victims in the Sandy Hook shooting are actors or otherwise lying about their loved ones' deaths; and (4) families of Sandy Hook victims are engaging in fraud to profit from their loved ones' deaths. In fact, that is why he assisted Halbig in his "investigatory," defamatory, and harassing activities.

59.     On information and belief, on September 3, 2016, Sklanka posted under a pseudonym, or facilitated the posting of, an article on MonteFrank.com, asserting:

Avielle Richman is a fabricated identity using the real life person Lenie Urbina of Sandy Hook, CT. Jeremy Richman of The Avielle Foundation continues to commit Fraud against the American public and against the world, collecting donations under false pretenses that his daughter died.[5]

60.     The article also asserted:

Now that "Avielle Richman" and Lenie Urbina have been exposed as being the same person, we know that the "Avielle Foundation" is actively engaging in fraud and theft of donor's [sic] money. The Richman and Urbina families have been

_____

[5] Barry Miller, *Update: Wolfgang Halbig Threatened & MonteFrank.com Is Not Going Down*, MonteFrank.com (Sept. 3, 2016), https://archive.is/e44tV#selection-203.0-203.284.

caught red-handed and have a lot of explaining to do. This includes Sandy Hook Medical Examiner Dr. H. Wayne Carver who claimed to have performed an autopsy on "Avielle"/Lenie.[6]

61.     Sklanka also hosted and published his own podcasts on YouTube about the Sandy Hook shooting under the username "SleightofSin." Based on witness statements, the plaintiffs believe podcasts contain publications by Sklanka within the statute of limitations asserting that the Sandy Hook shooting was a hoax and that the families of victims fabricated their children's deaths.

62.     A video already in the plaintiffs' possession indicates that Sklanka participated in and/or co-hosted a podcast published on March 25, 2015 in which he stated that "Sandy Hook . . . was all crappy acting," and that he was "sick of people being destroyed by an event [Sandy Hook] that was fabricated, let alone other people that are possibly being destroyed due to an event that didn't happen."

63.     In a video already in the plaintiffs' possession, Sklanka described working closely with Halbig on Sandy-Hook-related activities. The participant speaking immediately after Sklanka noted that Halbig would be appearing on Alex Jones's show the following day, and encouraged the podcast's listeners to listen to that broadcast "on GCN" and "bombard the caller lines . . . and comment sections" to give "encouragement to the Wolf to get this action moving" and for "Alex Jones to investigate." Another participant then argued that they should persuade Alex Jones to send Rob Dew to Connecticut with Halbig "to report." Sklanka stated in response: "I second that."

64.     Faced with this lawsuit, Sklanka deleted his YouTube profile and other social media accounts, thus hiding those videos from public view. However, with reasonable discovery, the plaintiffs believe they would gain access to additional videos containing legally actionable publications by Sklanka and be able to enumerate them in greater detail.

65.     The plaintiffs were not aware of Sklanka's activities with Halbig until within the past year. Because Sklanka operated behind the scenes and under a pseudonym, the plaintiffs had no reason to know of his role in the activities related to this complaint.

66.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[7]

67.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

68.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

---

[6] *Id.*

[7] https://www.facebook.com/mert.melfa/videos/539807396217619/.

69.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

70.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

71.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

72.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

73.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

74.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

75.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

76.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

> A.   For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.
>
> B.   Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[8]

---

[8] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/
avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-
expert-witness-girl-photos-lenie-urbina/.

    C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[9]

    D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

    E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

    77. Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[10] His Facebook page continues to display those publications.

    78. Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

    79. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

    80. In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

    81. For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[11]

    82. The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

---

[9] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.
[10] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252.
https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.
[11] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

83.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

84.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[12] traveled to and were located in Hartford, Connecticut, for the creation of this video.

85.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[13]

86.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[14]

87.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[15]

88.     Jones continued, "Bidondi did a great job. I just wish I had known about this. I would have gone up there. Halbig tried to get me to go. I just am trying to launch the TV network and the new website and everything else."

89.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[16]

90.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

91.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

92.     Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

93.     Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

---

[12] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[13] https://www.youtube.com/watch?v=4_2FznkfcBU.
[14] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[15] https://www.youtube.com/watch?v=jCOe3qIgyFA.
[16] https://www.youtube.com/watch?v=TGCfi_ot0CU.

94.    Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

95.    Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

96.    The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

97.    The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[17]

98.    The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

99.    Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

100.    Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[18]

101.    According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

---

[17] *See generally* Richard J. Hofstadtler, *The Paranoid Style in American Politics, and Other Essays* (1964).
[18] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

102.    In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[19]

103.    In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

104.    News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

105.    Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[20]

106.    In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[21]

## THE CAMPAIGN OF ABUSE

107.    Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

108.    On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[22]

109.    That article alleges that plaintiff Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

---

[19] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).
[20] Charlie Warzel, *Alex Jones Will Never Stop Being Alex Jones*, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.
[21] Corky Siemaszko, *InfoWars' Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.
[22] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

110.    An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

111.    At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

112.    On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[23]

113.    The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

114.    In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

115.    The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

116.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

## January 27, 2013

117.    On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[24] Just over a month had passed since the shooting at Sandy Hook.

118.    Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

---

[23] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.
[24] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

119.    Jones later stated, "I clearly believe from the evidence, children were really killed at Sandy Hook, and it's a real tragedy. But the fact that there having people script things and that answers are being scripted, is incontrovertible."

120.    Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robbie Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, basically breaking down and crying."

121.    Jones then played a video of plaintiff Robert Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

122.    Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

123.    As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

124.    Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

125.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

126.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 27, 2013

127.    On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[25]

128.    During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

129.    In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

---

[25] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

130.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

131.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

132.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## March 14, 2014

133.    On March 14, 2014, The Alex Jones Radio show broadcast an episode advertised on YouTube under the title "Sandy Hook, False Narratives Vs. The Reality."[26] During that episode Jones hosted Wolfgang Halbig.

134.    Jones stated, "We've got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts of different people."

135.    He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

136.    Jones stated, "The biggest piece of evidence is that [former New York Mayor Michael] Bloomberg had his social network folks ready two days before."

137.    After claiming that he and Infowars had proven that the Boston Marathon bombing was a hoax, Jones later stated, "These people got to be stopped. If they'll stage the Boston bombing and Sandy Hook, they will do anything. The good news is that most people I've seen don't believe Sandy Hook. I think it blew up in their face."

138.    Later, in conversation with Halbig, Jones stated, "Obviously I agree with you, something's going on, they're covering up, it's all staged."

139.    Later in the conversation, referring to the Sandy Hook shooting, Halbig stated "I think it was a major drill, portrayed as one of the best illusions ever."

140.    Jones stated, "We want to send—maybe even I'll go—we want to send reporters up there, Wolfgang, with you, and I understand how dangerous this is so maybe my reporters don't want to go, they probably will want to go, but maybe it's a mission I should go on, there's just so much to run here."

141.    The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

---

[26] https://www.youtube.com/watch?v=esIvAO2aIlw; https://www.mediamatters.org/embed/clips/2016/11/29/51283/gcn-alexjones-20140314-shooting.

**May 13, 2014**

142.    On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[27]

143.    That day, Jones hosted Wolfgang Halbig.

144.    During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

145.    Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

146.    Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

147.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

148.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

149.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

150.    He continued, "The whole thing, you've got 'em jumping the gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

151.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

152.    During that show, Jones stated, in reference to the Sandy Hook shooting, "Kids going in circles, totally staged . . . . I mean clearly, it's a drill, just like the Boston bombing."

153.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012." As he spoke, video of Robbie Parker at the December 15, 2012 press conference played.

---

[27] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

154.     Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

155.     During Jones's and Halbig's discussion stating that the Sandy Hook shooting was faked, video of plaintiff Robert Parker's press conference played above the chyron "Odd Parent Reaction from SandyHook [sic]," pausing it and playing it in slow motion during parts where it appears Parker is smiling.

156.     During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake! Blue screens, it's fake! . . . You got parents laughing [mocking laughing], 'watch this,' and then [mocking crying] method acting, [mocking crying and wailing] 'Oh, my child!' I mean, it's just ridiculous! You've got coroners that start laughing—and I don't mean uncomfortably, I mean like laughing—with the State Police when they're giving press conferences. I mean, it just is the fakest thing since the three-dollar bill!"

157.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

158.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

159.     These statements were also contained in another video posted to YouTube, entitled "Sandy Hook Red Flags Ignored by Newtown School Board."[28]

160.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### September 25, 2014

161.     On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[29]

162.     This assertion was a complete fabrication: the FBI had made no such statement.

163.     During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

164.     This was a false statement. FBI crime statistics showed no such thing.

---

[28] https://www.youtube.com/watch?v=YiXpr30oUkA.
[29] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

165.     Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

166.     Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

167.     Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

168.     Jones asserted that the school was "a cut-out" used as a stage for the event.

169.     Jones and Halbig both stated "I wish it was real instead of fake."

170.     Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

171.     Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

172.     Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

173.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**September 26, 2014**

174.     On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

175.     The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

176.     The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

177.     The article quoted Halbig as saying that there was "a 'script' followed during the event."

178. It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

179. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

180. On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

181. On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[30]

182. The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

183. During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

184. Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

185. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

186. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

187. On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[31]

---

[30] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.
[31] https://www.youtube.com/watch?v=TGCfi_ot0CU.

188.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

189.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

190.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

191.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

192.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

193.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

194.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

195.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

196.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

197.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

198.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

199.    The pictures used were images of Noah Pozner.

200.    Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

201.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey— so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[32]

202.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

203.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

204.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### February 12, 2015

205.    On February 12, 2015, during the broadcast of The Alex Jones Radio Show, Jones, David Knight, and Rob Dew discussed the December 12, 2014 "debate" broadcast by Jones and Infowars and discussed in paragraphs 181 through 186 of this Complaint.[33]

206.    Jones, Knight, and Dew recounted several purported arguments that the Sandy Hook shooting was faked, including that rescue helicopters weren't called, the investigation was "classified," "ambulances weren't even at the school" and were "stuck at the firehouse," and that former New York Mayor Michael Bloomberg "alert[ed] his people the day before to get ready for a big push."

207.    Rob Dew stated "it looks like something went on there."

208.    Jones interrupted him saying, "A drill."

---

[32] https://www.youtube.com/watch?v=Ap-DvMoiMOY.
[33] https://www.youtube.com/watch?v=_QKCAo54hPk.

209.  Dew continued, "It stinks to high heaven. You got the actor father who comes out [and] gets into character. I was a theater major. I worked with actors. I used to watch them get ready before they would go out and cry like that."

210.  Jones interjected, "You have a degree in theater!"

211.  Dew continued, "I was in the play *Our Town*. I'm sitting there watching these other people about to go out and do the funeral scene and they're pumping themselves up, doing exactly what [Robbie] did [gasping, labored breathing]."

212.  Jones interjected, "First he's laughing and smiling, and then . . . ."

213.  Dew continued, "And then he's totally sad, crying, and he was cracking jokes right before. That's an actor. That's an actor. I'm sorry [shrugs shoulders demonstratively]."

214.  Then, a zoomed-in video of Robbie Parker at the press conference was played as Jones and Dew commented on it.

215.  "I mean there it is," Dew said. "He's smiling."

216.  Jones said, "Then he huffs and puffs and gets into . . . ."

217.  Dew said, "That is a tell-tale sign of somebody acting right there. Now I don't know for a fact that this guy's an actor. That looks like acting all the way."

218.  Later, they discussed the HONR Network, a group associated with Leonard Pozner dedicated to opposing Sandy Hook hoaxing. Jones stated, "Well we'll just start investigating that. And I guess I'm gonna have to probably go up to Newtown. I'm gonna probably go investigate Florida as well."

**March 4, 2015**

219.  On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[34]

220.  Jones accepted a caller, "Eric from Connecticut," with whom he discussed the Sandy Hook shooting. Eric stated, "One more thing, with my own personal investigation with this, is you find out who Robbie Parker works for, and you really start going down the rabbit hole." They discussed about how Parker was purportedly a "solicitor for the chips [sic] program," a database where "you register your kids," to which Jones responded, "The DNA, the Masons pushed that."

221.  As they spoke, a mirrored computer screen played a muted YouTube video (from user "Russianvids") depicting Robbie Parker speaking at the December 15, 2012 press conference.

---

[34] https://www.youtube.com/watch?v=_7ib5WkULBY.

222.     The title of the Youtube video was depicted, as well: "Sandy Hook Shooting Hoax Fraud Robbie Parker Actor Exposed Smiling Laughing then Fake Crying [sic]."

223.     As the video played, a mouse cursor selected the words "Robbie Parker" in the title of the video, highlighting them to the viewer. Throughout the episode, Jones could be seen manipulating an Apple-brand cordless mouse. On information and belief, Jones was the person who highlighted the words "Robbie Parker."

224.     Jones then hosted Halbig on the episode.

225.     During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

226.     Halbig stated the school was not in operation at the time of the shooting.

227.     Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

228.     Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

229.     Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

230.     Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

231.     Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

232.     Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

233.     Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

234.     A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

235.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

236.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 28, 2015**

237.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[35]

238.    David Knight hosted Halbig on Infowars Nightly News.

239.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

240.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

241.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

242.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

243.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

245.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[36]

246.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

247.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

248.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

249.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[35] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[36] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

250. Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[37] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

251. During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

252. Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

253. On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

## July 7, 2015

254. On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[38]

255. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[39]

256. Jones rehearsed a number of his favorite arguments that the Sandy Hook shooting was staged. He stated, "It looked like a carnival. It looked like a big PR stunt. It came out that Bloomberg, a day before, sent an email out to his gun control groups, in all 50 states, saying, 'prepare to roll, major operation coming up.' . . . We have videos, that look just incredibly suspicious, people are laughing and everything, and then they start huffing and puffing and start crying on TV, which is pure acting method, you've got a degree, Rob, in theater. . . . This is something that even laypeople notice."

257. This statement is clearly referring to Robbie Parker, and is most reasonably interpreted to be stating that Robbie was an actor and faked his daughter's death.

258. "[T]he more we look at Sandy Hook," Jones said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

---

[37] https://www.youtube.com/watch?v=5cll79t7Mrw.
[38] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[39] https://www.youtube.com/watch?v=jCOe3qIgyFA.

259. He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

260. Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

261. Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

262. A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

263. On information and belief, this episode was also broadcast through Jones's radio affiliates.

264. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

265. On that same day, The Alex Jones Show broadcast a longer video entitled "Full Show – Government is Manufacturing Crises."[40] It contained the same statements as the video entitled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."

266. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 17, 2016

267. On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

268. These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

269. Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

---

[40] https://www.youtube.com/watch?v=O34Oeg6GUIk.

270.    Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[41] Specifically, it seems Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which Jones has frequently described as "classic acting."

271.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

272.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

273.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### November 18, 2016

274.    On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[42]

275.    During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

276.    He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

277.    He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

278.    Jones continued, rehearsing several of his most commonly employed arguments that the Sandy Hook shooting was staged. Referencing Veronique de la Rosa's interview with Anderson Cooper, he stated, "That shows some kind of cover-up happening. And then I saw

---

[41] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.

[42] https://www.youtube.com/watch?v=MwudDfz1yAk.

Anderson Cooper—I've been in TV for twenty-something years, I know a blue-screen or a green-screen—turn and his nose disappeared. Then I saw clearly that they were using footage on the green screen looped, because it would show flowers and other things during other broadcasts that were moving, and then basically cutting to the same piece of footage."

279. Then he stated: "Then we see footage of one of the reported fathers of the victims, Robbie Parker, doing classic acting training, where he's laughing and joking and then they go hey 'we're live' and he goes 'Oh,' and [mocking, exaggerated moaning]." Jones was referring to plaintiff Robert Parker's statements during a press conference of December 15, 2012, which he has frequently described as "classic acting." Jones then played the video of Parker at the press conference.

280. Jones stated, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

281. In closing, Jones stated: "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real. Let's look into Sandy Hook."

282. The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

283. On information and belief, this episode was also broadcast through Jones's radio affiliates.

284. The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 28, 2016

285. On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[43]

---

[43] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.

286.     In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[44]

287.     Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

288.     Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

289.     Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

290.     These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

291.     Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

292.     This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

293.     Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

294.     He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

295.     The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

296.     Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

## March 8, 2017

297.     On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

298.     During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

299.     Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

---

[44] https://www.youtube.com/watch?v=9PdrlrSCLu0.

300.     A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

301.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

302.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## April 22, 2017

303.     On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[45]

304.     During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

305.     Jones told his audience that they should not "believe any of it."

306.     As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' death.

307.     During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

308.     In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

---

[45] https://www.youtube.com/watch?v=rUn1jKhWTXI.

309. The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

310. Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

311. The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

312. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

## April 28, 2017

313. On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[46]

314. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

## June 13, 2017

315. On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[47]

316. Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[46] https://www.youtube.com/watch?v=StOyqyt0fkY.
[47] https://www.facebook.com/80256732576/videos/10155465593882577/.

# The Megyn Kelly Interview

## *The Preview*

317.     On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

318.     NBC released a preview of the interview on the internet on the following day.

319.     In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

320.     Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

321.     In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

322.     Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

323.     Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

324.     The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

325.     These statements were heard by millions of people.

## *June 15, 2017 – Infowars*

326.     During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

327.     Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

328.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

***Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming***

329.     The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

330.     Before the interview aired that day, Jones published several pre-show videos on Infowars.

331.     During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

    A.  In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

    B.  Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

    C.  He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

    D.  He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

    E.  While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormally stilted and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

332.     Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

333.     As discussed in paragraphs 127 through 132 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

334.     In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way

or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

335.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

336.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

337.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

338.    These statements were heard by hundreds of thousands, if not millions of people.

### *The June 18, 2017 NBC Broadcast*

339.    During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

340.    At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 187 through 195 of this complaint.

341.    In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

342.    Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

343.    In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

344.    Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

345.    In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

346.    Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

347.    Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

348.    Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

349.    Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

350.    Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

351.    Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

352.    Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

353.    In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

354.    It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

355.    There is no evidence "on the other side."

356.    A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

357.    More than three million people saw and heard these statements by Jones.

### Alex Jones's June 18, 2017 Counter-Programming

358.    Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

359.    The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

360.    As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged, false event.

361.    This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

362.     Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

363.     This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

364.     On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

365.     Hundreds of thousands, if not millions, of people heard these statements.

### *June 26, 2017*

366.     During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

367.     On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[48]

368.     Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

369.     Shroyer's support for this statement was deceptively edited video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

370.     Shroyer also played as support for his statement a video clip of Sandy Hook parent Lynn McDonnel, which had been deceptively edited to imply that she was never allowed access to her child's body. In the unedited interview, Mrs. McDonnel stated that she was in possession of her child's body.

371.     Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

---

[48] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

372. Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

373. In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

374. A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

375. These statements were outrageous, recklessly false, and malicious. Along with the original videos, contemporary news accounts stated that the victims' bodies were released to their loved ones, and funerals where the victims' bodies were in the custody of their loved ones were widely reported in the press.[49]

376. These statements were heard by at least tens of thousands, if not millions, of people.

## July 20, 2017

377. On July 20, 2017, Jones re-broadcast the Shroyer segment of June 26, 2017, as part of his Alex Jones Radio Show programming.[50]

378. During his discussion of the Shroyer segment, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. . . . That was a month ago. He said, 'I wouldn't hold my breath looking for a response. We've not seen a clarification! I'm the one that called him up after I saw the show that night, and I said, 'You know, Owen . . . could be that we need to get clarification on what'—'Oh, I could never find out. The stuff I found was that they never let them see their bodies.' That's kind of what's weird about this." Then he said, in a tone clearly indicating sarcasm, "Maybe they did. So [making incredulous face] I'm sure it's all real! But for some reason, they don't want to let you see those clips together [Shroyer's segment]."

379. On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

## October 26, 2017

---

[49] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting;
http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101;
https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100.
[50] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333.

380.    In an October 26, 2017 video entitled "JFK Assassination Documents To DROP Tonight," Mr. Jones claimed that the CIA visited Sandy Hook shooter Adam Lanza and recruited him. He claimed that the truth about Lanza is not known because "they bulldozed the house to get rid of it." Mr. Jones told his audience that Sandy Hook was "as phony as a three-dollar bill, with CNN doing fake newscasts, with blue screens."

381.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

## April 20, 2018

382.    Jones has accused the plaintiffs of lying not only about Sandy Hook, but about the pain and torment they have experienced at his hands. In a video on April 20, 2018 entitled, "MSM Continues to Demonize Alex Jones," Jones mocked the plaintiffs, performing a cruel, false, malicious, and outrageous parody of their suffering: "I think they almost do this to mess with us or something. I'm serious, man…They go, 'Oh, my gosh, why are you doing that? You hurt me.' And we're like, 'No, no. We're sorry.' 'You've hurt me.' And like five years later, 'You hurt me. Stop hurting me.' And we're like, 'But we're not bringing you up.'"

383.    As shown by the previous allegations (and the statement itself), Jones and the other defendants have for years repeatedly and continually brought the plaintiffs up, and made cruel, outrageous, reckless, and false allegations about them and the tragedy that robbed them of their loved ones. Indeed, Jones made statements accusing the plaintiffs of fabricating the deaths of their loved ones and suggesting that Sandy Hook was a hoax just months before the first lawsuits were filed against him by Sandy Hook families.

384.    In the same video, Jones continued to accuse the plaintiffs of lying about his conduct, falsely asserting that he had not discussed Sandy Hook in years. Performing another mocking imitation of the plaintiffs, Jones stated: "'Oh, my gosh. Alex has no heart. He is—nothing is sacred. He brought it up again.' No. You did and lied about it."

385.    Jones also falsely claimed he had never attacked the victims, stating, "I have never gone after the Sandy Hook parents . . . Who in the hell would try to go after people's parents who have dead children?"

386.    The answer to that question, as shown by the previous allegations, is Jones and the other defendants.

387.    In that same broadcast, Jones also made additional recklessly false claims, rehearsing a number of his arguments that the Sandy Hook shooting was faked and the plaintiffs fabricated the deaths of their loved ones. For example, Mr. Jones stated, "You can look it up. They stood down in Sandy Hook. They stood down in Parkland. That's a fact." Later in the same video, Jones repeated his claim that there was a police "stand down" at Sandy Hook.

388.    In the same broadcast, Jones rehearsed his bizarre allegations that Anderson Cooper's interview of Veronique De La Rosa was faked, stating, "It's just a background with the

flowers of the town hall and her and Anderson Cooper. And then he turns and his head is shimmery, and his nose disappears, which everybody knows is a chromakey." Mr. Jones also repeated his claim that Anderson Cooper was working for the CIA, and he continued to assert that the interview was shot in front of a blue-screen rather than the result of digital compression.

## Other Statements

389.    On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery. Numerous videos and other broadcasts published by the defendants have recently been removed from the public domain either by the defendants themselves or companies like Twitter, Facebook, and YouTube. Discovery, including documents and witness testimony, is required for the plaintiffs to present the full scope of the defendants' campaign of outrageous lies and abuse.

## THE BACKPEDALING AND ADMISSIONS

390.    The Sandy Hook shooting and its aftermath were exhaustively documented by the local and national press; local, state, and federal law enforcement; other government entities; and other means. It is no exaggeration to say that the true and accepted story of Sandy Hook—that the plaintiffs lost their loved ones in Adam Lanza's murderous rampage—is supported by a mountain of evidence. Most of these records and evidence are publicly available. This in itself is enough to show that the defendants made the outrageous, false, and malicious statements detailed in this complaint with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Added to this are the defendants' deceptive edits to and contextualization of videos, documents, or other records to purportedly support their statements.

391.    Above and beyond this, on numerous occasions, some listed in the allegations above, Jones and the other defendants have admitted either that they never believed the Sandy Hook shooting was faked or that they had serious doubts about the truth of their statements, that they made those statements with knowledge that the statements were false, or with reckless disregard as to whether or not they were true. Those admissions became more frequent after the plaintiffs and other Sandy Hook families filed lawsuits against the defendants related to the defendants' statements about Sandy Hook, the plaintiffs, and the Sandy Hook families.

### April 20, 2018

392.    On April 20, 2018, the Alex Jones Show broadcast a video entitled "Watch As Megyn Kelly Opens Old Wounds Of Sandy Hook Victims."[51]

393.    In it, Jones made a number of statements indicating that he never actually believed, or else had serious reasons not to believe, his previous statements claiming that the Sandy Hook shooting was a hoax and that the plaintiffs fabricated the deaths of their loved ones.

394.    Jones stated, "I can't prove the shooting didn't happen."

---

[51] https://www.youtube.com/watch?v=uQkAJykqyeo.

395. Jones stated, "It's been years since I even played devil's advocate in debates where I said it all happened like was said, or none of it happened. I could see how people would believe that [the Sandy Hook shooting was faked] because of all the media lying but we've investigated it and we think it happened."

396. Jones acknowledged the power of his platform. "We have our own platform," he said. "Millions are going to see this. Millions are watching."

397. "And here's the deal," he said. "I know the parents know that I've been clear on this for at least four years." While this statement is false—as this Complaint details, Jones repeatedly claimed that the Sandy Hook shooting was false and that the parents were actors during that period—it is an admission that by Jones that he believed Sandy Hook really happened and the families lost their loved ones during the time he made nearly all the statements in this complaint.

398. He continued, "I began to say that Sandy Hook happened years before and they took that as weakness."

399. Then, Jones played a video of Neil Heslin's April appearance on Megyn Kelly Today, alternately pausing it and interjecting his own commentary.

400. When, in the video, Heslin said that Jones's lies about Sandy Hook were disrespectful to "the law enforcement, the first responders" who served at Sandy Hook the day of the shooting, Jones interjected, "Who stood down!"

401. Then Jones said, "Hit pause." When the video stopped, Jones screamed into the camera, "You can look it up. They [law enforcement and first responders] stood down in Sandy Hook, they stood down in Parkland. That's a fact!"

402. Then Jones read an email from Leonard Posner, and a responsive email that Jones stated that he himself dictated. In that response, Jones stated: "Thank you for contacting us to share your point of view. Alex has no doubt that this was a real tragedy." According to Jones and the text of the email, this email was sent in January 29, 2013. Then, in real time, Jones remarked, "Paul Watson was like threatening to quit, and I wasn't even saying it didn't happen, I was just devil's advocating." In other words, from the beginning of his campaign of outrageous lies against the plaintiffs, Jones knew and believed that they and the other Sandy Hook families were not actors, had actually lost their loved ones, and that he was lying in making the statements recounted in this Complaint.

403. He continued: "And I'd have these families on right now . . . they don't do it, because they don't want to humanize me. They want to lie." The most reasonable interpretation of this statement is that Jones is accusing the plaintiffs of lying about Jones's statements about them.

**May 23, 2018**

404.    On May 23, 2018, The Alex Jones Show broadcast a video entitled, on YouTube, "Alex Jones' Statement On New Sandy Hook Lawsuit."[52] He described "the admitted goal" of lawsuits against him (like this one) as being to create the "Alex Jones statute" to "overturn[] the First Amendment."

405.    During the video, Jones made various statements about his state of mind at times relevant in this Complaint.

406.    "I kept saying I believe it happened," he stated. Later in the video, he said, "Before, I just questioned it. . . . Once it was personalized, once I saw the players, the people, I said 'I think it's real.' I had the debate that was already going on."

407.    He also stated: "Three years ago, when the so-called Sandy Hook activists were on my butt saying I was covering it up because I said I thought it happened 'cause I couldn't prove it one way or the other. There were some anomalies. I genuinely was trying to research it. I just said 'I'm done with this. It happened. I'm moving on. Don't blame gun owners for it.'"

408.    Jones was admitting that, at the times relevant to most if not all of the publications contained in this Complaint, he believed that the Sandy Hook shooting happened and that the families lost their loved ones.

**June 4, 2018**

409.    In 2018, Alex Jones and unidentified Infowars personnel repeatedly accosted former Democratic presidential candidate Sen. Bernie Sanders and several of his staff in Los Angeles International Airport. Jones and Infowars videotaped the series of encounters, and later broadcast them on Infowars on June 4, 2018.

410.    Later in the video, an unidentified man in the boarding line stepped between Jones and Sanders. He said to Jones: "You deny Sandy Hook, and you're giving him [Sanders] a hard time?"

411.    Jones did not deny that he had denied the Sandy Hook shooting, but instead started asking the unidentified man questions about Hillary Clinton.

412.    Later in the conversation, the unidentified man stated to Jones: "You edited videos of Sandy Hook."

413.    Jones responded, "Yeah that's right."

414.    The unidentified man to Jones said in response, while laughing: "You're an idiot. You win."

---

[52] https://www.youtube.com/watch?v=AfvhhcXPCps.

415.     The unidentified man laughed and made that remark because he realized that Jones had just admitted on camera to deceptively editing videos related to the Sandy Hook shooting that he used as purported evidence to question and deny what happened at Sandy Hook Elementary School on December 14, 2012.

## COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

416.     All previous allegations in this complaint are incorporated as if fully set forth herein.

417.     The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

418.     The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

419.     The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs would be placed.

420.     These false publications have caused the plaintiffs actual and substantial damages.

421.     In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

422.     The plaintiffs are private individuals and are neither public officials nor public figures.

423.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

424.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

425.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

426.     These acts of the defendants resulted in damage to the plaintiffs.

## COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

427.    All previous allegations in this complaint are incorporated as if fully set forth herein.

428.    In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' death; the defendants published numerous defamatory statements.

429.    These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' death and/or are actors lying about the deaths of their loved ones.

430.    The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

431.    The defendants' defamatory publications readily identified the plaintiffs to millions of people.

432.    The defendants' defamatory publications were broadcast to millions of people.

433.    The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

434.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

435.    The plaintiffs are private individuals and are neither public officials nor public figures.

436.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

437.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

438.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

439.    These acts of the defendants resulted in damage to the plaintiffs.

## COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

440.    All previous allegations in this complaint are incorporated as if fully set forth herein.

441.    In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

442.    The defendants' conduct was extreme and outrageous.

443.    The defendants' conduct was the cause of the plaintiffs' distress.

444.    The emotional distress sustained by the plaintiffs was severe.

445.    The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

446.    In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

447.    The plaintiffs have suffered actual and substantial damages.

448.    The plaintiffs are private individuals and are neither public officials nor public figures.

449.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

450.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

451.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

452.    These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
### (All Plaintiffs v. All Defendants)

453.    All previous allegations in this complaint are incorporated as if fully set forth

herein.

454.    The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

455.    The plaintiffs' distress was foreseeable.

456.    The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

457.    The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

458.    The plaintiffs have suffered actual and substantial damages.

459.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

460.    The plaintiffs are private individuals and are neither public officials nor public figures.

461.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

462.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

463.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

464.    These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*; Civil Conspiracy (All Plaintiffs v. All Defendants)

465.    All previous allegations in this complaint are incorporated as if fully set forth herein.

466.    The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

467.    This campaign of lies, abuse, and harassment was a deceptive practice and offended

public policy.

468.    The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

469.    The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

470.    The plaintiffs are private individuals and are neither public officials nor public figures.

471.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

472.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

473.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

474.    These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.      Monetary damages;

B.      Punitive damages;

C.      Attorneys' fees;

D.      Costs;

E.      Declarative relief;

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 15th day of November, 2018.

                                              THE PLAINTIFFS,

                                       By    _____
                                              WILLIAM M. BLOSS
                                              ALINOR C. STERLING
                                              MATTHEW S. BLUMENTHAL
                                              KOSKOFF KOSKOFF & BIEDER
                                              350 FAIRFIELD AVENUE
                                              BRIDGEPORT, CT 06604
                                              PHONE: (203) 336-4421
                                              FAX:   (203) 368-3244
                                              asterling@koskoff.com
                                              wbloss@koskoff.com
                                              mblumenthal@koskoff.com
                                              JURIS #32250

**PLEASE ENTER THE APPEARANCE OF:**

**KOSKOFF, KOSKOFF & BIEDER, P.C.**
**350 FAIRFIELD AVENUE**
**BRIDGEPORT, CONNECTICUT 06604**
**TELEPHONE: 203-336-4421**
**JURIS NO. 032250**

**FOR THE PLAINTIFF**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT D

1

```
XO6 UWY CV18-6046436-S      :    SUPERIOR COURT

ERICA LAFFERTY, ET AL       :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046437-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

------------------------------------------------------------

XO6 UWY CV18-6046438-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```

## COURT'S RULING

B E F O R E:

      THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

  Representing the Plaintiffs:

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY ALINOR STERLING
      ATTORNEY MATTHEW BLUMENTHAL
      Koskoff Koskoff & Bieder
      350 Fairfield Avenue
      Bridgeport, Connecticut  06604

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                        Recorded and Transcribed By:
                        Patricia Sabol
                        Court Monitor
                        400 Grand Street
                        Waterbury, Connecticut  06702

3

```
 1        THE COURT:  All right.  So I will order a copy of

 2   the transcript of the following ruling, and I will

 3   sign it and I will place it in the court file as my

 4   decision for the purposes of any appeal.

 5        So I'll first address the Clinton deposition

 6   issue and the conduct of July 1, 2021.  In the July

 7   19, 2021 court filing by the defendants Infowars, LLC,

 8   Free Speech Systems, LLC, Infowars Health, LLC and

 9   Prison Planet, LLC, they described how in the motion

10   to depose Hillary Clinton, testimony designated by the

11   plaintiffs as highly confidential was filed in the

12   Clinton deposition motion.  They explained that this

13   was done because in their opinion, the plaintiffs did

14   not have a good-faith basis to designate the

15   deposition as highly confidential before the

16   deposition had commenced, despite the fact that the

17   Jones defendants had previously done so themselves.

18   And it is not lost on the Court that the highly

19   confidential information was improperly filed in the

20   middle of the first deposition of a plaintiff.

21        The July 19, 2021 filing is in sharp contrast to

22   the Jones defendants' position at the October 20, 2021

23   sanctions hearing where the Court addressed what, if

24   any, sanctions should enter.  At the October 20

25   hearing, the Jones defendants claim they could publish

26   confidential information as long as they did not

27   reveal the name of the witness.  That is, they argued
```

4

1    unconvincingly that they didn't understand the very

2    protective order that they themselves drafted and

3    asked the Court to approve as a Court order, which the

4    Court did.

5        The position of the Jones defendants at the

6    October 20, 2021 sanctions hearing did nothing but

7    reinforce the Court's August 5th, 2021 order and

8    findings that the cavalier actions on July 1st, 2021

9    constituted willful misconduct and violated the

10   Court's clear and unambiguous protective order.

11       The history of the attorneys who have appeared

12   for the defendants, Alex Jones, Infowars, LLC, Free

13   Speech Systems, LLC, Infowars Health, LLC and Prison

14   Planet TV, LLC is a convoluted one, even putting aside

15   the motions to withdraw appearance, the claims of

16   conflict of interest and the motions for stay advanced

17   by these five defendants.

18       As the record reflects, on June 28, 2018,

19   Attorney Wolman appeared for all five of the Jones

20   defendants.  Eight months later, on March 1st, 2019,

21   Attorney Wolman is out of the case and Pattis & Smith

22   filed an in-lieu-of appearance for all five

23   defendants.  On February 24, 2020, Attorney Latonica

24   also appeared for all five defendants.  Five months

25   later on July 7, 2020, Attorney Latonica and Pattis &

26   Smith is now out of the case and Attorney Wolman is

27   back in the case for all five defendants.  Then on

1   June 28, 2020, Pattis and Smith is back in the case,

2   but now only appears for the four LLC defendants.

3       But what is perhaps more significant is the

4   transparent attempt to cloud the issues by Pattis &

5   Smith, for example, by listing the names of only three

6   of the four clients they represent when filing the

7   motion to take the deposition of Hillary Clinton and

8   then listing all four clients in the July 19, 2021

9   filing relating to the issue.  And by Attorney Wolman

10  who then argued in his October 20, 2021 file that

11  Infowars, LLC had no involvement in the motion for

12  commission because their lawyer did not list their

13  name on the motion.  It is simply improper under our

14  rules of practice for an attorney to do so.

15      Turning to the issue of the subsidiary ledgers.

16  The five Jones defendants on November 6, 2020 filed

17  with the Court their discovery objections relating to

18  the deposition of Free Speech Systems' accounting

19  manager and current employee, Melinda Flores.  In

20  response to the plaintiff's request for subsidiary

21  ledgers, the Jones defendants objected on the basis

22  that the production of the subsidiary ledgers was

23  oppressive, unduly burdensome, disproportionate,

24  harassing and that it will require digging through

25  eight years of accounting.  No objection was raised as

26  to the term "subsidiary ledger", although parties

27  frequently will object to a discovery request if they

6

consider it vague or confusing.

On April 29, 2021, the Court overruled the
objection. On May 6, 2021, the Court ordered the
deposition of Flores to take place on June 4, 2021 and
ordered the documents to be produced by the close of
business on May 14, 2021 stating that failure to
comply may result in sanctions.

On May 14, 2021, the five Jones defendants
responded to the document request and Court order and
stating that the subsidiary ledgers were incorporated
into the trial balances and had been produced.

At her June 4, 2021 deposition, Flores, the
accounting manager, testified that subsidiary ledgers
or detail was easily accessible and available to her.
She testified that it would show the sources of
advertising income and she testified repeatedly that
Free Speech Systems maintained subsidiary ledger
information. Flores did not believe she was obligated
to produce the subsidiary ledgers, and it is unclear
as to whether they have been produced.

It was impossible to reconcile the expert hired
by Free Speech Systems with the November 6, 2020
objections filed with the Court and with Flores'
deposition testimony. While the Jones defendants in
their May 5th, 2021 motion state that Flores would be
the best employee to identify and produce the
requested documents and further state that Flores

7

1    would be compelled by Free Speech Systems to produce

2    the requested documents at the deposition, the

3    defendants hired expert, Mr. Roe, said that Flores was

4    wrong and that Free Speech Systems doesn't use or have

5    subsidiary ledgers.

6        The Court, in its August 6, 2021 order, found

7    that the subsidiary ledger information was easily

8    accessible by Flores by clicking on each general

9    account, that, despite the Court orders and although

10   the information exists and is maintained by Free

11   Speech Systems and was required by the Court order to

12   be produced, it had not been produced.  And, again, it

13   is still unclear as to what documents have been

14   produced.

15       The Court rejected Roe's statements in his

16   affidavit as not credible in light of the

17   circumstances.  The Court found that the plaintiffs

18   were prejudiced in their ability to prosecute their

19   claims and conduct further meaningful depositions and

20   that sanctions would be addressed at a future hearing.

21       At the October, 2021 sanctions hearing, the Court

22   addressed whether sanctions should enter.  The Court

23   finds that sanctions are, in fact, appropriate in

24   light of the defendant's failure to fully and fairly

25   comply with the plaintiff's discovery request and the

26   Court's orders of April 29, 2021, May 6, 2021 and

27   August 6, 2021.

8

1          Turning to the trial balances.  In addition to

2     objecting to the deposition of Flores, the Jones

3     defendants, as I mentioned, filed discovery objections

4     to the request for production directed to Flores.  The

5     Court ruled in favor of the defendants on one

6     production request and ruled in favor of the

7     plaintiffs with respect to others.

8          In addition to the subsidiary ledgers, the Court

9     ordered production of the trial balances.  Flores had

10    run trial balances in the past unrelated to this

11    action.  Flores testified at her June 4, 2021

12    deposition that she personally accessed Quick Books

13    and selected the option to generate trial balances for

14    2012 to 2019.  She testified that she ran the reports

15    and printed them out and believed that the reports

16    were produced.  Her testimony the reports that she ran

17    were produced was left uncorrected by counsel at the

18    deposition.

19         The reports were not produced by the

20    Court-ordered deadline of May 14, 2021.  They were not

21    produced at her June 4, 2021 deposition, and they have

22    not been produced to date, despite their obligation to

23    do so.

24         While the Jones defendants, in their May 5, 2021

25    Court filing, emphasized that Flores would be the best

26    employee to identify and produce the requested

27    documents which would include the trial balances and

1         that Flores would be compelled by Free Speech Systems

2         to produce the documents at her deposition, not only

3         were the reports not produced, but the Jones

4         defendants in their October 7, 2021 filing now claim

5         that Flores, a mere bookkeeper, provided flawed

6         information to the defendants that the defendants,

7         through Roe, had to correct.  And the Court rejects

8         that position.

9             The Jones defendants argue that Roe combined some

10        accounts that were not used consistently and

11        consolidated some general accounts because various

12        transactions all involved the same account and those

13        records created by the Jones defendants' outside

14        accountant were the records that were produced.  But

15        these records that removed accounts and consolidated

16        accounts altered the information in the reports that

17        their own accounting manager had produced, and they

18        contain trial balances that did not balance.  These

19        sanitized, inaccurate records created by Roe were

20        simply not responsive to the plaintiff's request or to

21        the Court's order.

22             Turning to the analytics.  The date for the

23        parties to exchange written discovery has passed after

24        numerous extensions by the Court.  On May 14, 2021,

25        the Court ordered that the defendants were obligated

26        to fully and fairly comply with the plaintiff's

27        earlier request for disclosure and production.

On June 1, 2021, the defendants filed an
emergency motion for protective order apparently
seeking protection from the Court's own order where
the defendants again attempted to argue the scope of
appropriate discovery.

The Court, on June 2, 2021, declined to do so and
extended the deadline for final compliance to June 28,
2021 ordering the defendants to begin to comply
immediately on a rolling basis. In its June 2nd
order, the Court warned that failure to comply would
result in sanctions including default.

With respect to analytics, including Google
Analytics and social media Analytics, the defendants
on May 7, 2019 represented that they had provided all
the analytics that they had. They stated with respect
to Google Analytics that they had access to Google
Analytics reports, but did not regularly use them. As
the Court previously set forth in its September 30,
2021 order, the defendants also claim that on June 17,
2019, they informally emailed zip files containing
Google Analytics reports to the plaintiffs, but not
the codefendants, an email the plaintiffs state they
did not receive and that the Court found would not
have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a
notice of compliance stating that complete final
supplemental compliance was made by the defendants,

1      Alex Jones and Free Speech Systems, LLC and that

2      Infowars, LLC, Infowars Health, LLC and Prison Planet,

3      LLC, quote:  Had previously produced all documents

4      required to be produced, end quote, representing that

5      with respect to the Google Analytics documents, Free

6      Speech Systems, LLC could not export the dataset and

7      that the only way they could comply was through the

8      sandbox approach.

9          Then on August 8, 2021, the Jones defendants for

10     the first time formally produced Excel spreadsheets

11     limited to Google Analytics apparently for Infowars

12     dot com and not for any of the other websites such as

13     Prison Planet TV or Infowars Health.  Importantly, the

14     Jones defendants to date have still not produced any

15     analytics data from any other platform such as Alexa,

16     Comcast or Criteo.

17         The Jones defendants production of the social

18     media analytics has similarly been insubstantial and

19     similarly has fallen far short both procedurally and

20     substantively, despite prior representations by the

21     Jones defendants that they had produced the social

22     media analytics and despite the May 25, 2021

23     deposition testimony of Louis Certucci, Free Speech

24     Systems social media manager for nearly a decade, that

25     there were no such documents.

26         At the June 28, 2021 deposition of Free Speech

27     Systems corporate designee Zimmerman, Mr. Zimmerman

12

1   testified that, in fact, he had obtained some

2   responsive documents from Certucci which were then

3   loaded into a deposition chat room by counsel for the

4   Jones defendants.  It appears that these documents

5   were minimal summaries or reports for Facebook and

6   Twitter, but not for other platforms used by the

7   defendants such as You Tube.

8        Any claim of the defendants that the failure to

9   produce these documents was inadvertent falls flat as

10  there was no evidence submitted to the Court that the

11  defendants had a reasonable procedure in place to

12  compile responsive materials within their power,

13  possession or knowledge.

14       Months later, on October 8, 2021, the Jones

15  defendants formally produced six documents for the

16  spring of 2017 for Facebook containing similar

17  information to the Zimmerman chat room documents, but

18  not included in the chat room documents and screen

19  shots of posts by Free Speech Systems to an

20  unidentified social media account with no analytics.

21       The defendants represented that they had produced

22  all the analytics when they had not done so.  They

23  represented in court filings that they did not rely on

24  social media analytics and this, too, is false.

25       I'm going to need to take a thirty second water

26  break, please.

27       (A short break in the proceedings occurred.)

13

1   This response was false. The plaintiffs in

2   support of their motion for sanctions on the analytics

3   issue attached as exhibit D, an email dated December

4   15, 2014 between former Free Speech Systems business

5   manager Timothy Fruge and current Free Speech Systems

6   employee Buckley Hamman. Fruge attaches annotated

7   charts of detailed analytics concerning Jones' 2014

8   social media audience including gender demographics

9   engagement and social media sites that refer people to

10  Infowars dot com. As pointed out by the plaintiffs,

11  Fruge's annotations are even more telling than the

12  charts themselves and totally contradict the Jones

13  defendants misrepresentations to the Court that,

14  quote: There is no evidence to suggest that Mr. Jones

15  or Free Speech Systems ever used these analytics to

16  drive content, end quote.

17      The next image on the document shows key

18  indicators on Twitter. Those are engagement and

19  influence. Again, this is reading from Fruge's notes.

20  Again, the next image shows the key indicators on

21  Twitter. Those are engagement and influence. Notice

22  our influence is great and our engagement is low. I

23  bring this up -- again these are Fruge's notes --

24  because we should try and raise our engagement with

25  our audience. Engagement is how well we are

26  communicating and interacting with our audience. The

27  higher our engagement, the more valuable our audience

14

1    will become to our business.  And that is the end of

2    Fruge's notes.

3         I would note that regardless of this reliance on

4    social media analytics, the concept is simple.  The

5    defendants were ordered to produce the documents and

6    our law requires them to produce information within

7    their knowledge, possession or power.  Discovery is

8    not supposed to be a guessing game.  What the Jones

9    defendants have produced by way of analytics is not

10   even remotely full and fair compliance required under

11   our rules.

12        The Court finds that the Jones defendants have

13   withheld analytics and information that is critical to

14   the plaintiff's ability to conduct meaningful

15   discovery and to prosecute their claims.  This callous

16   disregard of their obligations to fully and fairly

17   comply with discovery and Court orders on its own

18   merits a default against the Jones defendants.

19        Neither the Court nor the parties can expect

20   perfection when it comes to the discovery process.

21   What is required, however, and what all parties are

22   entitled to is fundamental fairness that the other

23   side produces that information which is within their

24   knowledge, possession and power and that the other

25   side meet its continuing duty to disclose additional

26   or new material and amend prior compliance when it is

27   incorrect.

15

1    Here the Jones defendants were not just careless.

2    Their failure to produce critical documents, their

3    disregard for the discovery process and procedure and

4    for Court orders is a pattern of obstructive conduct

5    that interferes with the ability of the plaintiffs to

6    conduct meaningful discovery and prevents the

7    plaintiffs from properly prosecuting their claims.

8    The Court held off on scheduling this sanctions

9    hearing in the hopes that many of these problems would

10   be corrected and that the Jones defendants would

11   ultimately comply with their discovery obligations and

12   numerous Court orders, and they have not.

13   In addressing the sanctions that should enter

14   here, the Court is not punishing the defendants.  The

15   Court also recognizes that a sanction of default is

16   one of last resort.  This Court previously sanctioned

17   the defendants not by entering a default, but by a

18   lesser sanction, the preclusion of the defendant's

19   special motions to dismiss.  At this point entering

20   other lesser sanctions such as monetary sanctions, the

21   preclusion of evidence or the establishment of facts

22   is inadequate given the scope and extent of the

23   discovery material that the defendants have failed to

24   produce.

25   As pointed out by the plaintiffs, they are

26   attempting to conduct discovery on what the defendants

27   publish and the defendants' revenue.  And the failure

16

1    of the defendants to produce the analytics impacts the

2    ability of the plaintiffs to address what is published

3    and the defendants failure to produce the financial

4    records such as sub-ledgers and trial balances affects

5    the ability of the plaintiffs to address the

6    defendants' revenue.  The prejudice suffered by the

7    plaintiffs, who had the right to conduct appropriate,

8    meaningful discovery so they could prosecute their

9    claims again, was caused by the Jones defendants

10   willful noncompliance, that is, the Jones defendants

11   failure to produce critical material information that

12   the plaintiff needed to prove their claims.

13        For these reasons, the Court is entering a

14   default against the defendants Alex Jones, Infowars,

15   LLC, Free Speech Systems, LLC, Infowars Health, LLC

16   and Prison Planet TV, LLC.  The case will proceed as a

17   hearing in damages as to the defendants.  The Court

18   notes Mr. Jones is sole controlling authority of all

19   the defendants, and that the defendants filed motions

20   and signed off on their discovery issues jointly.  And

21   all the defendants have failed to fully and fairly

22   comply with their discovery obligations.

23        As I said, I will order a copy of the transcript.

24   I will sign it and I will file it in the Court as the

25   Court's order.

26

27                              Bellis, J.

17

| | | | |
|---|---|---|---|
| 1 | XO6 UWY CV18-6046436-S | : | SUPERIOR COURT. |
| 2 | ERICA LAFFERTY, ET AL | : | JUDICIAL DISTRICT OF WATERBURY |
| 3 | V | : | AT WATERBURY, CONNECTICUT |
| 4 | ALEX EMRIC JONES, ET AL | : | NOVEMBER 15, 2021 |
| 5 | ----------------------------------------------------------------- | | |
| 6 | XO6 UWY CV18-6046437-S | : | SUPERIOR COURT |
| 7 | WILLIAM SHERLACH, ET AL | : | JUDICIAL DISTRICT OF WATERBURY |
| 8 | V | : | AT WATERBURY, CONNECTICUT |
| 9 | ALEX EMRIC JONES, ET AL | : | NOVEMBER 15, 2021 |
| 10 | ----------------------------------------------------------------- | | |
| 11 | XO6 UWY CV18-6046438-S | : | SUPERIOR COURT |
| 12 | WILLIAM SHERLACH, ET AL | : | JUDICIAL DISTRICT OF WATERBURY |
| 13 | V | : | AT WATERBURY, CONNECTICUT |
| 14 | ALEX EMRIC JONES, ET AL | : | NOVEMBER 15, 2021 |

15

16                    C E R T I F I C A T I O N

17        I hereby certify the foregoing pages are a true and

18    correct transcription of the audio recording of the

19    above-referenced case, heard in the Superior Court, Judicial

20    District of Waterbury, at Waterbury, Connecticut, before the

21    Honorable Barbara N. Bellis, Judge, on the 15th day of

22    November, 2021.

23        Dated this 15th day of November, 2021, in Waterbury,

24    Connecticut.

25                                        _____

26                                        Patricia Sabol

27                                        Court Monitor

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT E

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

12/24/2021

ORDER

ORDER REGARDING:
12/13/2021 620.00 OBJECTION

The foregoing, having been considered by the Court, is hereby:

ORDER:

Sustained in part and overruled in part. While the court finds that the notice of defenses are otherwise adequate under the law, the Alex Jones defendants are prohibited from contesting liability or raising affirmative defenses in light of the disciplinary default entered against them. Therefore, the notice of defenses is stricken, and the case will proceed as a hearing in damages as to these defendants.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT F

## 336 Conn. 332
Supreme Court of Connecticut.

Erica LAFFERTY et al.

v.

Alex Emric JONES et al.

William Sherlach

v.

Alex Jones et al.

William Sherlach et al.

v.

Alex Emric Jones et al.

(SC 20327)
|
Argued September 26, 2019
|
Officially released July 23, 2020[**]

**Synopsis**

**Background:** First responder and family members of children killed in mass shooting at elementary school brought actions against radio show host and affiliated corporate entities, claiming that statements made on radio show advancing certain conspiracy theories about the shooting were tortious in nature. Host and entities filed anti-SLAPP special motions to dismiss, and first responder and family members filed motions for limited discovery. The Superior Court, Judicial District of Waterbury, Barbara Bellis, J., granted limited discovery, but, after finding that host had engaged in harassing and intimidating behavior and that defendants had violated discovery orders, revoked opportunity to file anti-SLAPP motions as sanction. Defendants appealed.

**Holdings:** The Supreme Court, Robinson, C.J., held that:

as a matter of first impression, host's speech on radio show posed an imminent and likely threat to the administration of justice and thus was sanctionable;

discovery abuses were willful, as required to warrant sanctions; and

revoking opportunity to file anti-SLAPP motion was appropriate sanction.

Affirmed.

**Attorneys and Law Firms**

**\*\*435** Norman A. Pattis, Bethany, with whom was Kevin Smith, for the appellants (named defendant et al.).

Joshua D. Koskoff, with whom was Alinor C. Sterling, Bridgeport, for the appellees (plaintiffs).

Robinson, C. J., Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker, Js.[*]

**Opinion**

ROBINSON, C. J.

**\*336** This public interest appeal presents the opportunity to consider the scope of a trial court's inherent authority to sanction a party to litigation for his or her remarks about the case in light of that party's right to free speech under the first amendment to the United States constitution. The plaintiffs in these cases, a first responder and family members of those killed in the mass shooting at Sandy Hook Elementary School,[1] brought these actions against the defendants, Alex Emric Jones and several of his affiliated corporate entities,[2] claiming that statements made on Jones' radio show advancing certain conspiracy theories about the Sandy Hook shooting were tortious in nature. The defendants appeal[3] from the orders of the trial court sanctioning them by revoking **\*\*436** their opportunity to pursue **\*337** the special motions to dismiss provided by Connecticut's anti-SLAPP[4] statute, General Statutes § 52-196a,[5] issued after the trial court found that the defendants **\*338** had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei. On appeal, the defendants claim, inter alia, that the trial court (1) improperly sanctioned the defendants because Jones' speech was protected under the first amendment, and (2) abused its discretion in sanctioning the defendants because the trial court improperly permitted discovery **\*\*437** that exceeded the limited scope contemplated by § 52-196a (d). The defendants also claim that the trial court violated their due process rights by failing to afford them sufficient notice and a meaningful

opportunity to be heard before issuing the sanctions orders. We disagree and, accordingly, affirm the trial court's sanctions orders.

The record reveals the following relevant facts and procedural history. On December 14, 2012, Adam Lanza murdered twenty children and six staff members in a mass shooting at Sandy Hook Elementary School in Newtown. Some conspiracy theorists questioned the circumstances surrounding the shooting and called it a hoax. In response to statements made by Jones and other individuals featured on his radio show, the plaintiffs brought three separate civil actions against the defendants in 2018. The complaints alleged counts of invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, and negligent infliction of emotional distress, all **\*339** of which were accompanied by counts of civil conspiracy. In addition, the complaints claimed violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The trial court consolidated all three cases.

In November, 2018, the defendants filed special motions to dismiss the plaintiffs' complaints pursuant to the anti-SLAPP statute. See General Statutes § 52-196a (b). In order to respond to the special motions to dismiss, the plaintiffs moved for limited discovery pursuant to § 52-196a (d). The plaintiffs argued that they had demonstrated good cause to entitle them to "specified and limited discovery relevant to the special motion[s] to dismiss" pursuant to § 52-196a (d) and asked the trial court to permit discovery on every issue raised by the defendants' special motions to dismiss to allow them to demonstrate probable cause of success on the merits of their complaints. See General Statutes § 52-196a (e) (3). The defendants opposed the plaintiffs' motion for limited discovery, claiming that the plaintiffs' broad discovery requests were contrary to the purpose of the anti-SLAPP statute and that the plaintiffs had failed to show good cause.

With respect to the specific discovery requests, the plaintiffs initially requested five special interrogatories and twenty-one requests for production from Jones.[6] At a hearing on December 17, 2018, the trial court found **\*340** good cause and granted the plaintiffs' motion for limited discovery but indicated that it would not grant all of the plaintiffs' requests and would consider each of the defendants' objections individually. The trial court then allowed the parties

numerous opportunities to mediate disputes and delineate their discovery obligations at discovery status conferences.

After narrowing the plaintiffs' requests, the trial court initially ordered the defendants to produce their discovery compliance by February 23, 2019. The defendants failed to meet that deadline.[7] The defendants **\*\*438** then filed motions for an extension of time, which the trial court granted, allowing them until March 20, 2019, to produce their discovery materials. In granting the motions, the trial court "urge[d] the defendants to honor this court ordered deadline because the defendants are the ones [who] want their motion[s] to dismiss adjudicated, but if they're going to continue to ignore court deadlines, they're going to lose the ability ... to pursue their [special] motion[s] to dismiss."

Two days before the March 20, 2019 discovery deadline, the defendants again moved for an extension of time. This time, the trial court denied the motions, indicating at a hearing with the parties that the defendants had not substantially complied with its discovery orders. The trial court explained that the "defendants, at this point, are coming from a position of weakness. They've blown past the court's deadlines. There hasn't been a single piece of paper [produced] or interrogatory answered." In light of the defendants' noncompliance, the plaintiffs moved for sanctions on March 20, 2019. Specifically, the plaintiffs argued that, under Practice Book § 13-14[8] and the trial court's inherent authority, **\*341** the court should impose sanctions for the defendants' violations of discovery deadlines.

At a hearing on April 3, 2019, the trial court began to address the plaintiffs' motions for sanctions but delayed ruling on them to allow the defendants' counsel time to resolve an unspecified ethical concern. Subsequently, on April 10, 2019, the court heard argument on the motions for sanctions. The defendants argued that they had responded by that time to almost every discovery request and that they were in substantial compliance with the court's discovery orders. The trial court agreed with the defendants, concluding that, although they had not complied with every discovery request, the production to that point was sufficient to allow them to pursue the merits of the special motions to dismiss.

Subsequently, in late May, 2019, the plaintiffs brought additional discovery issues to the trial court's attention. Specifically, the plaintiffs requested, inter alia, additional responsive marketing data from Google Analytics and a complete search of Jones' cell phone. After another hearing,

246 A.3d 429

the trial court ordered the defendants to produce marketing data responsive to the court approved production requests. The court warned that it would "consider appropriate sanctions for the defendants' failure to fully and fairly comply" with its latest orders.

**\*342** On Friday, June 14, 2019, Jones and his attorney, Norman A. Pattis, appeared together on Jones' radio broadcast to discuss the pending case. Jones explained to the broadcast audience that someone had **\*\*439** embedded child pornography in e-mails turned over to the plaintiffs in discovery. Jones then began a long invective against those whom he believed had planted the child pornography, which we quote in relevant part:[9]

"Jones: I'm here to tell the little pimps, the Senator Murphys and the prosecutor, the Obama appointed prosecutor [who's] doing all this, bitch, I don't need to talk about poor dead kids to have listeners.

* * *

"Jones: They say you're a pedophile. We knew it was coming. And when the Obama appointed [United States] attorney demanded, out of 9.6 million e-mails in the last seven years since Sandy Hook, metadata, which **\*343** meant tracking the e-mails are where they went, well, we fought it in court. The judge ordered for us to release a large number of those e-mails. That's Chris Mattei [who] got that done, a very interesting individual with the firm of Koskoff & Koskoff run by Senator Murphy and Senator Blumenthal that say, for America to survive, quote, I must be taken off the air. ...

"It was hidden. In Sandy Hook e-mails threatening us, there was child porn. ... And they get these e-mails a few weeks ago, and they go right to the [Federal Bureau of Investigation (FBI)] and say, '[w]e've got him with child porn.' The FBI says, '[h]e never opened it. He didn't send it.' And then they act like, oh, they're our friends. They're not going to do anything with this. ...

"Now, I wonder who during discovery would send e-mails out of millions and then know what to search and look at. ... One million dollars on conviction for who sent the child porn. ... We're going to turn you loose, the [internet service providers], the law enforcement. You know who did it. ...

"You think when you call up, oh, we'll protect you. We found the child porn. I like women with big giant tits and big asses. I

don't like kids like you goddamn[ed] rapists, f-heads. In fact, you fucks are going to get it, you fucking child molesters. I'll fucking get you in the end, you fucks. ... You're trying to set me up with child porn. I'm going to get your ass. One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your **\*\*440** ass. You understand me now? You're not going to ever defeat Texas, you sacks of shit. So you get ready for that.

* * *

"Jones: Why does law enforcement say $5000, dead or alive? One million. 'Cause we all know who did it.

* * *

**\*344** "Jones: What a nice group of Democrats. How surprising. What nice people. Chris Mattei, Chris Mattei. Let's zoom in on Chris Mattei. Oh, nice little Chris Mattei. What a good American. What a good boy. You think you'll put on me —anyways, I'm done. Total war. You want it? You got it. I'm not into kids like your Democratic party, you cocksuckers. So get ready. ...

"Jones: The point is, I'm not putting up ... with these guys anymore, man, and their behavior, 'cause I'm not an idiot. They literally went right in there and found this hidden stuff. Oh, my God. Oh, my God. And they're my friends. We want to protect you now, Alex. Oh, you're not going to get in trouble for what we found. F-U man, F-U to hell. I pray God, not anybody else, God visit[s] vengeance upon you in the name of Jesus Christ and all the saints. I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does.

* * *

"Jones: I want them to. I want them to track it back to you know who. ... I wonder who the person of interest is.

"Pattis: Look, are you showing Chris Mattei's photograph on here?[10]

"Jones: Oh, no. That was an accidental cut. He's a nice Obama boy. ... He's a white ... boy that thinks he owns America.

* * *

**\*345** "Jones: That's why I said, one million. I'm not BSing. One million dollars when they are convicted. The bounty is out, bitches, and you know, you feds, they're going to know you did it. They're going to get your ass, you little dirt bag. One million, bitch. It's out on your ass. ...

"Jones: One million—I pay all debts—one million is on the street for who sent me—and we're going to get the e-mails. We're going to publish them next week. And we're going to make a whole thing. We're not going to show the child porn, but we're going to put the e-mails out, and we're going to show you where they came from. One million on the street. ...

"Jones: A million dollars is after them. So I bet you'll sleep real good tonight, little jerk. 'Cause your own buddies are going to turn you in, and you're going to go to prison, you little white ... boy jerkoff. Son of a bitch. I mean, I can't handle them. They want war? They're going to get war. I am sick of these people, a bunch of chicken craps [who] have taken this country over [who] want to attack real Americans. ...

"Jones: We're going to get them. One million. One million dollars is on the street against you. You didn't destroy America on time, bitch. I am pissed, man. I will give everything I have to stop living in this world with these people.

* * *

**\*\*441** "Jones: I am sure that [the United States] attorneys appointed by Obama are sweet little cupcakes. Come on. ...

"Jones: I don't even think errand boy did this. I'm actually not saying that.[11] ... And so, if they want war—you know, it's not a threat. It's like an AC/DC **\*346** song. If you want blood, you've got it. Blood on the streets, man. ...

"Jones: And I'm just asking the Pentagon and the patriots that are left, and 4chan and 8chan, and Anonymous, anybody [who's] a patriot, I am under attack, and if they bring me down, they'll bring you down. I just have faith in you. I'm under attack. And I summon the mean war. I summon all of it against the enemy. ...

"Jones: ... How would you like an Obama appointed [United States] attorney, man, [who] literally found a needle in a field of haystacks and tried to go to the feds and get me indicted? ... And now I ask my listeners and everyone, you claimed I sent people. I never sent anybody. And I want legal and lawful action. But I pray to God that America awaken[s]. Will Texas be defeated? You will now decide. This is war." (Footnotes added.)

The very next Monday, June 17, 2019, the plaintiffs filed motions asking the trial court to review the broadcast. The plaintiffs also asked for "an expedited briefing schedule concerning what orders must issue in connection with [Jones'] on-air statements ...." In those motions, the plaintiffs explained that a data firm they had retained located child pornography in the defendants' metadata and that they "immediately contacted the FBI." That same day, the trial court issued an order that "[c]ounsel should be prepared to address the matter at tomorrow's hearing ...."

The next day, June 18, 2019, the parties appeared and argued whether the trial court should order sanctions as a result of the broadcast. After hearing argument, the trial court imposed sanctions against the defendants and revoked their opportunity to pursue the merits of their special motions to dismiss pursuant to **\*347** § 52-196a (b).[12] This expedited public interest appeal followed. See footnote 3 of this opinion.

On appeal, the defendants claim that the trial court (1) improperly sanctioned them in violation of their first amendment rights, (2) abused its discretion in fashioning sanctions for discovery noncompliance, and (3) denied them due process by failing to afford them notice and a meaningful opportunity to be heard.

I

We begin with the defendants' challenge to the merits of the sanctions orders, which the trial court based on two grounds. First, the trial court found that the defendants were noncompliant with discovery, with their failure to comply with additional production deadlines viewed in light of their previous noncompliance. Second, the trial court found that, on the June 14, 2019 broadcast, Jones accused Mattei of committing a felony and then harassed, intimidated, and threatened him.[13] Because **\*\*442** the trial court provided these two bases for its sanctions orders, we must assess the court's orders both for their propriety as sanctions and their constitutionality. We first conclude that the sanctions did not run afoul of the first amendment because they addressed speech that was an imminent and likely threat to the administration of justice. We also conclude that these

two rationales, when considered together, provided sufficient grounds for sanctioning the defendants. Accordingly, it was not an abuse of the trial court's discretion **\*348** to sanction the defendants for their discovery violations and Jones' vituperative speech.

A

We first consider whether the trial court's sanctions were permissible under the first amendment's free speech protections. The defendants argue that the trial court's ruling is "bereft of any analysis of the first amendment" and that the court's inherent authority is not an adequate ground to sanction them on the basis of Jones' speech. The defendants further contend that, because Jones' broadcast was not a true threat, did not incite violence, and did not constitute fighting words, the trial court's sanction was impermissible under the first amendment. In response, the plaintiffs first submit that the sanctions were a constitutionally permissible exercise of the trial court's authority to sanction bad faith litigation misconduct, which includes the harassment and intimidation of opposing counsel. Second, the plaintiffs argue that the broadcast was not protected speech because it was a true threat. Although we agree with the defendants that a trial court's inherent authority is subject to constitutional limitations, we nevertheless conclude that Jones' speech during his June 14, 2019 broadcast was not protected by the first amendment because it posed an imminent and likely threat to the administration of justice.

It is well settled that a trial court "has the inherent authority to impose sanctions against an attorney and his client for a course of claimed dilatory, bad faith and harassing litigation conduct ...." (Internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999); see also R. Pushaw, "The Inherent Powers of Federal Courts and the Structural Constitution," 86 Iowa L. Rev. 735, 764–65 (2001) ("The inherent authority to administer judicial proceedings **\*349** carries with it a corollary power to control those involved in court business—parties, witnesses, jurors, spectators, and lawyers—to maintain order, decorum, and respect. Sanctions have long been deemed imperative to protect against the disruption or abuse of judicial processes and to ensure obedience to a court's orders, thereby preserving its authority and dignity." (Footnote omitted.)).

A long line of decisions makes clear that this inherent authority to sanction a party extends to sanctioning participants to litigation for engaging in threatening and harassing behavior. See *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 22–23, 204 A.3d 71 (dismissing writ of error stemming from sanctions order, issued under court's inherent authority, against nonparty partner in defendant partnership for sending "an inappropriate e-mail" to opposing counsel and telling her to "sit on his fucking head" (internal quotation marks omitted)), cert. denied, 331 Conn. 923, 206 A.3d 765 (2019);[14] see also **\*\*443** *Waivio* v. *Board of Trustees of the University of Illinois*, 290 Fed. Appx. 935, 936–37 (7th Cir. 2008) (affirming judgment of dismissal when plaintiff engaged in "delaying and threatening conduct in the course of the litigation," including threatening to kill opposing counsel), cert. denied, 557 U.S. 926, 129 S. Ct. 2842, 174 L. Ed. 2d 563 (2009); *Thomas* v. *Tenneco Packaging Co.*, 293 F.3d 1306, 1308 (11th Cir. 2002) (upholding sanctions against lawyer for filings "directed at opposing counsel" that trial court "deemed abusive and offensive"); *Carroll* v. *Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 291–93 (5th Cir. 1997) (upholding sanction of defendant attorney who engaged in "abusive conduct at his deposition"); **\*350** *Michael* v. *Boutwell*, 138 F. Supp. 3d 761, 785–87 (N.D. Miss. 2015) (concluding that defendant's threatening of witness warranted sanction of attorney's fees, expenses and $1000 fine but not dispositive sanction of default judgment); *Kalwasinski* v. *Ryan*, Docket No. 96-CV-6475, 2007 WL 2743434, \*3 (W.D.N.Y. September 17, 2007) (dismissing self-represented inmate's federal civil rights action because he "deliberately and intentionally participat[ed] in making threats of physical harm against parties and witnesses in his case"); *Fidelity National Title Ins. Co. of New York* v. *Intercounty National Title Ins. Co.*, Docket No. 00 C 5658, 2002 WL 1433717, \*12–13 (N.D. Ill. July 2, 2002) (dismissing defendant's counterclaims "[p]ursuant to [the court's] inherent authority to sanction bad faith conduct in litigation" on basis of his "abusive and threatening" letter to opposing counsel).

When acting under its inherent powers, a court should proceed with caution; "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). This cautionary approach requires that any exercise of the inherent power to sanction be limited by constitutional concerns, such as the requirements of due process. See, e.g., *Roadway Express, Inc.* v. *Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)

("[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record"); R. Pushaw, supra, 86 Iowa L. Rev. 784 ("[t]o be sure, the [c]ourt has recognized that the [c]onstitution limits federal judges' inherent powers"). As a result, a trial court's exercise of its inherent authority to sanction a party for harassing or threatening speech in the context of litigation is limited by the protections of the first amendment.[15] "The [f]irst [a]mendment **\*351** requires courts to tread warily when restricting litigants' speech. They may do so only when necessary to protect the fairness or integrity of the particular litigation before them." **\*\*444** *Bank of Hope v. Chon*, 938 F.3d 389, 397 (3d Cir. 2019); see also *Economy Carpets Manufacturers & Distributors, Inc. v. Better Business Bureau of Baton Rouge Area, Inc.*, 330 So. 2d 301, 304 (La. 1976) ("the judicial authority, as all powers of government, is not without limit, and [when] it is asserted an individual's right of free speech has been abridged by the exercise of that power, the burden is [on] us to define its limitations"). Speech that might otherwise be protected may be restricted under certain circumstances because of pending judicial proceedings. See, e.g., *In re Brianna B.*, 66 Conn. App. 695, 701, 785 A.2d 1189 (2001) ("[t]he [United States Supreme Court] has ... emphasized the vitality of individual rights to free speech during legal proceedings, such as discovery, but that the right to free speech is not without limit").

Fundamental first amendment principles guide our analysis of the defendants' claims in this appeal. "The [f]irst [a]mendment, applicable to the [s]tates through the [due process clause of the] [f]ourteenth [a]mendment, provides that Congress shall make no law ... abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. ... Thus, the [f]irst [a]mendment ordinarily denies [the government] the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens **\*352** believes to be false and fraught with evil consequence. ... The [f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech. ... The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution." (Internal quotation marks omitted.) *State v. Moulton*, 310 Conn. 337, 348–49, 78 A.3d 55 (2013), quoting

*Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

Whether the trial court's sanctions constitute an impermissible restriction on the defendants' speech presents a question of law, over which our review is plenary. "In certain first amendment contexts ... appellate courts are bound to apply a de novo standard of review. ... [In such cases], the inquiry into the protected status of ... speech is one of law, not fact. ... As such, an appellate court is compelled to examine for [itself] the ... statements [at] issue and the circumstances under which they [were] made to [determine] whether ... they ... are of a character [that] the principles of the [f]irst [a]mendment ... protect. ... [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. *New York Times Co. v. Sullivan*, [376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]. ... This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles .... [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. ... Therefore, even though, ordinarily ... [f]indings of fact ... shall not be set aside unless **\*353** clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Internal quotation marks omitted.) *State v. Krijger*, 313 Conn. 434, 446–47, 97 A.3d 946 (2014). However, "the heightened **\*\*445** scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact." *Id.*, at 447, 97 A.3d 946.

Whether judicial sanctions imposed for extrajudicial statements made by a party to pending litigation run afoul of the first amendment presents a question of first impression in Connecticut. We find instructive the test that the United States Supreme Court has adopted for considering the constitutionality of contempt as a sanction for out-of-court statements commenting on judicial proceedings.[16] The leading case is *Bridges v. California*, 314 U.S. 252, 275–77, 62 S. Ct. 190, 86 L. Ed. 192 (1941), in which the Supreme Court considered whether a union leader could be held in contempt when a newspaper published statements that he had made threatening a strike. The court considered whether the speech presented a "clear and present danger" to the administration of justice. *Id.*, at 261–262, 273, 62

S. Ct. 190. Specifically, the court analyzed "the particular utterances ... in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment." Id., at 271, 62 S. Ct. 190. The court reversed the contempt finding because it concluded that a threat to call an impending strike, which the court observed was a *legal* course of action,[17] had not interfered with the administration of justice. Id., at 277–78, 62 S. Ct. 190.

**\*354** Subsequently, in *Craig* v. *Harney*, 331 U.S. 367, 368, 375–78, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947), the court applied *Bridges* to a contempt finding imposed for news articles that criticized a judge's ruling and discussed the community's response. Illuminating further clear and present danger, the court explained: "The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute *an imminent, not merely a likely*, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." (Emphasis added.) Id., at 376, 67 S. Ct. 1249. In *Craig*, the court deemed speech critical of an elected judge "appropriate, if not necessary." Id., at 377, 67 S. Ct. 1249. Because "there was ... no threat or menace to the integrity of the trial"; id.; the court held that the speech was protected. Id., at 378, 67 S. Ct. 1249.

The Supreme Court again considered the applicability of *Bridges* in *Wood* v. *Georgia*, 370 U.S. 375, 82 S. Ct. 1364, 8 L. Ed. 2d 569 (1962). In *Wood*, a state court judge convened a grand jury to investigate election law violations, and a local sheriff published a written statement outside of court criticizing the judge and the investigation, which was made available to the grand jury. **\*\*446** Id., at 376–80, 393, 82 S. Ct. 1364. As a result, the state judge held the sheriff in contempt. Id., at 380, 82 S. Ct. 1364. The Supreme Court concluded that, "in the absence of some other showing of a substantive evil actually designed to impede the course of justice in justification of the exercise of the contempt power to silence the [sheriff], his utterances are entitled to be protected." Id., at 389, 82 S. Ct. 1364. The court emphasized that *Wood* did not involve a trial or a "judicial proceeding pending" in which such conduct could result in prejudice **\*355** to the other side. (Internal quotation marks omitted.) Id. The court reversed the state court's order of contempt because the sheriff's speech did not pose a clear and present danger to the administration of justice in the absence

of evidence of "actual interference"[18] with the grand jury investigation. Id., at 393, 395, 82 S. Ct. 1364.

But, as first amendment case law has progressed, the clear and present danger standard articulated in *Bridges* has been subject to criticism. For example, Justice William O. Douglas excoriated the use of clear and present danger in his concurrence in *Brandenburg* v. *Ohio*, 395 U.S. 444, 452– 54, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969). See also, e.g., T. Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877, 912 (1963) ("There is still some blood remaining in the doctrine, and it has continued to be used in certain types of situations. But, as a general test of the limits of the first amendment, [clear and present danger] must be regarded as unacceptable." (Footnote omitted.)). One major criticism is the ease with which the test may be manipulated to include protected speech. See *Brandenburg* v. *Ohio*, supra, at 454, 89 S.Ct. 1827 (Douglas, J., concurring) **\*356** ("When one reads the opinions closely and sees when and how the 'clear and present danger' test has been applied, great misgivings are aroused. ... [T]he threats were often loud but always puny and made serious only by judges so wedded to the status quo that critical analysis made them nervous."); L. Kendrick, "On 'Clear and Present Danger,' " 94 Notre Dame L. Rev. 1653, 1660 (2019) (explaining that clear and present danger test "has been criticized time and again for depending too much on circumstances and thereby giving judges too much discretion and failing to give speakers proper notice of the legality of their activities" (footnotes omitted)).

Although the United States Supreme Court has not directly rejected clear and present danger, the court has alluded to its **\*\*447** evolution as a first amendment doctrine. For example, Justice David Souter, in his concurrence in *Denver Area Educational Telecommunications Consortium, Inc.* v. *Federal Communications Commission*, 518 U.S. 727, 778, 116 S. Ct. 2374, 135 L. Ed. 2d 888 (1996), argued that clear and present danger has evolved into the incitement test from *Brandenburg*, under which "constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, supra, 395 U.S. at 447, 89 S.Ct. 1827. The United States Supreme Court also alluded to this divergence in *Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978), stating: "The Supreme Court of Virginia relied on the [clear and present danger] test .... We question the relevance of

that standard here; moreover we cannot accept the mechanical application of the test which led that court to its conclusion. [The] test was never intended 'to express a technical legal doctrine or **\*357** to convey a formula for adjudicating cases.' " Id., at 842, 98 S. Ct. 1535. Nevertheless, the court went on to apply the test and hold that a newspaper article that disclosed confidential information did not meet the test. Id., at 844–45, 98 S. Ct. 1535.

More recently, the United States Supreme Court considered a similar issue to that presented in this case in the context of attorney speech. See generally *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991). In *Gentile*, the court concluded that a "substantial likelihood of material prejudice" standard was a constitutionally permissible standard to limit extrajudicial attorney speech. (Internal quotation marks omitted.) Id., at 1075, 111 S. Ct. 2720. In the absence of an express indication from the Supreme Court that a lower standard is permissible, we decline to extend the court's holding in *Gentile* to nonattorneys. This is because the court supported its reasoning by relying on the special status of attorneys, demonstrated through the government's role in attorney regulation and rules already in existence restricting attorney speech. See id., at 1066–74, 111 S. Ct. 2720. The court specifically declined to state which standard would apply to the speech of nonattorneys. See id., at 1072–73, 111 S. Ct. 2720 n.5 (noting that rule being interpreted did not apply to nonattorneys or attorneys outside of pending case).

Courts after *Gentile* have continued to apply clear and present danger to extrajudicial speech in certain circumstances. See, e.g., *In re Kendall*, 712 F.3d 814, 826 (3d Cir. 2013) (applying clear and present danger when analyzing whether judge was improperly held in criminal contempt for speech contained in judicial opinion); *Standing Committee on Discipline* v. *Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995) (applying clear and present danger to attorney speech outside of pending judicial proceeding); *United States* v. *Bingham*, 769 F. Supp. 1039, 1045 (N.D. Ill. 1991) (concluding that defense counsel's speech in televised interview on eve **\*358** of jury selection constituted clear and present danger). For example, the court in *In re White*, Docket No. 2:07CV342, 2013 WL 5295652, \*24–26, \*68 (E.D. Va. September 13, 2013), considered whether sanctions for attorney's fees should enter as a result of a nonparty's allegedly threatening speech. The court analyzed this request for sanctions in light of different first amendment **\*\*448** tests, including clear and present danger.[19] See id., at \*70 ("[a]lthough there is some

indication that *Brandenburg*'s more stringent standard— incitement to imminent lawlessness—has displaced the 'clear and present danger' test articulated in ... earlier cases, the [c]ourt observes that some post-*Brandenburg* cases continue to apply the 'clear and present danger' test to court restrictions of speech threatening the due and orderly administration of justice" (footnote omitted)). The court determined that there was "no indication" that White's online statements had "disrupted or interfered with a [c]ourt proceeding, [or] that his commentary was imminently likely to so interfere," and, as such, his speech did not pose "a serious and imminent threat to the administration of justice." (Emphasis omitted; internal quotation marks omitted.) Id. This lack of clarity surrounding clear and present danger, as noted in *In re White*, similarly leaves open the question of what standard applies to the speech of *parties to the litigation*. See *Wilson* v. *Moore*, 193 F. Supp. 2d 1290, 1293 (S.D. Fla. 2002) (applying clear and present danger test to speech of criminal defendant made during appeal process).

"The [United States] Supreme Court has held that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice." **\*359** *Standing Committee on Discipline* v. *Yagman*, supra, 55 F.3d at 1442, citing *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. at 1074–75, 111 S.Ct. 2720, and *Sheppard* v. *Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Importantly, "[a] rule governing speech, even speech entitled to full constitutional protection, need not use the words 'clear and present danger' in order to pass constitutional muster." *Gentile* v. *State Bar of Nevada*, supra, at 1036, 111 S.Ct. 2720 (Kennedy, J.). Because the Supreme Court has not yet clearly supplanted clear and present danger in the area of extrajudicial speech, we will use it as a guideline in our analysis. Even still, it is necessary to refine the standard to our present circumstances to incorporate the requirements of *Brandenburg* and the inquiries outlined in *Gentile*. "Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. at 842–43, 98 S.Ct. 1535; see also *Turney* v. *Pugh*, 400 F.3d 1197, 1202 (9th Cir. 2005). We conclude that, if extrajudicial speech by a party to litigation poses an imminent and likely threat to the administration of judicial proceedings at issue, a court may sanction a party for that speech.

It is necessary to outline certain factors that affect whether extrajudicial speech threatens the administration of justice. "The [United States Supreme] Court gave two principal reasons for adopting this lower threshold [in *Gentile*], one concerned with the identity of the speaker, the other with the timing of the speech." *Standing Committee on Discipline* v. *Yagman*, supra, 55 F.3d at 1442; see *In re Hinds*, 90 N.J. 604, 609, 449 A.2d 483 (1982) (in using reasonable likelihood standard, "the determination of whether a particular statement is likely to interfere with a fair trial involves a careful balancing of factors, including consideration of the status of the **\*360** attorney, the nature and timing of the statement, as well as the context in which **\*\*449** it was uttered"); see also *In re Hinds*, supra, at 622–23, 449 A.2d 483. As a result, we, too, will consider such factors.

If the speaker is a party to litigation, the government's interest in ensuring the fair administration of justice is heightened, especially if the trial involves a criminal defendant. See *Chicago Council of Lawyers* v. *Bauer*, 522 F.2d 242, 248 (7th Cir. 1975) ("[t]hat courts have the duty to ensure fair trials—'the most fundamental of all freedoms'—is beyond question" (footnote omitted)), cert. denied sub nom. *Cunningham* v. *Chicago Council of Lawyers*, 427 U.S. 912, 96 S. Ct. 3201, 49 L. Ed. 2d 1204 (1976); id., at 257–58 ("we require even a greater insularity against the possibility of interference with fairness in criminal cases"). Judicial restrictions on a litigant's speech are more permissible than judicial restrictions on comments made by an outsider to the litigation, such as the press. See *In re Application of Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir.) ("there is a substantial difference between a restraining order directed against the press—a form of censorship which the [f]irst [a]mendment sought to abolish from these shores—and the order here directed solely against trial participants"), cert. denied sub nom. *Dow Jones & Co.* v. *Simon*, 488 U.S. 946, 109 S. Ct. 377, 102 L. Ed. 2d 365 (1988); see also *Standing Committee on Discipline* v. *Yagman*, supra, 55 F.3d at 1443 ("[w]hen lawyers speak out on *matters unconnected to a pending case*, there is no direct and immediate impact on the fair trial rights of litigants" (emphasis added)).

Relying in part on the distinction made in *Gentile* between trial participants and those outside the litigation, the Fifth Circuit declined to apply the stringent clear and present danger standard to a trial participant gag order. *United States* v. *Brown*, 218 F.3d 415, 426–27 (5th Cir. 2000), cert. denied, 531 U.S. 1111, 121 S. Ct. 854, 148 L. Ed. 2d 769 (2001). In *Brown*, the court decided **\*361** that the lower

standard in *Gentile* may be extended to nonattorney litigation participants, as there was "no reason ... to distinguish between [attorneys and parties] for the purpose of evaluating a gag order directed at them both." Id., at 428; see also *State* v. *Carruthers*, 35 S.W.3d 516, 562–63 (Tenn. 2000) (declining to apply clear and present danger test to trial participants), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001). We decline to completely extend the reasoning in *Brown* to this case and instead invoke a higher standard reminiscent of clear and present danger that takes into account the speaker's identity. See *Commission for Lawyer Discipline* v. *Benton*, 980 S.W.2d 425, 431 (Tex. 1998) (describing "the *Gentile* standard [as] a constitutional minimum"), cert. denied, 526 U.S. 1146, 119 S. Ct. 2021, 143 L. Ed. 2d 1033 (1999). We recognize that Jones' position, as a civil defendant, presents a different situation than a plaintiff, who affirmatively requests a court's jurisdiction over her case. See *United States* v. *Carmichael*, 326 F. Supp. 2d 1267, 1294 (M.D. Ala. 2004) (declining to apply lower standard in *Gentile* to criminal defendant). Accordingly, we afford Jones the benefit of the doubt and engage in the most rigorous and searching review of any infringement of his first amendment rights.

Courts must have the ability to restrict the rights of participants to the extent necessary to protect the fairness of the litigation. "Although litigants do not surrender their [f]irst [a]mendment rights at the courthouse door ... those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions [the] [c]ourt has approved restriction on the communications of trial participants where necessary to **\*\*450** ensure a fair trial for a criminal defendant. ... In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." (Citations omitted; internal quotation marks omitted.) **\*362** *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32–33 n.18, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). "Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." (Internal quotation marks omitted.) *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. at 1072, 111 S.Ct. 2720. "[The United States Supreme Court] expressly contemplated that the speech of those participating before the courts could be limited. This distinction between participants in the litigation and strangers to it is brought into sharp relief by [the] holding in *Seattle Times Co.* v. *Rhinehart*, [supra, at 20, 104 S.Ct. 2199]." (Emphasis omitted; footnote omitted.) *Gentile* v. *State Bar of Nevada*, supra, at 1072–73,

111 S. Ct. 2720. "The primary danger of extrajudicial speech
to the administration of justice must be that the outcome of
a judicial proceeding, or the ability of the court to do its
work, might be improperly influenced by people who have
no legitimate part in the courts' resolution of that matter. Of
course, the person making an extrajudicial statement might
actually be a party in an ongoing proceeding. Or, an out-of-
court statement might not affect any pending matter, but might
influence the course of some future proceeding. The point
is that an attempt to interfere with the outcome of a case is
properly punishable because justice is being affected through
means other than those established for the proper disposition
of a controversy." L. Raveson, "Advocacy and Contempt:
Constitutional Limitations on the Judicial Contempt Power;
Part One: The Conflict Between Advocacy and Contempt,"
65 Wash. L. Rev. 477, 499–500 (1990).

A related, but necessary inquiry, considers the timing and the
nature of the speech. Speech is more likely to interfere with
the administration of justice if it is calculated to intimidate
or threaten other participants in the litigation. "It is without
question that courts may sanction parties and their attorneys
who engage in harassment of their opponents. ... The [f]irst
[a]mendment *363 does not shield improper tactics used
by litigants to advance their interests, even if those tactics
involve communication of a message." (Citation omitted.)
B. Willis, C.P.A., Inc. v. Goodpaster, 183 F.3d 1231, 1234
(10th Cir.), cert. denied sub nom. Willis v. Goodpaster, 528
U.S. 1046, 120 S. Ct. 581, 145 L. Ed. 2d 483 (1999);
see D'Agostino v. Lynch, 382 Ill. App. 3d 960, 970, 320
Ill.Dec. 446, 887 N.E.2d 590 ("harassing the court and
the litigants appearing before it" was "calculated to disrupt
court proceedings and bring the administration of law into
disrepute"), appeal denied, 229 Ill. 2d 619, 325 Ill.Dec. 2,
897 N.E.2d 250 (2008); Fidelity National Title Ins. Co. of
New York v. Intercounty National Title Ins. Co., supra, 2002
WL 1433717, at *11 ("A party's use of anonymous letters
to opposing counsel to sabotage the litigation is an abuse of
the judicial process. Anonymous, threatening letters prevent
a speedy, open, and just resolution of the dispute on its
merits.").

Additionally, "[t]he possibility that other measures will serve
the [s]tate's interests should also be weighed." Landmark
Communications, Inc. v. Virginia, supra, 435 U.S. at 843, 98
S.Ct. 1535. We also consider whether the sanction is narrowly
tailored to achieve the government's substantial interest in
ensuring the administration of justice. **451 Gentile v. State
Bar of Nevada, supra, 501 U.S. at 1075, 111 S.Ct. 2720.

Our analysis also is informed by several cases from our sister
states' appellate courts applying the clear and present danger
standard to uphold contempt findings arising from statements
by litigants.[20] In one recent decision, the Georgia Court of
Appeals upheld the contempt *364 conviction of a witness
who, while at the courthouse as a character witness in his
son's criminal trial, insulted the minor victim's mother in
the hallway outside the courtroom and "exclaim[ed] that he
hoped God would make the children and grandchildren of
those who lied about his son suffer in the same way his son
was currently suffering." Moton v. State, 332 Ga. App. 300,
300–301, 772 S.E.2d 393 (2015). An Illinois appeals court
upheld a contempt conviction after the contemnor filed a
motion alleging, inter alia, that the opposing parties and their
attorney were part of the Mafia and had bribed the presiding
judge. See D'Agostino v. Lynch, supra, 382 Ill. App. 3d at
961, 320 Ill.Dec. 446, 887 N.E.2d 590. In that case, the court
stated that "[c]omments that are systematically designed to
thwart the judicial process constitute a 'clear and present
danger' to the administration of justice" and concluded that
the "unsubstantiated accusations" against the judge qualified.
Id., at 970–72, 887 N.E.2d 590, 320 Ill.Dec. 446; see also
People v. Goss, 10 Ill. 2d 533, 536–37, 141 N.E.2d 385
(1957) (upholding contempt order under clear and present
danger test when nonparty appeared on television show and
accused party to court proceeding of being from "a family
with [court admitted] hoodlum connections" and called
witness "professional sneak and liar" (internal quotation
marks omitted)).

In establishing the constitutional bounds of the court's
authority, we also find instructive those cases concluding
that the litigant's conduct did not present a clear and present
danger to the administration of justice. *365 See Pennekamp
v. Florida, 328 U.S. 331, 336–39, 348, 66 S. Ct. 1029, 90
L. Ed. 1295 (1946) (publishers of editorials and cartoon
critical of judges did not pose clear and present danger);
Garland v. State, 253 Ga. 789, 789, 791, 325 S.E.2d 131
(1985) (reversing contempt conviction of attorney whose
remarks criticizing judge for violating judicial ethics and
conducting "sham proceeding" were published in newspaper
(internal quotation marks omitted)); Worcester Telegram &
Gazette, Inc. v. Commonwealth, 354 Mass. 578, 579–83,
238 N.E.2d 861 (1968) (reversing contempt convictions of
publisher and reporter, whose newspaper article inferred
that defendant in pending criminal proceeding previously
had been "convicted of a serious **452 crime" leading
to mistrial, because they did not purposefully try to affect

trial's outcome); *In re Contempt of Dudzinski*, 257 Mich. App. 96, 106–107, 667 N.W.2d 68 (reversing contempt conviction of appellant who had worn "Kourts Kops Krooks" shirt in courtroom while quietly observing proceedings (internal quotation marks omitted)), appeal denied, 469 Mich. 988, 673 N.W.2d 756 (2003); *Smith* v. *Pace*, 313 S.W.3d 124, 126–27, 137 (Mo. 2010) (concluding that there was no interference or imminent threat of interference with administration of justice when lawyer defendant used "strong words ... in petitioning the court ... for a writ seeking to quash a subpoena" and therein accused judge and prosecutor of "misconduct" and "impropriety" (internal quotation marks omitted)). These cases demonstrate the types of speech that are protected and stand in stark contrast to Jones' speech in this case.

In applying this precedent to the speech at issue in the present case, we first observe that the trial court did not expressly consider whether the speech posed an imminent and likely threat to the administration of justice in ruling on the motions for sanctions.[21] The trial **\*366** court instead found its authority to sanction under the court's inherent authority "to address out-of-court, bad faith litigation misconduct where there is a claim that a party harassed or threatened or sought to intimidate counsel on the other side" and noted its "obligation to ensure the integrity of the judicial process and [the] functioning of the court." Nevertheless, the findings that led the trial court to sanction the defendants are consistent with our aforementioned standard. Specifically, the trial court found that, on the June 14, 2019 broadcast, Jones (1) accused opposing counsel of a felony ("planting child pornography"), (2) used threatening language toward opposing counsel through violent rhetoric, and (3) harassed and intimidated opposing counsel, calling him "a bitch, a sweet little cupcake, a sack of filth," and declaring war on him. It is obvious that the central reason why Jones' speech was censured and why it ultimately could pose a threat to the administration of justice is its genuine potential to influence the fairness of the proceedings. Specifically, Jones' broadcast produced additional threats to those involved in the case and created a hostile atmosphere that could discourage individuals from participating in the litigation.

Balancing the risk of fairness to the proceedings with "the need for free and unfettered expression," as required by *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. at 843, 98 S.Ct. 1535, does not render Jones' speech immune to sanctions under the first amendment, and we reject the defendants' assertion that "there is no barrier to a litigant, especially a litigant who is a broadcaster, speaking

freely about pending litigation. [Jones'] decision to air his grievances over the airwaves and online is hardly remarkable. These media constitute the new public square." Although we recognize and reaffirm the importance of robust public comment about the court system and the judicial process, and acknowledge that, outside **\*367** of litigation, Jones' speech may be protected,[22] the trial court's duty to **\*\*453** ensure a fair trial for those appearing before it permits some restrictions on harassing and threatening speech toward participants in the litigation. Without the ability to place such restrictions, trial courts will be left defenseless to stop both actual interference and perceived threats to just adjudications. " 'Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.' *Pennekamp* v. *Florida*, [supra, 328 U.S. at 347, 66 S.Ct. 1029]. But it must not be allowed to divert the trial from the 'very purpose of a court system ... to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.' " *Sheppard* v. *Maxwell*, supra, 384 U.S. at 350–51, 86 S.Ct. 1507.

Regardless of whether enforcement comes in the form of civil or criminal penalties, speech that interferes with the administration of justice cannot be tolerated. In *State* v. *Taupier*, 330 Conn. 149, 193 A.3d 1 (2018), cert. denied, —— U.S. ——, 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019), this court considered a first amendment challenge to a defendant's conviction of threatening in the first degree for an e-mail communication concerning a Superior Court judge. Id., at 153–54, 193 A.3d 1. In that case, the defendant had "made it clear that he was extremely angry at the 'court,' over which [the judge] had presided, that he had discovered where [the judge] lived, that he had surveilled [the judge's] residence, that he had thought through a very detailed and specific way to kill [the judge] at that location, and that he had anticipated being punished for his conduct." Id., at 191, 193 A.3d 1. The court **\*368** concluded that the speech was a true threat and, therefore, was unprotected. Id., at 199, 193 A.3d 1. This conclusion was, in part, implicitly supported by the effect such speech had on the administration of justice, i.e., threatening violence against the judge presiding over the defendant's family court proceedings. See id., at 184, 193 A.3d 1 (pointing to judge's reaction, defendant's history with family court system, and defendant and judge's past history as evidence supporting conviction). Such a threat, at the very least, could require the judge to recuse herself from the defendant's cases and, as such, interferes with a fair adjudication.

There are two important distinctions between *Bridges* and
its progeny, on the one hand, and the present case, on the
other, that lead us to conclude that Jones' broadcast posed
an imminent and likely threat to the administration of justice.
The first is Jones' role as a party in the litigation and
the second is the unmistakably threatening and vituperative
nature of the speech at issue. Both of these factors influence
the imminence and likelihood of the threatened harm. In both
*Wood* and *Bridges*, the statements were made by nonparties
criticizing judicial action. In the present case, Jones is a party
commenting on his own litigation and, therefore, has a greater
opportunity and perceived incentive to affect the outcome of
the case.[23] As a party to a **454 judicial *369 proceeding,
Jones is participating in a government function and therefore
is under the court's jurisdiction. For this reason, the trial court
may sanction him for speech that, when made by a stranger
to the litigation, may be acceptable.[24]

The second difference between the present case and *Bridges*
and *Woods* is the nature of the intimidating and threatening
speech, which demonstrates the coercive influence that might
reasonably be expected as a result of Jones' broadcast. "Since
we are committed to a government of laws and not of men, it
is of the utmost importance that the administration of justice
be absolutely fair and orderly. [The United States Supreme
Court] has recognized that the unhindered and untrammeled
functioning of our courts is part of the very foundation
of our constitutional democracy." *Cox* v. *Louisiana*, 379
U.S. 559, 562, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965).
"Courts must have [the] power to protect the interests of ...
litigants before them from unseemly efforts to pervert judicial
action." *Pennekamp* v. *Florida*, supra, 328 U.S. at 347, 66
S.Ct. 1029. The record in this case reflects additional threats
targeting those involved in the case in connection with Jones'
speech.[25] In an order dated *370 June 21, 2019, the trial
court stated: "In the interest of full disclosure to all parties,
the court was contacted by the Connecticut State Police,
[which was] reportedly contacted by the FBI regarding threats
against the undersigned [judge] made by individuals on the ...
Infowars website."[26] In addition, the plaintiffs' counsel also
represented to the trial court that, as a result of the broadcast,
they had "since received threats from the outside" and even
obtained police protection when attending the court hearing
after the broadcast. We take seriously these statements on the
record because "[i]t long has been the practice that a trial court
may rely [on] certain representations made to it by attorneys,
who are officers of the court and bound to make truthful

statements of fact or law to the court." (Internal quotation
marks omitted.) *State* v. *Chambers*, 296 Conn. 397, 419, 994
A.2d 1248 (2010).

Jones' speech further was calculated to interfere with the
fairness of the **455 proceedings as it directly targeted
opposing counsel, accusing him of felonious behavior and
threatening him, and reasonably can be expected to influence
how the plaintiffs litigate their case.[27] On the broadcast, Jones
declared war on those who planted the child pornography,
implicated the plaintiffs' counsel, and promoted a million
dollar bounty. Jones stated: "You're trying to set me up
with child porn. I'm going to get your ass. One million
dollars. One million dollars, you little gang members. One
million dollars to put your head on a pike. One million
dollars, bitch. I'm going to get your ass." A party who
places a one million dollar bounty on the head of opposing
counsel, whether literally or figuratively in the form of his
conviction, undeniably interferes with the proceedings. This
speech *371 clearly " 'is directed to inciting or producing' a
threat to the administration of justice that is both 'imminent'
and 'likely' to materialize." *Turney* v. *Pugh*, supra, 400
F.3d at 1202, 400 F.3d 1197. Harassing and intimidating
counsel so that they withdraw from litigating a case is
beyond cavil; it is an unfair and inappropriate litigation
strategy that strikes at the core of our system.[28] See *Harry*
v. *Lagomarsine*, Docket No. 18-CV-1822 (BMC) (LB), 2019
WL 1177718, *3 (E.D.N.Y. March 13, 2019) (explaining how
threats to opposing counsel "effected a permanent change
in [the] defendants' representation"); *Kalwasinski* v. *Ryan*,
supra, 2007 WL 2743434, at *3 ("[b]y deliberately and
intentionally participating in making threats of physical harm
against parties and witnesses in his case, he has engaged
in conduct that he should have known would threaten a
fair decision in this matter"). We recognize that there is a
place for strong advocacy in litigation, but language evoking
threats of physical harm is not tolerable. In light of these
reasons, we conclude that Jones' speech could pose a threat
to the plaintiffs' ability to litigate their case, rendering it an
imminent and likely threat to the administration of justice.

Finally, we consider whether the state's interests may be
served in another manner and whether the sanctions imposed
are narrowly tailored to the state's interest in ensuring fair
judicial proceedings. See, e.g., *372 *Gentile* v. *State Bar of
Nevada*, supra, 501 U.S. at 1076, 111 S.Ct. 2720; *Landmark
Communications, Inc.* v. *Virginia*, supra, 435 U.S. at 843,
98 S.Ct. 1535. The trial court penalized the defendants in a
restrained manner in order to preserve the judicial process. In

this case, the trial court might have issued a gag order, but such a measure could improperly penalize future speech in the form of a prior restraint. See, e.g., *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 249–50, 97 Ill.Dec. 454, 492 N.E.2d 1327 (1986) (noting that there are less restrictive means than a gag order "to **456 preserve the integrity of the proceedings before it," such as contempt). Instead, the court appropriately dealt with two issues in a proportional sanction that was more measured than the individual punishments of civil or criminal contempt that have been upheld as a consequence for similar conduct. Indeed, the court refrained from imposing the more severe sanction requested by the plaintiffs, specifically, defaulting the defendant. The court selected a lower penalty, namely, the revocation of special statutory benefit, because the defendants abused the process set out in the statute through their discovery practices. Accordingly, we conclude that the trial court did not violate the first amendment when it imposed sanctions on the basis of Jones' broadcast, which presented an imminent and likely threat to the administration of justice.[29]

B

**373** We next consider whether the trial court abused its discretion by sanctioning the defendants for their discovery abuses and Jones' broadcast. A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. *Millbrook Owners Assn., Inc. v. Hamilton Standard*, 257 Conn. 1, 9–10, 776 A.2d 1115 (2001) ("One source of the trial court's authority to impose sanctions is the court's inherent power. ... In addition, our rules of practice, adopted by the judges of the Superior Court in the exercise of their inherent rule-making authority ... also [provide] for specific instances in which a trial court may impose sanctions." (Citations omitted; footnote omitted.)); see *Chambers v. NASCO, Inc.*, supra, 501 U.S. at 50–51, 111 S.Ct. 2123 (discussing relationship between sanctions under Federal Rules of Civil Procedure and court's inherent power). As discussed previously, this inherent authority permits sanctions for "dilatory, bad faith and harassing litigation conduct ...." (Internal quotation marks omitted.) *CFM of Connecticut, Inc. v. Chowdhury*, supra, 239 Conn. at 393, 685 A.2d 1108. Additionally, under Practice Book § 13-14, a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant or by

dismissing a plaintiff's case. See Practice Book § 13-14 (b). The anti-SLAPP statute does not limit the court's authority to impose sanctions. See General Statutes § 52-196a (h) (2).

In reviewing the portion of the sanctions based on the violation of discovery orders, we consider three factors. "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form **457 the basis of a sanction if the record establishes *374 that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review. Third, the sanction imposed must be proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." *Millbrook Owners Assn., Inc. v. Hamilton Standard*, supra, 257 Conn. at 17–18, 776 A.2d 1115. "The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. Never will the case on appeal look as it does to a [trial court] ... faced with the need to impose reasonable bounds and order on discovery." (Internal quotation marks omitted.) *Usowski v. Jacobson*, 267 Conn. 73, 85, 836 A.2d 1167 (2003). "Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Internal quotation marks omitted.) *Mulrooney v. Wambolt*, 215 Conn. 211, 223, 575 A.2d 996 (1990).

In its oral decision granting the motions for sanctions, the trial court observed that "the discovery in this case has been marked with obfuscation and delay on the part of the defendants ...." The court cited two specific examples of discovery noncompliance: (1) the defendants failed to produce adequate Google Analytics information with respect to marketing data and to conduct a complete search of Jones' cell phone, and (2) the defendants "disregarded" discovery deadlines on multiple occasions, "continue[d] to object to ... discovery, and failed to produce that which is within their knowledge, possession, or power to obtain."

**375** It is undisputed that the trial court's discovery orders were reasonably clear and that the defendants violated four

of them.[30] The defendants do not raise distinct arguments under the first two prongs of *Millbrook Owner's Assn., Inc.,* but, instead, largely challenge the "harshness" of the sanctions imposed. In considering whether the sanction revoking the defendants' opportunity to pursue the special motions to dismiss was proportional to the defendants' discovery violations, we are guided by "the factors we previously **\*\*458** have employed when reviewing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to respond to the posed questions, that is, whether it is due to inability rather than the [wilfulness], bad faith or fault of the [party] ... (2) the degree of prejudice suffered by the opposing party, which in turn may depend on the importance of the information requested to that party's case; and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Yeager* v. *Alvarez,* 302 Conn. 772, 787, 31 A.3d 794 (2011). We also consider how Jones' broadcast **\*376** impacted the trial court's decision sanctioning the defendants for bad faith litigation practices. See *MacCalla* v. *American Medical Response of Connecticut, Inc.,* 188 Conn. App. 228, 230, 239, 204 A.3d 753 (2019) (upholding sanction of dismissal on basis of plaintiffs' noncompliance with discovery orders and "the unprofessional and dilatory conduct of the plaintiffs' counsel," who called "a party's corporate representative [who was] attending a deposition a trespasser," and holding that this conduct "evinces a disregard for the provisions of the Practice Book and the authority of the court").

The plaintiffs argue that the sanctions are proportional because the defendants' violations were "deliberate," "wilful," and in "bad faith ...." The defendants counter that their actions were not taken in bad faith. "[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself." *Ridgaway* v. *Mount Vernon Fire Ins. Co.,* 328 Conn. 60, 76, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard,* supra, 257 Conn. at 16, 776 A.2d 1115 ("dismissal of an action is not an abuse of discretion where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority" (internal quotation marks omitted)). In the present case, the trial court did not expressly find that the defendants' discovery abuses were performed in bad faith but, in its oral decision, pointedly characterized their actions as being marked by a pattern of "obfuscation and delay ...." Additionally, the record supports the trial court's finding that the defendants repeatedly ignored

court deadlines and continued to challenge the underlying merits of discovery, even after the court found the requisite good cause to allow discovery under § 52-196a (d).[31] See, e.g., **\*377** *National Hockey League* v. *Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (upholding dismissal of action in light of "[the] respondents' 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities" when respondents failed to answer written interrogatories by deadline). Accordingly, we conclude that the record supports the trial court's finding that the defendants wilfully disregarded the court's discovery orders.

This wilful disregard was exacerbated by Jones' conduct during the June 14, 2019 broadcast. The trial court found that Jones' actions were "indefensible, unconscionable, despicable, and possibly criminal," and that the "deliberate tirade and harassment and intimidation against Attorney Mattei and his firm [were] unacceptable and sanctionable." Because Jones' statements were one part of a whole picture of bad faith litigation misconduct, we **\*\*459** conclude that the trial court's reliance on Jones' speech as part of the rationale for the sanctions orders was appropriate in this context.

With respect to the defendants' ability to comply with discovery, one mitigating factor that potentially could have explained the defendants' noncompliance with the discovery deadlines was their change in counsel midway through the discovery process. Although the parties disagree as to whether this change in counsel was a "strategic" tactic, the record indicates that, even under the defendants' original counsel, the documents were still far from ready for production.[32] Moreover, the record supports the trial court's determination that the change in counsel did not by itself affect the defendants' ability to produce the discovery on time.[33]

**\*378** Turning to the prejudice factor, we consider the importance of the undisclosed discovery material, the effect the information would have on the party requesting it, and whether the information was available through other means. *Yeager* v. *Alvarez,* supra, 302 Conn. at 787–88, 31 A.3d 794; see *id.,* at 789–90, 31 A.3d 794 (defendants were not prejudiced by noncompliance when materials that they sought had been indirectly included in plaintiffs' production). In the present case, the record supports the trial court's implicit finding that the defendants' noncompliance was prejudicial to the plaintiffs[34] because, each time the defendants did not comply with the court ordered discovery, the plaintiffs were

unable to access information that could assist them in proving probable cause that they would succeed on the merits of their complaints. For example, access to the defendants' marketing data would be relevant to proving a financial connection between the defendants' actions and the statements made during the broadcast.[35] See *Krahel v. Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (considering importance of unproduced discovery and its effect on plaintiff's case when analyzing prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018).

Finally, we consider the proportionality of the specific sanction employed to the violations at issue. Here, the trial court was not just considering one violation of a court deadline but several, and, therefore, the defendants' noncompliance warranted an appropriate sanction by that court. See **\*379** *Emerick v. Glastonbury*, 177 Conn. App. 701, 736–37, 173 A.3d 28 (2017) ("The plaintiff's conduct, considered in its entirety, satisfied this standard. ... The court's repeated warnings, suggestions and **\*460** fines had no impact on the plaintiff, as he ignored the court's admonitions and continued to delay the trial." (Citation omitted.)), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018). These violations, when considered together, reasonably could be found to make up a pattern of wilfulness on the part of the defendants. But cf. *D'Ascanio v. Toyota Industries Corp.*, 309 Conn. 663, 681, 72 A.3d 1019 (2013) (reversing sanction of dismissal because "the objectionable conduct at issue was an isolated event and was not one in a series of actions in disregard of the court's authority"); *Usowski v. Jacobson*, supra, 267 Conn. at 93, 836 A.2d 1167 (trial court abused its discretion in sanctioning party by dismissing action on ground that "the record does not establish that the failure to comply with the discovery orders constituted a continuing pattern of violations" because "other factors of a mitigating nature also were present"). The trial court considered this wilfulness along with the defendants' harassing and intimidating speech toward the plaintiffs' counsel, which together created a whole spectrum of bad faith litigation misconduct. "As is often the case in life ... the whole of abusive action is greater than the sum of the parts of which it is made. Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice ...." *Fuery v. Chicago*, 900 F.3d 450, 454 (7th Cir. 2018). "[I]t is the [trial] court [that] can evaluate the whole ball of wax and determine whether the small incremental blows to the integrity of the trial add up to something that requires sanctioning. Death by a thousand cuts

is no less severe than death by a single powerful blow." *Id.*, at 464.

Although the sanctions imposed by the trial court are not the sanctions enumerated within the rules of **\*380** practice, this does not mean they were disproportionate or impermissible as a matter of law. For example, in *Yeager v. Alvarez*, supra, 302 Conn. at 772, 31 A.3d 794, we concluded that a trial court had the authority to "strike an otherwise valid offer of compromise" as a sanction for a discovery violation; id., at 778, 31 A.3d 794; because it "falls well within the ambit of judicial power contemplated by both the court's inherent authority and the rules of practice. Significantly, [Practice Book § 13-14 (a)] authorizes a trial court to penalize discovery violations by entering orders 'as the ends of justice require.' In fact, § 13-14 (b) contains sanctions even more severe than those imposed in this matter. These severe sanctions, which may strip a party of all prospect of prevailing, logically encompass a host of lesser penalties. Such milder sanctions may include orders that reduce a party's likelihood of success at trial ...." Id., at 781, 31 A.3d 794.

The sanctions imposed by the trial court in the present case revoked a statutory benefit, namely, the opportunity to pursue the special motions to dismiss under § 52-196a (d), which further penalized the defendants by rescinding a stay of the full discovery process. Nonetheless, as the trial court found, this was a measured sanction for the defendants' noncompliance with limited discovery, which was an abuse of the very benefit they sought to utilize. Moreover, the sanctions imposed were well short of a default or dismissal, insofar as they do not preclude the defendants from having the merits of their cases adjudicated in a conventional manner, such as by summary judgment or trial. See *Millbrook Owners Assn., Inc. v. Hamilton Standard*, supra, 257 Conn. at 16, 776 A.2d 1115 ("the court's discretion should be exercised mindful of the 'policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the **\*461** litigant his day in court' "); cf. *Emerick v. Glastonbury*, supra, 177 Conn. App. at 737, 173 A.3d 28 (upholding sanction of dismissal when plaintiff engaged in "continuing and deliberate misconduct ... [that] demonstrated **\*381** ... deliberate disregard for the court's orders").

In assessing the proportionality of the sanctions, we next turn to the defendants' central argument for excusing their noncompliance, namely, that the discovery in this case was overbroad and that the sanctions, therefore, were not appropriate. According to the defendants, "[w]hen discovery

is allowed under § 52-196a, it is allowed as an exception to the statutory rule that discovery is to be stayed pending a decision on the special motion to dismiss, and—when allowed —it must be specific and limited. But, without any clarity from the court as to how the specific and limited discovery should proceed, the plaintiffs exploited the untended frontiers of the judge's order until the specific and limited discovery ordered by the court was indistinguishable from the broad contours of general discovery in all civil cases ...." (Emphasis omitted; footnote omitted.)

First, notwithstanding the merits of the defendants' breadth argument, the plaintiffs correctly point out that, despite the defendants' grievances with the scope of discovery, the defendants are still required to comply with the court's orders. "[A] party has a duty to obey a court order even if the order is later held to have been unwarranted." *Tomasso Bros., Inc. v. October Twenty-Four, Inc.*, 230 Conn. 641, 658 n.20, 646 A.2d 133 (1994); see also *Mulholland v. Mulholland*, 229 Conn. 643, 649, 643 A.2d 246 (1994). "An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Fox v. First Bank*, 198 Conn. 34, 40 n.3, 501 A.2d 747 (1985).

Second, nothing in the anti-SLAPP statute limits the trial court's discretion to order "specified and limited discovery relevant to the special motion to dismiss" beyond the "good cause" standard set forth in **\*382** § 52-196a (d).[36] We will not fill this legislative silence by imposing broad restrictions on the trial court's discretion to determine good cause, insofar as each case will present different claims and defenses bearing on whether limited discovery should be granted. Cf. *Standard Tallow Corp. v. Jowdy*, 190 Conn. 48, 57, 459 A.2d 503 (1983) ("[t]he granting or denial of a discovery request rests in the sound discretion of the court"); *Coss v. Steward*, 126 Conn. App. 30, 46–47, 10 A.3d 539 (2011) (discussing good cause requirement for protective orders and trial court's discretion in granting them). We conclude, therefore, that the defendants' claims that discovery was improvidently granted under **\*\*462** the anti-SLAPP statute does not excuse their failure to comply with the trial court's orders. Accordingly, the trial court did not abuse its discretion in sanctioning the defendants for discovery violations and Jones' June 14, 2019 broadcast.

II

The final issue in this appeal is whether the defendants were afforded adequate notice and a meaningful opportunity to respond before the trial court imposed sanctions. The defendants argue that the court ordered sanctions in an overly summary process because, on **\*383** Monday, June 17, 2019, the plaintiffs filed their motion requesting court review of the broadcast, along with expedited briefing on "what orders must issue in connection with [Jones'] on-air statements," and indicated they would move for "specific relief on an expedited basis," and, the very next day, the court ruled on the merits of the plaintiffs' motion for sanctions without any briefing by the defendants. Additionally, the defendants argue that the court handed their attorney a copy of a recent judicial decision the court considered instructive; see *Maurice v. Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. at 21, 204 A.3d 71; and gave the defendants' counsel only the lunch hour to prepare for argument on whether the trial court should order sanctions. The plaintiffs counter that the defendants were afforded sufficient due process because the trial court repeatedly had warned them that it would revoke the opportunity to pursue the special motions to dismiss. They also point out that a June 17, 2019 court order notified counsel that they should be prepared to discuss the broadcast at the hearing scheduled for the following day. Finally, the plaintiffs argue that the defendants did not at any point indicate to the court that they needed additional time to prepare. We agree with the plaintiffs and conclude that the trial court's sanctions did not violate the defendants' due process rights.

"At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard." *Council on Probate Judicial Conduct re James H. Kinsella*, 193 Conn. 180, 207, 476 A.2d 1041 (1984); see *CFM of Connecticut, Inc. v. Chowdhury*, supra, 239 Conn. at 393, 685 A.2d 1108 ("As a procedural matter, before imposing ... sanctions, the court must afford the sanctioned party or attorney a proper hearing on the ... motion for sanctions. ... There must be fair **\*384** notice and an opportunity for a hearing on the record." (Citation omitted; internal quotation marks omitted.)). "Whether the defendant was deprived of his due process rights is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *New Hartford v. Connecticut Resources Recovery Authority*, 291 Conn. 489, 500, 970 A.2d 570 (2009).

Having reviewed the record, we conclude that the defendants received adequate notice so as to be apprised of the

possibility of sanctions entering as a result of their conduct.[37] Specifically, the plaintiffs **463 filed a motion seeking sanctions several months earlier because of the defendants' discovery noncompliance. The trial court discussed the possibility of sanctioning the defendants on several occasions and had reissued this warning in its order on June 10, 2019, regarding the outstanding Google Analytics material. The day before the hearing, the plaintiffs indicated that they would seek interim relief, and the court issued an order stating that it would address the broadcast at the hearing. Because of the *385 trial court's countless warnings that it would sanction the defendants in this specific manner, the defendants cannot reasonably contest that they were not adequately notified of the possibility of such sanctions. Cf. *Fattibene* v. *Kealey*, 18 Conn. App. 344, 350, 353–54, 558 A.2d 677 (1989) (reversing sanctions order when trial court ruled on motion for sanctions without first considering plaintiff's objection). In addition, the trial court held a hearing, at which it heard thorough argument on the issue, and at no point during the argument did the defendants request additional time.[38] This satisfies the due process requirement for a meaningful opportunity to be heard. See, e.g., *Thalheim* v. *Greenwich*, 256 Conn. 628, 650–51, 775 A.2d 947 (2001) (concluding that sanctioned attorney had been afforded "adequate notice and a meaningful opportunity to be heard" when trial court issued order requesting that he "show cause why [he] should not be sanctioned" and attorney received hearing (internal quotation marks omitted)).

The sanctions orders are affirmed.

In this opinion the other justices concurred.

**All Citations**

336 Conn. 332, 246 A.3d 429

## Footnotes

** July 23, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.
This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

1 The plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg.

2 The defendants participating in this appeal are Jones and several of his affiliated corporate entities, namely, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC. We refer to these parties collectively as the defendants and, when necessary, individually by name.
The additional defendants named in the complaint, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., are not parties to this appeal.

3 The defendants appeal pursuant to the Chief Justice's grant of their petition to file an expedited public interest appeal pursuant to General Statutes § 52-265a. A sanctions order for discovery violations generally is considered interlocutory and is not appealable until a party is held in contempt for noncompliance. *Incardona* v. *Roer*, 309 Conn. 754, 760, 73 A.3d 686 (2013). We have appellate jurisdiction, however, because it is well established that "appeals from interlocutory orders may be taken pursuant to § 52-265a." *Foley* v. *State Elections Enforcement Commission*, 297 Conn. 764, 767 n.2, 2 A.3d 823 (2010).

4 SLAPP is an acronym for "strategic lawsuit against public participation," the "distinctive elements of [which] are (1) a civil complaint (2) filed against a nongovernment individual (3) because of their communications to government bodies (4) that involves a substantive issue of some public concern. ... The purpose of a SLAPP suit is to punish and intimidate citizens who petition state agencies and have the ultimate effect of chilling any such action." (Citation omitted; internal quotation marks omitted.) *Field* v. *Kearns*, 43 Conn. App. 265, 275–76, 682 A.2d 148, cert. denied, 239 Conn. 942, 684 A.2d 711 (1996).

5 General Statutes § 52-196a provides in relevant part: "(b) In any civil action in which a party files a complaint, counterclaim or cross claim against an opposing party that is based on the opposing party's exercise of its right of free speech, right to

petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint, counterclaim or cross claim.

"(c) Any party filing a special motion to dismiss shall file such motion not later than thirty days after the date of return of the complaint, or the filing of a counterclaim or cross claim described in subsection (b) of this section. The court, upon a showing of good cause by a party seeking to file a special motion to dismiss, may extend the time to file a special motion to dismiss.

"(d) The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. Notwithstanding the entry of an order to stay discovery, the court, upon motion of a party and a showing of good cause, or upon its own motion, may order specified and limited discovery relevant to the special motion to dismiss.

"(e) (1) The court shall conduct an expedited hearing on a special motion to dismiss. ... (2) When ruling on a special motion to dismiss, the court shall consider pleadings and supporting and opposing affidavits of the parties attesting to the facts upon which liability or a defense, as the case may be, is based. (3) The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, unless the party that brought the complaint, counterclaim or cross claim sets forth with particularity the circumstances giving rise to the complaint, counterclaim or cross claim and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint, counterclaim or cross claim. (4) The court shall rule on a special motion to dismiss as soon as practicable.

"(f) (1) If the court grants a special motion to dismiss under this section, the court shall award the moving party costs and reasonable attorney's fees, including such costs and fees incurred in connection with the filing of the special motion to dismiss. (2) If the court denies a special motion to dismiss under this section and finds that such special motion to dismiss is frivolous and solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to the party opposing such special motion to dismiss.

"(g) The findings or determinations made pursuant to subsections (e) and (f) of this section shall not be admitted into evidence at any later stage of the proceeding or in any subsequent action. ...."

6  Similar interrogatories and requests for production, with small variations in number and language, were made to Cory T. Sklanka, Wolfgang Halbig, Free Speech Systems, LLC, Infowars Health, LLC, Infowars, LLC, Prison Planet TV, LLC, Midas Resources, Inc., and Genesis Communications Network, Inc. In addition, the plaintiffs noticed the individual depositions of Jones, Sklanka, Halbig, Kurt Nimmo, the former editor of Infowars, LLC, and Steve Pieczenik, a guest on Jones' radio show who had expressed that the Sandy Hook shooting was a hoax, as well as the corporate designees of Free Speech Systems, LLC, Genesis Communications Network, Inc., Infowars Health, LLC, Infowars, LLC, Midas Resources, Inc., and Prison Planet TV, LLC.

7  The defendants filed motions for an extension of time on February 22, 2019, the day before production was due. It does not appear that the trial court decided those motions.

8  Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following: (1) The entry of a nonsuit or default against the party failing to comply ... [and] (5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal. ...."

9  The defendants and the plaintiffs both included transcripts of the June 14, 2019 broadcast in their appendices filed with this court. Their transcripts do not differ materially with respect to the language quoted in this opinion except for one phrase. The defendants' transcript uses the phrase "white shoe boy," whereas the plaintiffs' transcript uses the phrase "white Jew boy ...." The trial court, in its oral decision ordering sanctions, relied on the plaintiffs' transcript containing the phrase "white Jew boy ...." The defendants subsequently filed a motion to correct the transcript, which the trial court did not decide.

In their appellate briefs, the defendants noted the inconsistencies between the two transcripts and that the trial court had not ruled on their motion to correct, but they do not specifically challenge the accuracy of this phrase on appeal. As the trial court did not decide the motion to correct, we omit the words "Jew" and "shoe" in the quoted transcript.

The transcripts of the broadcast each exceed thirty pages, so we have not reproduced them in their entirety. We include only those portions relied on by the trial court, supplemented when necessary for context. Specifically, we have omitted those portions in which Jones discusses the case's background and the details of the child pornography incident, Jones' introduction of Pattis, Jones' critique of the plaintiffs' case and the Google Analytics reports, discussion of the first amendment ramifications of questioning the veracity of the Sandy Hook shooting, most of Pattis' statements, and other duplicative or irrelevant portions of the broadcast.

10   The defendants' transcript provides: "Look. You're showing Chris Mattei's photograph on the air."

11   The defendants' transcript provides: "No, I'm sure—you don't think errand boy did this. I'm actually not saying that."

12   The trial court also indicated that it would award attorney's fees related to the child pornography issue at a later date, "upon further hearing and the filing of affidavits ...."

13   The trial court also stated: "Now, the transcript doesn't reflect this, but, when I listened to the broadcast, I heard, I'm going to kill. Now, that's not in the transcript, but that is my read and understanding, and what I heard [o]n the broadcast." Because the word "kill" is not mentioned in the transcripts, we do not consider it in our analysis of the trial court's sanctions orders.

14   The defendants incorrectly state that the sanctioned party in *Maurice* v. *Chester Housing Associates Ltd. Partnership,* supra, 188 Conn. App. at 21, 204 A.3d 71, did not challenge the sanction on first amendment grounds. Instead, the Appellate Court declined to reach the issue, deeming the courthouse a nonpublic forum. Id., at 33, 204 A.3d 71 n.11.

15   These first amendment implications, however, often are not raised or deeply considered. For example, in *Carroll* v. *Jaques Admiralty Law Firm, P.C.,* supra, 110 F.3d at 294, the court succinctly concluded, without substantive discussion, that the sanction imposed did not violate the affected party's first amendment rights. But see *In re White,* Docket No. 2:07CV342, 2013 WL 5295652, *38 (E.D. Va. September 13, 2013) ("[w]here government action, such as an award of sanctions, is directed toward presumptively protected expression, our system of justice places 'the duty ... on this [c]ourt to say where the individual's freedom ends and the [s]tate's power begins' ").

16   Contempt cases are instructive because the power to sanction and the power to hold an individual in contempt both stem from the court's inherent authority. See, e.g., *Jaconski* v. *AMF, Inc.,* 208 Conn. 230, 232–33, 543 A.2d 728 (1988); 17 Am. Jur. 2d 399, Contempt § 1 (2004).

17   The importance of the legality of the action at issue is demonstrated by the fact that the United States Supreme Court mentioned it twice. See *Bridges* v. *California,* supra, 314 U.S. at 277, 62 S.Ct. 190 ("[o]n no construction, therefore, can the telegram be taken as a threat either by [the defendant] or the union to follow an illegal course of action"); id., at 278, 62 S. Ct. 190 ("[l]et us assume that the telegram could be construed as an announcement of [the defendant's] intention to call a strike, something which, it is admitted, neither the general law of California nor the court's decree prohibited").

18   Actual interference might be construed as an additional factor under the clear and present danger test. See *Wood* v. *Georgia,* supra, 370 U.S. at 399, 82 S.Ct. 1364 (Harlan, J., dissenting). Read in context, however, *Wood* suggests that the court's search for actual interference likely stems from the facts of *Wood* rather than a substantive alteration to the *Bridges* standard, as the court stated: "[I]n the absence of any showing of an actual interference with the undertakings of the grand jury, *this record lacks persuasion in illustrating the serious degree of harm to the administration of law* ...." (Emphasis added.) Id., at 393, 82 S. Ct. 1364. Indeed, the court specifically observed that the harm that speech could cause to a grand jury investigation is different from that of a trial. See id., at 390, 82 S. Ct. 1364 ("the limitations on free speech assume a different proportion when expression is directed toward a trial as compared to a grand jury investigation"). Also, earlier cases construing this test required an analysis of imminence and likelihood, which is inconsistent with an actual interference requirement. See *Craig* v. *Harney,* supra, 331 U.S. at 373, 376, 67 S.Ct. 1249; *Pennekamp* v. *Florida,* 328 U.S. 331, 334, 350, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946); *Bridges* v. *California,* supra, 314 U.S. at 263, 62 S.Ct. 190. As a result, we interpret *Wood* in harmony with those cases that came before it and conclude that a showing of actual interference is but one factor in the clear and present danger analysis.

19   The District Court also analyzed whether sanctions should enter under a strict scrutiny analysis. *In re White,* supra, 2013 WL 5295652, at *71.

20   Additionally, courts have applied *Bridges* to extrajudicial speech restrictions beyond contempt. For example, it was discussed recently by the Colorado Supreme Court in examining a jury tampering conviction. See *People* v. *Iannicelli,* 449 P.3d 387, 392–93 (Colo. 2019). Although the case ultimately was decided on grounds of statutory construction; see id., at 394–97; the court recognized that "[s]peech concerning judicial proceedings is not without limits ... because like free

speech, a fair trial is one 'of the most cherished policies of our civilization' and must also be protected." *Id.*, at 392; see *id.*, at 396 n.3 ("[W]e acknowledge that defining the precise scope of [Colorado's jury tampering statute] presents complex questions as to both [f]irst [a]mendment rights and the [s]tate's interest in ensuring the fair and orderly administration of justice. The facts of this case, however, do not require us to attempt to craft an all-encompassing rule applicable in every factual scenario. Accordingly, we leave that difficult task for another day."); see also *United States* v. *Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012) ("[t]he relevant cases establish that the [f]irst [a]mendment squarely protects speech concerning judicial proceedings and public debate regarding the functioning of the judicial system, so long as that speech does not interfere with the fair and impartial administration of justice").

21 In their argument before the trial court, the defendants contended that the broadcast "did not disrupt the administration of justice."

22 "Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly." *Wood* v. *Georgia*, supra, 370 U.S. at 389, 82 S.Ct. 1364.

23 The defendants disagree and cite to *In re Sawyer*, 360 U.S. 622, 636, 79 S. Ct. 1376, 3 L. Ed. 2d 1473 (1959), for the proposition that the parties' speech cannot be "more censurable" than that of nonparties during the pendency of a court case. We disagree. *In re Sawyer* concerns an attorney, not a party, and supports the opposite view when quoted in context: "We can conceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, *other than that they might tend to obstruct the administration of justice. Remarks made during the course of a trial might tend to such obstruction where remarks made afterwards would not.* But this distinction is foreign to this case, because the charges and findings in no way turn on an allegation of obstruction of justice, or of an attempt to obstruct justice, in a pending case." (Emphasis added.) *Id.*

24 It is important to note that, although Jones is a defendant and therefore has not been willingly brought into the litigation, that status does not diminish the need for a fair trial, does not grant him license to harass and intimidate opposing counsel, and does not lessen the potential impact of his statements on the trial. However, not all speech by Jones regarding the case is sanctionable—only harassing and threatening speech that presents a likely and imminent threat to the administration of justice. See, e.g., M. Swartz, Note, "Trial Participant Speech Restrictions: Gagging First Amendment Rights," 90 Colum. L. Rev. 1411, 1421–22 (1990) (noting special concerns for criminal and civil defendants). This fact, along with the nature of civil proceedings as a whole, supports our use of the most stringent standard to analyze Jones' speech. See *Chicago Council of Lawyers* v. *Bauer*, supra, 522 F.2d at 257–58 (noting how fair trial concerns are lessened in civil litigation).

25 It is important to note that a judge may still sanction for threatening or intimidating speech in the absence of actual interference with the administration of justice, yet we consider these direct threats as aggravating circumstances in this particular case.

26 It is unclear whether these threats against the trial judge stemmed from the original broadcast or a subsequent broadcast by Jones discussing the sanctions orders.

27 The trial court specifically considered this when it questioned defense counsel about how Jones' speech affects the "integrity of the process here and the functioning of the court and the judicial process ...."

28 In fact, the defendants implicitly recognized this interference, as they argued to the trial court that Attorney Mattei should not participate in the case if he feels threatened, stating: "[I]f you've got a former federal prosecutor in here who's saying, as a result of this, he can't do his job, then maybe you should get him off the case because he's not prepared to serve his clients." The defendants renewed this argument in their brief to this court, arguing: "If [Mattei] feels sufficiently chilled or impaired, he can, of course, seek to withdraw as counsel."

The defendants also argue that Jones, in a subsequent broadcast, "made clear he did not intend to threaten [Mattei]." The trial court interpreted this later broadcast as a classic nonapology, stating: "[W]hen I watched the broadcast several times, I wasn't able to see an apology in there. ... It doesn't sound like an apology."

29 The plaintiffs also argue that Jones' speech qualifies as a true threat unprotected by the first amendment. The defendants disagree with this assertion, arguing that the broadcast "was not unequivocal, unconditional, immediate and specific [so] as to convey a gravity of purpose and imminent prospect of execution." Additionally, the defendants argue that the trial court did not allow Jones the opportunity to present evidence to counter a true threat finding, distinguishing this case from *Haughwout* v. *Tordenti*, 332 Conn 559, 211 A.3d 1 (2019). We initially note that, as the case currently stands, the record is not adequately developed to determine whether Jones' statements qualify as a true threat. But cf. *id.*, at 562 n.4, 211 A.3d 1 (trial court's decision was supported by facts from disciplinary proceeding and plaintiff's testimony). Because we have

determined that Jones' speech constituted an imminent and likely threat to the administration of justice, we need not reach the issue of whether Jones' speech also qualifies under a different category of unprotected speech as a matter of law.

30  The defendants purport to dispute these issues in their brief by stating, in a heading, that "[t]he court sanctioned [them] for violating the discovery process ... despite the lack of sufficiently clear orders or actual violations." Despite mentioning this in the heading, there is no clear argument in the brief to support this argument. Instead, the defendants' discovery argument basically contests the merits and breadth of the discovery permitted by the trial court. As a result, we construe the first two prongs of *Millbrook Owners' Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. at 17–18, 776 A.2d 1115, as undisputed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. ... Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. ... [F]or this court judiciously and efficiently to consider claims of error raised on appeal ... the parties must clearly and fully set forth their arguments in their briefs. ... The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

31  For example, even after the trial court ordered the defendants to produce the Google Analytics materials on June 10, 2019, the defendants continued to contest whether they should be ordered to produce the data.

32  At a March 22, 2019 hearing, Attorney Pattis stated: "I was given those documents on or about March 6. I was also given some interrogatory responses on March 6. Those interrogatory responses were not satisfactory to my way of thinking."

33  At the March 22, 2019 hearing, the court explained: "I think part of the problem is that your clients are maybe tying their own lawyers' hands by getting other lawyers involved so that nobody knows what anyone else is doing. That would be the most favorable light. ... The least favorable light would be manipulation."

34  At an April 3, 2019 hearing, the plaintiffs' counsel cited "delay after delay after delay by a party [who] ... invoked the statute but [who] wasn't prepared to comply with its provisions, [which] is prejudicing my clients."

35  The plaintiffs' counsel argued that the Google Analytics would show "[s]ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." He further argued that "Infowars [LLC] and Free Speech Systems [LLC] [generate] millions and millions and millions of dollars of revenue each year. The content that they broadcast, including the content about Sandy Hook, they use to drive traffic to their website. That's why we're entitled to this stuff."

36  Although the legislative history of the anti-SLAPP statute does not further illuminate the meaning of the phrase "good cause," as used in § 52-196a (d), we find the purpose of the statute instructive. Speaking in support of the bill later enacted as § 52-196a, then Representative William Tong explained that it was intended to address "situations in which people have spoken out on matters of public concern including the press and we've seen situations where people file litigation. There appears to be no basis to that litigation but it's designed to chill free speech and the expression of constitutional rights, and so this provides for a special motion to dismiss so that early in the process somebody who's speaking and exercised their constitutional rights can try to dismiss a frivolous or abusive claim that has no merit and short circuit a litigation where it might otherwise cost a great deal of money to continue to prosecute. We think it's an important measure ... to promote free speech and reporting by our news organizations as well." 60 H.R. Proc., Pt. 16, 2017 Sess., pp. 6879–80; see also footnote 4 of this opinion.

37  The defendants rely on *New Hartford* v. *Connecticut Resources Recovery Authority*, supra, 291 Conn. at 489, 970 A.2d 570, to support their claim of a due process violation. In that case, we held that the defendants were not afforded sufficient due process after a trial court found them in contempt. Id., at 491, 970 A.2d 570. The present case, however, is distinguishable because, in *New Hartford*, the defendants indicated at the hearing that they were unprepared to address the violation of the gag order. Id., at 494–95, 970 A.2d 570. In addition, "[t]he defendant was given less than one day to consider a motion for contempt," and "[t]he defendant's attorney stated that he had not read the full text of the posting, that he had not been able to speak to the persons responsible for the website posting or anyone else and that he would like to speak to them about why they had posted the article." Id., at 501, 970 A.2d 570. In contrast, unlike the attorney in *New Hartford*, Attorney Pattis was present on the broadcast, witnessed Jones' allegedly sanctionable conduct, and made representations to the court on the basis of his observations during the broadcast. Additionally, although the plaintiffs had filed motions requesting a review of the broadcast the day before the hearing, the plaintiffs had pending motions for sanctions left unanswered for several months. Also, the defendants were well aware of the court's warnings that it might sanction them if discovery noncompliance continued. As a result, we are not persuaded that *New Hartford* controls the present case.

38  The defendants did file a motion for a stay the day before the hearing so that Attorney Pattis could address a conflict of interest concern that had arisen. The trial court denied this motion. The defendants do not challenge this ruling on appeal.

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S.
                                                                        Government Works.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

IN RE:                                    §                Case No. 22-60043
                                          §
FREE SPEECH SYSTEMS, LLC,                 §                Chapter 11 (Subchapter V)
                                          §
         Debtor.                          §

# EXHIBIT G

| NO. X06-UWY-CV-18-6046436 S  : | SUPERIOR COURT |
|---|---|
| ERICA LAFFERTY, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |
| NO. X06-UWY-CV-18-6046437 S  : | SUPERIOR COURT |
| WILLIAM SHERLACH : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |
| NO. X06-UWY-CV-18-6046438 S  : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |

## MOTION TO RECUSE JUDGE BELLIS

Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through their counsel, move under Practice Book §§ 1-22, 1-23, and Conn. Gen. Stat. § 51-183 to disqualify Judge Barbara Bellis from hearing this case. The record in the above-captioned matters is rife with the appearance of judicial impropriety. The evolution of the case, including a threat made against Judge Bellis by an unknown third-party that the plaintiffs somehow attribute to Defendants, and the series of subsequent comments and rulings, would lead a reasonable person knowing all the circumstances to question Judge Bellis's impartiality.

Judge Bellis has employed a shifting standard for what constitutes specific, limited, and relevant discovery permitted under Conn. Gen. Stat. §52-196 and the Practice Book. This left Defendants victim to the plaintiffs' tireless campaign to expand the scope of the Court's discovery orders and to attempt to win on technicalities.

A reasonable person observing Defendants scramble to satisfy the shifting discovery standard and arbitrary threshold requirements for the special motion to dismiss and subsequent discovery, only to be ambushed by judicial whim and caprice, would question Judge Bellis's

1

impartiality in this proceeding. Although the decision terminating the anti-SLAPP motion was upheld by the Connecticut Supreme Court, it must be viewed as part of a course of conduct by a jurist who wound up presiding over multiple Sandy Hook cases involving the same nominal plaintiffs and their lawfirm.

Following the imposition of this sanction, Judge Bellis's rulings continued to demonstrate a high degree of antagonism towards Defendants. For example, at the first status conference following the remand of this action, Judge Bellis reminded counsel for Defendants that the Court referred Defendants' other counsel to the grievance committee (having previously given a pass to Plaintiffs' counsel's unethical pre-trial publicity). Despite being corrected factually, Judge Bellis erroneously claimed that Defendants may have violated Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal." The handling of this issue creates the appearance that Judge Bellis has prejudged the truthfulness of Defendants and their counsel. The insidious nature of this prejudice now pervades all aspects of this case, creating the appearance of impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Notably, despite placing such weight on Rule 3.3, Judge Bellis, when apprised of a clear violation of that rule by Plaintiffs' counsel newly stated she did not want the parties to advise of violations. And, oddly, sanctions orders have issued against all moving defendants, even when several of them had nothing to do with the alleged misconduct. A reasonable person would believe Judge Bellis has taken sides.

## FACTS

In support of this motion, the undersigned counsel for Defendants submits attached herewith his affidavit setting forth the facts that show grounds for disqualification. The record in this matter is complex and varied, spanning multiple counsel and, at times, weekly status hearings. The attached affidavit sets out the evolution of issues creating the appearance of judicial impropriety. That chronology will not be rehashed here, but summarized, in an effort to prevent Defendants from

2

becoming the metaphorical frog boiling in a vat of impropriety.

## I.    Alleged Third-Party Threat Against Judge Bellis

On 21 June 2019 Judge Bellis issued order DN271. That order indicated that the Connecticut State Police notified the court of an ongoing federal investigation related to threatening comments made by unknown third-party/ies about Judge Bellis. The threats were posted to the comments section of a news article published on Defendant Infowars website. Affidavit, para. 16a. The ordered contained no amplifying information. *Id*. The order indicated that Judge Bellis was not aware of any further information regarding the threat and therefore did not plan to take any further action. *Id*. While there is no reason to doubt that Judge Bellis received limited information from the Connecticut State Police about the ongoing federal investigation, the assertion that the court was not aware of any further information regarding the "threat" is inaccurate.

Since its inception, this matter is replete with plaintiffs' accusations that every time Defendants make a statement about any matter in public discourse it is in fact a "call to arms" designed to "activate" a network of conspiracy theorists. *See* Compl. ¶¶7, 12-16, 40-57. For example, plaintiffs' complaint and subsequent arguments on the record refer *ad nauseum* to the actions of a third-party, not related to Defendants. The story goes that, after Defendants ran a news report on the infamous "Pizzagate" conspiracy theory, a third-party traveled to Washington DC and fired 3 rounds from a rifle into a pizzeria. Accordingly, plaintiffs argue, Defendants are responsible for the independent actions of this third-party. *Palsgraf* aside, plaintiffs trot out this *post hoc* fallacy anytime Defendants exercise their First Amendment right to express an opinion. *See e.g.*, Affidavit, para. 15c.

The threat Judge Bellis referenced in order DN271, and its ramifications for this case, lay dormant until the plaintiffs referenced it in a pleading dated 19 August 2019 before the Connecticut Supreme Court. That pleading addressed whether Judge Bellis abused her discretion by ordering a

3

sanction against Defendants for statements made during a broadcast that the plaintiffs argued were a "true threat" against plaintiffs' counsel Chris Mattei. That sanction precluded Defendants' ability to take a special interest appeal under Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. Affidavit, para. 15a-j. Prior to this filing, neither party addressed the issue of the third-party's threat to Judge Bellis. Affidavit, para. 16a.

The plaintiffs' reference to the Judge Bellis threat consists of a single sentence and accompanying footnote. Plaintiff's claim, "Jones' audience threatened the judge in this case after the sanctions order issued and Jones turned his fire on her." *Id.* The accompanying footnote went on to claim:

> [a]fter the trial court sanctioned him, Jones posted a broadcast titled "Judicial Tyranny? Judge Says Criticism Of Democrat Lawyers Forbidden." Shortly after that broadcast was posted, the court filed a notice stating that it had been "contacted by the Connecticut State Police who were reportedly contacted by the FBI regarding threats against the undersigned made by individuals on the defendant Infowars website." Jones then apparently removed the broadcast; it is no longer accessible via the Infowars website.

*Id.* at n.22. This text appears in section III.C of the plaintiffs' brief[1]. Section III addressed whether the trial court abused its discretion in considering the broadcast by Alex Jones as a basis for the above-mentioned sanction. Here, plaintiffs argued that the speech in question was a true and immediate threat of violence, a call to his audience to engage in violent acts directed at plaintiffs' counsel.

In their pleading, the plaintiffs provides a more robust version of the argument that they presented orally during the 18 June 2019 hearing regarding sanctions,

> Jones' audience has a history; he knows it, and so does anyone who reads the news. The trial court recognized that Jones' broadcast was meant to activate his audience: "it was an intentional, calculated act of rage for his viewing audience.". . . That audience has threatened and stalked Sandy Hook family members and acted on

---

[1] The entirety of this section can be found at *Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief pp. 28-33.

Jones' promotion of Pizzagate to shoot up the Comet Ping Pong pizza restaurant in Washington D.C. Jones tapped into precisely that history. He called on "the patriots that are left, and 4chan and 8chan, and anonymous," and he summoned an attack: "I summon all of it against the enemy." That Jones' threat of violence says it is to be effectuated by others makes it no less a threat.

*Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief p. 30.

(Citations omitted). Plaintiffs' pleading continues by citing to a "recently issued" FBI "Field

Intelligence Bulletin." This bulletin concludes generally that broadcasts and news reports that "[are]

anti-government, [are] identity based, and [pertain to] fringe political conspiracy theories *very likely*

motivate some domestic extremists, wholly or in part, to commit criminal and sometimes violent

activity." *Id.* (emphasis added). Plaintiffs' pleadings note that the term "'Very likely' is a term of

art used by the FBI to mean an 80-95% chance." *Id.* at 31. The pleading goes on to claim that

broadcasts and news reports of this type,

very likely encourage the targeting of specific people, places, and organizations, thereby increasing the risk of extremist violence against such targets.... This targeting occurs when promoters of conspiracy theories, claiming to act as 'researchers' or 'investigators,' single out people, businesses, or groups which they falsely accuse of being involved in the imagined scheme. These targets are then subjected to harassment campaigns and threats by supporters of the theory, and become vulnerable to violence or other dangerous acts.

*Id.*

It is in this context and against this backdrop that the plaintiffs insert the above quoted

reference to order DN271. The not-so-subtle implication of the *post hoc* fallacy employed in the

plaintiffs' pleadings is clear. Just as the plaintiffs allege the broadcast mentioning Attorney Mattei

was a call to Alex Jones' audience to engage in violent acts against plaintiffs' counsel, so too are

the plaintiffs alleging that the news article mentioning Judge Bellis was a call to incite violence

against the court. Plaintiffs conclude, without providing evidence, that "Jones turned his fire on

[Judge Bellis]" insinuating Defendants were somehow responsible for getting his audience to

"threaten[] the judge... after the sanctions order issued." Affidavit, para. 16a.

5

Judge Bellis may have been careful to author order DN271 in a seemingly neutral and detached way—the court was made aware of an FBI investigation "regarding threats against the undersigned by individuals on the defendant Infowars website." Affidavit, para. 16a. However, the plaintiffs' accusation removes any shroud of neutrality, raising the specter that Alex Jones had a hand in the threat made against Judge Bellis. Despite offering no evidence to support this argument, from the record it appears that Judge Bellis relied on it, at least in part, to conclude that broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1.

## II. Evolution Of Discovery Compliance, Sanctions, and Defendants' Opportunity to Pursue their Special Motion to Dismiss

Conn. Gen. Stat. §52-196 protects defendants facing certain types of lawsuits by allowing them an opportunity to file a special motion to dismiss. While the special motion to dismiss is pending, all discovery is stayed, unless the court "order[s] specified and limited discovery relevant to the special motion to dismiss." Conn. Gen. Stat. §52-196(d), Initially, Judge Bellis left the parties to work discovery issues out themselves. Unremarkably, plaintiffs sought unlimited discovery and Defendants the opposite. Affidavit, para. 4. Unable to reach an agreement, in order DN148, Judge Bellis overruled all but two of Defendants' discovery objections without further explanation. Although interlocutory appeal of this order was not permitted, that denial is not an appellate endorsement of the breadth of discovery permitted. Subsequently, Defendants agreed to comply with a discovery deadline of 23 February 2019 at the risk of facing an even shorter deadline. *Id.* Defendants sought an extension due to an inability to meet that deadline. Plaintiffs immediately sought sanctions in the form of an order precluding Defendants from having their special motion to dismiss heard.

From 13 March to 10 April 2019, Defendants' inability to comply with the broad discovery

6

order was the sole basis for a potential sanction precluding the special motion to dismiss. Affidavit, para. 6-8. On 13 March, Defendants found themselves without counsel familiar with the record and pleadings, due in part to the surprising denial of a *pro hac vice* application of Defendants' original counsel of choice, a denial that curiously only occurred in this and the Texas Sandy Hook cases. Affidavit, para. 6ai. Although that attorney had been the subject of then-recent discipline, none of it was for litigation conduct, and numerous courts (including Hon. Daniel Klau in Connecticut) have seen fit to admit him *pro hac vice* or as an outright member of the bar since.[2]

By 22 March, Pattis & Smith, LLC was sole counsel for Defendants and attempting to comply with discovery. At that time, Defendants were still facing the threat of the sanction. Judge Bellis decided to stay her decision on the preclusion sanction, based on representations made by Defendants regarding (1) the impact changes in prior counsel had on discovery compliance and (2) a plan for getting in compliance in short order. Affidavit, para. 7c-d.

By 26 March, Defendants made substantial steps in complying with discovery. Affidavit, para. 8. Judge Bellis, recognizing this, stated the court would take a week to decide the sanctions issue and that any material produced prior to that decision would be considered as to compliance. Affidavit, para. 8c. Opposing counsel affirmatively agreed with this course of action. Affidavit, para. 8d.

By 10 April, with regard to the sanction, Judge Bellis stated "the issue at this point for me is whether there's been substantial good faith compliance or not such that the defendant should be allowed to pursue their special motion to dismiss." Affidavit, para. 9a. "I'm not looking at this point to go through each one individually and address whether—whether every single document has been

---

[2] The only other judge to deny him *pro hac vice* admission is the Texas judge presiding over similar Sandy Hook-related matters, despite the Texas Supreme Court having previously permitted him to appear *pro hac vice*. That only the trial court judges overseeing Sandy Hook matters would deprive Defendants of their counsel of choice plays into the reasonable person believing those judges are not impartial.

7

produced. . . I'm pushed at this point trying to figure out whether there's been finally an—an effort at meeting the discovery obligations." *Id.* At this hearing, Judge Bellis stated multiple times that Defendants substantially complied with the discovery orders. Affidavit, para. 9c-e. In fact, Judge Bellis expressed this view so strongly that the plaintiffs' conceded "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e.

Despite clearly finding Defendants in substantial compliance with the ordered discovery, Judge Bellis did not address the sanction issue at that time. Rather, plaintiffs raised an issue involving the signature on a discovery related affidavit. Affidavit, para. 9f. Defendants informed the court that an affidavit bearing Alex Jones signature and indicating that signature was made in New Haven was, in fact not signed by Alex Jones. Instead, it was signed in New Haven by an authorized representative after speaking with Alex Jones telephonically. Affidavit, para. 9fii. Thereupon, she ordered a separate hearing to resolve this issue and *sua sponte* incorporated this issue as a potential second basis for a sanction preventing Defendants from having their special motion to dismiss heard:

> I am going to have a hearing on that affidavit issue. And I don't think there's any harm in proceeding. I mean, I think this is *substantial compliance* but until I deal with that affidavit issue, I'm not — I'm not going to rule on — I'll take it under advisement; the motion for reconsideration and the motion for sanctions. But I'm going to have the hearing on the affidavit first.

Affidavit, para. 9fvii. (emphasis added).

By the following appearance, the attorney for Defendants already self-referred the matter to the Grievance Committee and filed a corrected affidavit. Affidavit, para. 10b. Despite this, Judge Bellis made a second referral and then sought the plaintiffs' input on what sanctions should enter against Defendants. Affidavit, para. 10c. Plaintiffs' reaction captured their surprise at Judge Bellis's inquiry,

> we came here today believing that this issue was one between Counsel and the

8

> Court, frankly. . . we just don't know enough about the circumstances under which
> that affidavit was made to know whether Mr. Jones's role. . . based on what we
> know right now, we weren't prepared to argue that.

Affidavit, para. 10d. Judge Bellis prodded the plaintiffs to take a position. Affidavit, para. 10e. The

plaintiffs declined and then Judge Bellis ruled "[a]ll right. Then in light of that, I am satisfied with

not taking any further action." Affidavit, para. 10e. Ultimately, on 20 December 2019, the Grievance

Committee dismissed the complaint related to the affidavit issue, finding it to be a mistake that did

not rise to the level of an ethical violation or violate the Rules of Professional Responsibility.

Affidavit, para. 17.

> At the next hearing, on 7 May, Judge Bellis began by stating:

> I do want to just state for the record what is probably clear to everyone at this point.
> I had said a few times that I thought that there was substantial enough compliance.
> So in effect I have really extended --had extended the deadlines for the defendant
> to comply. So that would be my ruling, just for the record, on the issue of the
> additional time to comply. I understand it's not necessarily 100 percent complete
> compliance, but I think *I've seen enough of it at this point to afford the defendants*
> *the opportunity to pursue their special motion to dismiss*.

Affidavit, para. 11a. (emphasis added). Plaintiffs continued to raise discovery issues, the majority

of which did not affect Judge Bellis's decision to allow Defendants to pursue the special motion to

dismiss. Affidavit, para. 11b. However, this changed when plaintiffs represented to Judge Bellis

that Defendants had not produced Alex Jones' signed interrogatory responses. Judge Bellis, without

fully comprehending that the plaintiffs were referring to an early draft of signed interrogatory

responses, immediately responded by saying "this is news to me. So here's what I would say on that.

*I now retract my prior comments that there has been substantial compliance, good-faith, substantial*

*compliance*." Affidavit, para. 11d. (emphasis added). Despite ultimately holding that the plaintiffs

were not entitled to discovery of the draft interrogatory responses, Judge Bellis took no steps to

clarify what ruling stood with regard to whether there had been substantial enough compliance to

afford the defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 11e.

9

The confusion arising from Judge Bellis's contradictory statements at the 7 May hearing appeared to be resolved by 5 June. At that hearing, plaintiffs continued to raise discovery compliance issues. Affidavit, para. 13a-d. In total, these issues covered 46 transcript pages. Affidavit, para.13f. At no time did Judge Bellis indicate that any of the issues raised demonstrated that Defendants were not in substantial compliance with the discovery ordered. For example, the plaintiffs took issue with deposition testimony regarding the manner in which Defendants searched for "business marketing plans." In response, Judge Bellis ruled that

> unless you have some, you know, a good faith basis and some evidence that in fact the documents do exist, I think that you have to be satisfied with the answers under oath. And no such documents exist is a proper response. . . *This is just full and fair compliance*. And sometimes the answer is going to be it doesn't exist.

Affidavit, para. 13d-e. (emphasis added).

With discovery compliance apparently settled, and believing the next step was litigating the special motion to dismiss, Defendants, requested permission from the court to obtain discovery from the plaintiffs, stating "in our motions we suggested we'd like permission to do a little bit of discovery ourselves." Affidavit, para. 13f. Judge Bellis immediately responded "I'll take that up on the papers" and attempted to silence Defendants. Affidavit, para. 13g-h. When Defendants objected, Judge Bellis terminated the hearing. *Id*.

Following the 5 June hearing, plaintiffs' counsel informed Defendants that they had been the victim of 12 distinct acts of cyber-crime. Affidavit, para. 14e. An unidentified third-party or parties sent emails to Defendants with attachments hiding child pornography. Affidavit, para. 14b-d. The child pornography was embedded in email metadata demanded by the plaintiffs and ordered to be produced within 14 days. Affidavit, para. 14a. Initially, only a single image was located after an "electronic storage information expert" retained by the plaintiffs scoured the metadata of approximately 58,000 emails for over 15 days. Affidavit, para. 14a-b. Based on this, plaintiffs then

provided the data to the FBI, who immediately spent an additional 6 days combing through the metadata, finding 11 additional hidden images of child pornography. Affidavit, para. 14c-d. Once the FBI and DOJ concluded their investigation, they informed plaintiffs' counsel of the results and then plaintiffs' counsel contacted counsel for Defendants. Affidavit, para. 14e.

When Defendants discovered a third-party or parties attempted to frame them for possession of child pornography they were understandably enraged. Affidavit, para. 14g-h. The manner in which they were made aware of this information was equally enraging. *Id*. Being told by a non-law enforcement entity that you are the victim of 12 distinct acts of cyber-crime involving a child pornography email scam, ostensibly to frame and extort you, is unorthodox as the FBI/DOJ have a Victim Services Division specifically dedicated to liaising with crime victims. Affidavit, para. 14g. While all this information was coalescing in his mind, Alex Jones raised these issues in an emotionally charged stream of consciousness broadcast on 14 June 2019. In this broadcast, Alex Jones expressed his opinion that the perpetrator(s) of these cyber-attacks should be brought to justice and that Attorney Mattei's involvement in this entire course of events was suspicious. Affidavit, para. 14h. The following day, on 15 June 2019, Alex Jones issued another broadcast, apologizing for his emotional response and indicating that the 14 June 2019 broadcast should not be construed as suggesting that plaintiffs' attorneys were involved in any criminal activity related to the discovery of child pornography in the metadata. Affidavit, para. 14i.

At the 18 June hearing, plaintiffs attempted to capitalize on these broadcasts, requesting the court review a transcript of the 14 June Broadcast. Affidavit, para. 15a. At that hearing the plaintiffs indicated that they intended to file a written brief requesting a hearing regarding what, if any, sanctions were appropriate. *Id*. Judge Bellis declined the plaintiffs request to (1) brief the issue and (2) have a meaningful hearing, indicating that the court would rule that day on whether sanctions should enter against Defendants because of the broadcast. Affidavit, para. 15b.

11

Plaintiffs, citing no caselaw and explicitly choosing to not discuss the actual content of the broadcast, argued sanctions were appropriate based on (1) "Pizzagate;" (2) the prior issues with discovery compliance; and (3) their assertion that the apology during the 15 June 2019 broadcast was insufficient. Affidavit, para. 15c. Judge Bellis then turned to Defendants, interrupting their defense counsel two sentences into their argument. Affidavit, para. 15d. Judge Bellis challenged Defendants' characterization of both the apology and the initial broadcasts. Affidavit, para. 15d-e. Counsel for Defendants attempted to respond to this challenge, only to be told "[w]ell, but then you need — then you would want to put on evidence in that regard, because there's no evidence. The evidence before me are the broadcasts that you submitted. . . this is unchartered territory, Counsel. . . and despite my research, *I couldn't find a case that came close.*" Affidavit, para. 15f. (emphasis added). The Court was already engaged in research without notice or affording Defendants the opportunity to do the same.

Judge Bellis then began a quasi-cross examination of counsel for Defendants, creating the appearance that the court was attempting to justify a predetermined outcome. Affidavit, para. 15g. Following additional argument, but without an evidentiary hearing or a meaningful opportunity to be heard, Judge Bellis denied Defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 15j. In doing so she held the 14 June 2019 broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. Judge Bellis went on to "reject Defendants' claim that Alex Jones was enraged. . . find[ing] based upon a review of the broadcast clips that it was an intentional, calculated act of rage for his viewing audience." Judge Bellis made this adverse ruling despite having admonished counsel for Defendants earlier that an evidentiary hearing was required to characterize the broadcasts. Affidavit, para. 15jiii3. Although the decisions of Judge Bellis were affirmed on appeal, her actions to that point nonetheless created the appearance of bias.

12

### III. The Perception of Prejudice Created By Judge Bellis's Conduct Towards Defendants Following The Appeal Of The Sanction Order

Defendants appealed this sanction to the State of Connecticut Supreme Court and, then, the United States Supreme Court. Affidavit, para. 18. Ultimately the appeal was not successful and, after a second attempt at removal, Defendants returned to Judge Bellis's courtroom on 14 April 2021. Affidavit, para. 18c. Immediately upon returning from the second removal, which had been based upon Plaintiffs' strategic dismissal of the one Connecticut-resident defendant, whose sole purpose as a defendant was to thwart removal, Judge Bellis demonstrated a bias against Defendants—admonishing their counsel for not immediately apprising the Court of a United States Supreme Court order denying a stay that was received when sabbath observance was beginning. Affidavit, para. 19. Judge Bellis indicated that she viewed this as a possible violation of Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal". *Id.*

The filing at issue was filed on 6 November 2020. *Id.* In that filing, counsel for Defendants cited the fact "that there was an application for a stay filed with the U.S. Supreme Court" as one of six bases in support of an objection. *Id.* The Supreme Court docket indicates that the application for a stay referenced in that filing was denied on November 5, 2020. However, counsel for Defendants did not receive notice of the denial until 3:57 p.m. on Friday, November 6, 2020. Affidavit, para. 19c. Counsel for Defendants became aware of this notice after submitting the filing and that awareness occurred after sabbath observance, which had begun minutes after the e-mailed denial was sent to Attorney Randazza, who could not apprise the Court himself because he had been denied the ability to appear. *Id.* On the next business day, Monday November 9, 2020, the plaintiffs informed the Court of the denial. *Id.* Judge Bellis acknowledged subsequently learning that the request for a stay was no longer pending. Affidavit, para. 19d. At a hearing on the issue, Judge Bellis insinuated that counsel for Defendants violated his ethical responsibility to be candid with

13

the court:

> with respect to the app -- the application for the stay with the US Supreme Court, what you filed with the Court on that day represented something that, in fact, was not accurate and I -- I would say it would have been incumbent upon you to correct what you had filed. I did learn subsequently that it wasn't correct, but I just think just as we move forward, if it's your or -- or even an innocent -- and I'm not saying it was anything but an innocent mistake, but it would be incumbent upon you to just correct that mistake because I don't want to have continued problems moving forward.

*Id.* Once Plaintiffs beat Defendants to notifying the Court of the denial of the stay, there was nothing for Defendants to do, yet Judge Bellis nonetheless chose to admonish counsel.

Judge Bellis's responses to putative ethical violations have been one-sided, as seen by her subsequent reaction to counsel for Defendants bringing similar and far more disruptive conduct by counsel for plaintiffs to the Court's attention. Affidavit, para. 20. The conduct at issue resulted in the court losing subject matter jurisdiction over certain claims and voided all orders entered regarding certain plaintiffs for a period of more than two years. Affidavit, para. 20b. This conduct had a substantial impact on the above captioned matters that far exceeded the issue that the Court previously admonished counsel for Defendants over. However, despite this, Judge Bellis did not admonish counsel for Plaintiffs. Rather, counsel for Defendants was again admonished by the Court for referencing the Rules of Professional Responsibility in this context. Ultimately, the Court indicated that referencing the Rules of Professional Conduct in filings before the Court could subject counsel to summary disciplinary orders by the Court. The Court indicated that it would rely on Practice Book § 2-45 to bypass the grievance committee which had previously dismissed Judge Bellis's earlier referral of counsel for Defendants regarding the affidavit issue. Affidavit, para. 20c.

This hostility to Defendants carried over into subsequent orders by the Court. At a deposition of a plaintiff in this case, counsel for the plaintiffs attempted to invoke the protections of a stipulated protective order (PO). Affidavit, para. 21b. That protective order permits counsel to designate all or part of a deposition as confidential based upon "a *good faith determination by counsel* so

14

designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. DN. 185.00 at 2-3. (emphasis added). At the start of the deposition a plaintiffs' attorney attempted to designate the entire deposition "Highly Confidential – Attorneys Eyes Only." Affidavit, para. 21b. Plaintiffs concede that this designation occurred "at the beginning of the deposition," and therefore without any knowledge of the actual information that was ultimately elicited. *Id.* Accordingly, plaintiffs' counsel failed to satisfy the PO's good faith determination threshold requirement. Affidavit, para. 21c. Because the PO was not properly invoked, counsel for Defendants believed there was no impediment to using the information disclosed during the deposition, especially information that did not fit any of the categories of information permitted to be designated confidential. Affidavit, para. 21d. Accordingly, prior to the conclusion of the deposition, and based on the information elicited, counsel for the defendants filed a motion for a commission to take the deposition of Hillary Clinton without naming the deponent. *Id.*

Plaintiffs filed a motion requesting sanctions for a purported violation of the PO. Affidavit, para. 21b. In response, Defendants argued that no violation occurred because plaintiffs failed to meet the PO's good faith determination threshold requirement. Affidavit, para. 21. In its order responding to the request for sanctions, the Court ignored Defendants' threshold requirement argument. *Id.* Instead, Judge Bellis recast Defendants' argument as an attack on whether there was good cause to issue the stipulated PO itself, characterized this argument as "frightening," and concluded that Defendants' disclosure of the information at issue was "willful misconduct." *Id.* However, Defendants made no such argument. *Id.* Even if counsel for Defendants technically violated the confidentiality order, sanctions were never appropriate where that violation was based on a good-faith view of the effect of that order and otherwise ensuring that no real confidential information (not even the deponent's name) was being revealed.

15

Judge Bellis has since sanctioned Defendants twice more, with another sanctions motion pending and the actual sanction to be determined. On August 6, 2021 (DN 428.10 & 428.11), the Court sanctioned Defendants for not having produced a "subsidiary ledger" for their accounts. Judge Bellis disregarded the fact that Defendants reasonably relied on their CPA, who provided a declaration in this case, that Free Speech Systems (the only defendant to whom the request was actually directed) does not use subsidiary ledgers. Sanctions were issued against Mr. Jones and all of his companies, even though, at worst, only Free Speech Systems was in violation of the order requiring production of subsidiary ledgers. It is one thing to compel Free Speech Systems to produce something it did not think it actually had based on a good faith interpretation of the Court's order, and it is another thing entirely to sanction four other defendants and to give no reason why an expert CPA's opinion is given no weight, finding the expert "not credible" without taking any live testimony or Plaintiffs' expert having been subjected to cross-examination. Neither did Judge Bellis explain how Plaintiffs were prejudiced when they were given an opportunity to redepose the bookkeeper (but have made little effort to do so since).

Then, on September 30, 2021 (DN 450.20 & 450.21), Judge Bellis sanctioned Defendants following a motion by Plaintiffs seeking sanctions for alleged non-compliance with their discovery requests for Google Analytics and social media analytics. In actuality, those requests were fulfilled in a timely manner. Instead of sanctioning Defendants on the bases proffered by Plaintiffs, Judge Bellis, *sua sponte*, decided that Practice Book § 10-12(a) was violated because the documents were not served on co-defendants who had not sought such discovery. Defendants are unable to find any cases in which a Connecticut court has ruled that Section 10-12(a) means that all produced documents in discovery are "papers" required to be served on all parties, not merely the requesting party. In Federal practice, the rules "only require[] the responding party to produce the requested documents to the requesting party or its representative, not to all parties in the litigation." *Zurich*

16

*Am. Ins. Co. v. BASF Corp.*, 2011 U.S. Dist. LEXIS 162697 at *8 (S.D. Fla. Nov. 4, 2011)(emphasis

in original). Perhaps the Court is right that the Practice Book has a different requirement, but that

sanctions would issue, in the absence of a clear and intentional violation, makes Judge Bellis appear

biased.

Another sanctions motion is pending, with Plaintiffs absurdly claiming that Defendants did

not produce their real trial balances. (DN 457.00). First, the request was only directed to Free

Speech Systems, not all Defendants. Second, the real trial balances were produced—Plaintiffs'

apparent complaint is that they were not given *incorrect* trial balances. If the Court awards sanctions

on this motion, the public will have no other view of Judge Bellis than her being on the Plaintiffs'

team. And, the fact that the plaintiffs are now trying to liquidate all of the above sanctions, to obtain

a default, shows how this whole process is being abused.

## ARGUMENT

The foregoing is just a sampling of the perception of prejudice created by Judge Bellis's

conduct in this matter. This prejudice pervades all aspects of this case creating an appearance of

impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Practice

Book §§ 1-22, 1-23 and Conn. Gen. Stat. § 51-183 provide that any party may, by motion and

affidavit, establish that a judge currently presiding over a matter is disqualified from acting because

of an appearance of judicial impropriety. A claim of an appearance of impropriety under Canon 1

Rule 1.2 of the Connecticut Code of Judicial Conduct is fundamentally different from a claim of

actual bias. *Abington Ltd. Pshp. v. Heublein*, 246 Conn. 815, 819 (1998).

> The Code of Judicial Conduct requires a judge to disqualify himself or herself in a
> proceeding in which the judge's impartiality might reasonably be questioned. The
> reasonableness standard is an objective one. Thus, the question is not only whether
> the particular judge is, in fact, impartial but *whether a reasonable person would
> question the judge's impartiality on the basis of all the circumstances. . . Even in
> the absence of actual bias, a judge must disqualify h[er]self in any proceeding in
> which h[er] impartiality might reasonably be questioned*, because the appearance

17

and the existence of impartiality are both essential elements of a fair exercise of judicial authority.

*State v. Webb*, 238 Conn. 389, 460-61, *aff'd after remand*, 252 Conn. 128, *cert. denied*, 531 U.S. 835 (2000) (citations omitted; internal quotation marks omitted; emphasis added). "The question is not whether the judge is impartial in fact." *Heublein*, at 820. "To prevail on [a] claim of a violation of this canon, the [moving party] need not show actual bias. The [moving party] has met its burden if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety." *Id.* at 819-21.

## I.    A Reasonable Person Would Question the Court's Impartiality

A reasonable person would question the court's impartiality based on (1) the alleged third-party threat against the court; (2) Judge Bellis's sanctioning Defendants following the 14 June broadcast; (3) Judge Bellis's indicating the Court would use Practice Book §2-45 to bypass the grievance committee and subject Counsel for Defendants to summary disciplinary orders; and (4) the perception of prejudice created by Judge Bellis's conduct towards Defendants following the appeal of the sanction order.

In addition, a reasonable person would question Judge Bellis's impartiality based on other matters over which she has presided. Prior to these matters, Judge Bellis was the presiding jurist in *D'Avino, et al. v. Starks*, Case No. FBT-CV-15-6048108-S, which were the claims of various Sandy Hook decedents against the estate of Nancy Lanza. That matter, which was consolidated with eight other matters, included many of the same plaintiffs as in this case (nominally, though in fiduciary capacity), represented by the same firm. Similarly, Judge Bellis is the presiding jurist over *Soto, et al. v. Bushmster Firearms Int'l, LLC,* Case No. UWY-CV15-60500025-S, which is claims of various Sandy Hook decedents against the gun manufacturer and other parties. That matter, which is ongoing, also includes many of the same plaintiffs as in this case (again, nominally), represented

18

by the same firm. There is no reason for Judge Bellis to be the Sandy Hook judge, exposed to arguments and evidence in other cases that would tend to color any jurist's opinion of defendants accused of calling Sandy Hook a hoax.

Courts use an objective rather than a subjective standard in deciding whether there has been a violation of Canon 1 Rule 1.2. This objective standard is guided by "two well established propositions concerning the appearance of judicial impropriety." *Heublein*, at 822. "The first proposition is that the prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process." *Id.* "The judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved." *Id.* at 823. "The duty to avoid creating an appearance of impropriety is one of taking reasonable precautions to avoid having a negative effect on the confidence of the thinking public in the administration of justice." *Id.* (internal quotation marks omitted.) The second proposition

> requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. . . Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. . . Yet *drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety.*

*Id.* at 823-24. (citations omitted; internal quotations omitted; emphasis added).

### a. Judge Bellis's Personal Involvement in this Matter via the Alleged Threat Against Her Created the Appearance of Impropriety

"It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted. *State v. Echols*, 170 Conn. 11, 13 (1975), quoting *Glasser v. United States*, 315 U.S. 60, 82 (1942). In Abington Ltd. Pshp. v. Heublein, the

19

Connecticut Supreme Court held that after a judge performed an *ex parte* site visit to a property that was the subject of the matter before him, "a well-informed, thoughtful and objective observer reasonably could decide that there was. . . a significant risk of a judicial impropriety." *Heublein*, at 826. In that case, the trial judge's site visit personally involved him in the subject matter of the litigation before the court, however, the judge refused to recuse himself based "entirely on his determination that his *ex parte* site visit had not in fact caused him to be prejudiced in any way." *Id.* at 821, 824. The Connecticut Supreme Court reasoned that, "the record in the case contain[ed] persuasive evidence of an appearance of impropriety," and that the trial judge abused his discretion by failing to recuse himself. *Id.* at 824. The Supreme Court reasoned further that a "judge's lack of knowledge of a disqualifying circumstance does not eliminate the risk that h[er] impartiality might reasonably be questioned by other persons." *Heublein*, at 825.

Courts scrutinize judicial conduct from inception through a full and fair hearing on the merits to determine whether a party "received a fair trial. . . before an impartial court, and that the core danger of judicial vindictiveness has not been realized." *State v. Herbert*, 99 Conn. App. 63, 69 (2007). Here, Judge Bellis conduct is similar to the trial judge in <u>Heublein</u>, where the Connecticut Supreme Court held an objective observer could conclude there was a risk of judicial impropriety. In <u>Heublein,</u> the trial judge became personally involved with the subject matter of the litigation. In the instant matter, Defendants' speech is the subject matter of the entire litigation. The alleged third-party threat against Judge Bellis has drawn her, albeit unwillingly, into the subject matter of this litigation. If the only information before the court were the notification by the Connecticut State police of the FBI investigation, then the prejudice realized in <u>Heublein</u> might be absent here. However, that is not the case.

Plaintiffs' complaint and subsequent arguments on the record allege that when Defendants speak it is designed to activate his audience to take action against the subject of the speech. Plaintiffs

20

trot out an FBI "Field Intelligence Bulletin" of dubious reliability to claim that when Defendants speak, the subject of that speech is "very likely"—meaning an 80-95% chance—to be targeted by Defendants' audience. As proof of this plaintiffs point to "Pizzagate." Had Judge Bellis rejected this correlation implies causation argument, then again the risk of the perception of judicial impropriety found in Heublein might not be present.

Unfortunately, Judge Bellis did not reject this logical fallacy. Instead, she embraced it. Based on this argument, Judge Bellis found the 14 June broadcast to be a "calculated act of rage for his viewing audience," determining via a personal viewing of the broadcast that Alex Jones stated, "I'm going to kill," despite this phrase not appearing in any transcript before the court. Affidavit, para. 15jiii2. Moreover, Judge Bellis relied on this argument to characterize the broadcasts as "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. This demonstrates Judge Bellis's true unfiltered view of Defendants commenting on the proceedings in this case. It is against this backdrop that the third-party threat must be evaluated. Clearly, in that context, the arguments advanced by the plaintiffs and Judge Bellis's endorsement of them creates the appearance of impropriety. Here, Judge Bellis, without an evidentiary hearing, concludes that when Defendants speak it is "indefensible, unconscionable, despicable, and possibly criminal behavior," based largely on the plaintiffs' "Pizzagate" rational. Employing an objective standard, there is no way to conclude that a reasonable person knowing all these circumstances would not question Judge Bellis's impartiality following the alleged third-party threat. To find otherwise is tantamount to collapsing the appearance of impropriety standard into a demand for proof of actual impropriety.

**b. Judge Bellis's Rulings Over the Course of Discovery Compliance Reveal a High Degree of Antagonism, Creating the Appearance That Fair Judgment Is Impossible, Thereby Requiring Her Disqualification.**

"In assessing a claim of judicial bias, [Connecticut Courts] are mindful that adverse rulings,

21

alone, provide an insufficient basis for finding bias even when those rulings may be erroneous." *Massey v. Branford*, 118 Conn. App. 491, 502, *cert. denied*, 295 Conn. 913, (2010). Adverse rulings alone "cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required." *Liteky v. United States*, 510 U.S. 540, 555 (1994). However, adverse rulings "*may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*; *Schimenti v. Schimenti*, 181 Conn. App. 385, 395 (2018).

In Berger v. United States, the United States Supreme Court held that the comments of the district judge revealed the degree of antagonism necessary to make fair judgement impossible and that the judge should have recused himself based on the alleged comments. *Liteky*, at 555-56; *Berger v. United States*, 255 U.S. 22, 36 (1921). The Supreme Court reasoned that when seeking recusal "the reasons and facts for the belief the litigant entertains . . . must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.*; at 33-4. The Supreme Court went on to conclude that, "[t]he facts and reasons" stated by the defendants in support of recusal "are not frivolous or fanciful but substantial and formidable and they have relation to the attitude of [the] Judge's ... mind toward defendants." *Id.*

Almost a century later, Connecticut Courts still follow the holding of Berger. In Schimenti v. Schimenti, the Connecticut Appellate Court held that a trial court judge should have recused herself from hearing a marriage dissolution proceeding. *Schimenti*, at 403-04. The appellate court reasoned that, while "a trial judge need not leave insights and common sense derived from her life's experience at the courthouse door. . . attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing." *Id.* at 402. By denying a request for an evidentiary hearing, "the trial judge did not follow her prescribed decision-making pathway but,

22

instead, relied exclusively on her own prejudices born of her life experiences. The court's proper

focus should have been on the well-established decisional pathway." *Id.* at 403. The appellate court

concluded by observing that, "[t]he floor established by the Due Process Clause clearly requires a

fair trial in a fair tribunal . . . In sum, the responsibility of the court in hearing a disputed matter is

to act with impartiality. This requirement entails not only being impartial but also acting in a manner

that projects impartiality." *Id.* (citation omitted; internal quotation marks omitted.) Here, Judge

Bellis did not hold an evidentiary hearing before terminating the anti-SLAPP motion and she did

not hold any evidentiary hearings before awarding any sanctions.

      Refusing to hold evidentiary hearings, the "well established decisional pathway" employed

by impartial courts, is not the only way Connecticut Courts suss out when a trial judge's adverse

rulings demonstrate a level of antagonism that makes a fair judgment impossible. Courts also look

to evidence that the court has prejudged a party's truthfulness. In Cameron v. Cameron, the

Connecticut Supreme Court reasoned that "[t]he trial judge may be under a duty to reprimand

counsel in order to protect the rights of litigants" and "also has a duty to see that no falsehood or

other fraud is perpetrated in court," however, "[o]nce a [trial judge] declares that [s]he believes a

party or a witness has been deceitful . . . she cannot continue to preside in h[er] role of impartial

arbiter." 187 Conn. 163, 170 (1982).. While minor criticisms to correct erroneous statements on an

affidavit may be justified, once a judge declares a belief a party has been deceitful, she must recuse

herself.

      Here, Judge Bellis adverse rulings against Defendants include both denying evidentiary

hearings and taking actions indicating that she believed that either Defendants or their counsel (or

their independent expert) had been deceitful. These actions continued on after the Grievance

Committee dismissed the Court's referral regarding the affidavit issue. Before 10 April 2019 the

position Defendants found themselves in as a result of Judge Bellis's adverse rulings were entirely

23

facially neutral. These adverse rulings alone are an insufficient basis for disqualification. However, on 10 April Judge Bellis repeated so frequently that Defendants had now substantially complied with the discovery orders that even plaintiffs' counsel remarked "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e. Up to this point, Defendants' special motion to dismiss and the plaintiffs request for a sanction precluding it, hinged on substantial compliance with the court's discovery orders. However, at this time the issue regarding a signature on an affidavit developed.

Judge Bellis's reaction to the affidavit signature issue is analogous to the reaction of the trial judge in Cameron, which went beyond merely correcting the issue and demonstrated a belief that the defendant and or counsel were attempting to perpetrate a fraud on the court. By the time Judge Bellis was ready to address the affidavit issue, the matter had already been referred to the grievance counsel and a corrected affidavit submitted. However, Judge Bellis referred the matter to the grievance counsel a second time and then *sua sponte* solicited an argument from the plaintiffs for sanctions against Defendants. This was without holding an evidentiary hearing regarding the creation of the original affidavit.

Judge Bellis pressed the plaintiffs to request a sanction. When the plaintiffs refused, Judge Bellis indicated that in light of the plaintiffs refusing to argue for sanctions, the court was satisfied with not taking any further action. However, later when ultimately sanctioning Defendants Judge Bellis explicitly referenced the affidavit issue. As the United States Supreme Court reasoned in Liteky, the focus is on the impact of adverse rulings, not merely the presence of adverse comments in the record. Accordingly, in the context of judicial disqualification, actions speak louder, or at least as loud, as words. And, the sanctions orders highlight these actions, once for a misunderstanding regarding the protective order, once for a differing understanding of what was supposed to be produced, and once for a *sua sponte* different interpretation of the rules where no

24

Connecticut case is known to have imposed a different requirement than in Federal practice.

This conclusion accords with the second proposition the Connecticut Supreme Court advanced in Heublein. In the context of disqualification due to the appearance of impropriety, requiring that a judge make comments on the record that explicitly demonstrate prejudice against a party would collapse the appearance of impropriety standard into a demand for proof of actual impropriety. Accordingly, evidence that Judge Bellis prejudged Defendants' truthfulness is found in her *sua sponte* incorporation of the affidavit issue as an additional basis for sanctioning Defendants and in rejecting Defendants' expert. This is especially true given that Judge Bellis did so both times without an evidentiary hearing.

The Grievance Committee's decision to dismiss the complaint arising from the affidavit issue only emphasizes the fact that Judge Bellis's reaction, at a minimum, creates the appearance of impropriety. The Grievance Committee reached their conclusion following an adversarial hearing at which both sides were afforded a meaningful opportunity to be heard. Affidavit para. 17. Like in Cameron, where the Supreme Court reasoned that once a trial judge indicates that she believes a party deceitful that judge cannot continue to preside over a matter, here Judge Bellis's conduct indicated a belief that Defendants were in some way deceitful.

Moreover, over a year after the Grievance Committee dismissed the complaint Judge Bellis continued to reference the affidavit issue, demonstrating a continued prejudice against Defendants. At a 6 May 2021 status conference, Judge Bellis threatened to refer Counsel for Defendants to the Grievance Committee again. Affidavit para. 19a. This time the conduct at issue was Counsel for Defendants' failure to violate his observance of the sabbath to inform the Court he received notice of a denial of a stay application. Affidavit para. 19c. When Counsel for Defendants referenced the stay in a filing, the reference to the status of the stay was correct based upon the available information. Despite this, Judge Bellis admonished Counsel for Defendants even though the Court

25

was made aware of the denial on the next business day. *Id.*

The Court's continued prejudice against Defendants was not confined to this single exchange. Given the Court's 6 May 2021 admonishment—in particular the importance it placed on counsel for Defendants not correcting a filing that contained a purported misrepresentation of the status of a request for a stay that lingered for a single weekend—counsel for Defendants raised similar conduct by Counsel for plaintiffs via a motion. That misconduct had a far more egregious impact on the litigation. Affidavit para. 20. Rather than similarly admonishing Counsel for Plaintiffs, Judge Bellis indicated that "[a]ny further such usage of the Rules of Professional Conduct by counsel in filings in this civil action shall result in immediate action by the court. See Practice Book §2-45." Affidavit para. 20c. Importantly, §2-45 permits a court to bypass the Grievance Committee and impose summary disciplinary orders without a complaint or hearing. Practice Book §2-45. Given the prior history in which Judge Bellis's referral of Counsel for Defendants to the grievance committee was dismissed, it is difficult to interpret this reference as anything other than threatening Counsel for Defendants with summary sanctions for referencing the Rules of Professional Responsibility.

Judge Bellis's reaction—both immediate and sustained— to the affidavit issue alone creates the appearance of impropriety that would cause an objective observer to question the courts impartiality. However, Judge Bellis based her decision to sanction Defendants on more than just the affidavit issue. Just prior to sanctioning Defendants in 2019, Judge Bellis referenced the child pornography issue and the 14 June broadcast as additional bases for the sanction. On information and belief, an evidentiary hearing into the inadvertent production of discovery containing child pornography would have shown the following: At plaintiffs' request, Judge Bellis ordered metadata for 58,000 emails be produced in 2 weeks. Affidavit, para. 14a. Plaintiffs then provided this data to a paid "electronic storage information expert" that spent 15 days reviewing the data. Affidavit, para.

26

14b. This was longer than the time allotted by Judge Bellis for Defendants to produce this material. In those 15 days, the experts were able to detect a single image of child pornography. *Id.* Next, the FBI spent an additional 6 days to find 11 additional emails containing child pornography. Affidavit, para. 14c-d. In total, it took 21 days, at unknown cost, for paid experts and the federal government to detect these images. Had Defendants attempted to complete this type of review prior to providing this material to the plaintiffs, they would have missed the court ordered discovery deadline by over 7 days. Undoubtedly, this would have been deemed another mark of "obfuscation and delay," most likely determined without a hearing to ascertain the reason why Defendants were not able to meet the 2-week production deadline.

Similarly, there was no evidentiary hearing regarding the 14 June Broadcast. At the 18 June hearing, plaintiffs announced their intention to file, at some future date, a motion regarding the hearing that would request sanctions. Judge Bellis declined this invitation to follow the "well-established decisional pathway" of an evidentiary hearing and meaningful opportunity to be heard, opting instead for counsels' best extemporaneous analysis sans evidence. The conflicting nature of Judge Bellis's analysis of the broadcast, demonstrates why the court in Schimenti favored the "well-established decisional pathway" of an evidentiary hearing over a judge relying on insights and common sense derived from her life's experience. Judge Bellis applied her own prejudices to what she assumed were the facts of the 14 June broadcast. For example, Judge Bellis claims to have heard "I'm going to kill" in the broadcast, despite it not appearing in any transcript before the court. Yet, when counsel for Defendants attempted to characterize the broadcasts, Judge Bellis prevented this without an evidentiary hearing.

In Schimenti, the appellate court stated that when a trial judge issues adverse rulings in this way it abandons its responsibility to act in a manner that projects impartiality. Judge Bellis's decision to assume facts, multiple refusals to hold evidentiary hearings, and rely on prejudices to

27

justify a sanction impacting the substantive rights of Defendants clearly falls far below the protective floor established by the Due Process Clause. Judge Bellis's rulings over the course of this litigation culminating in the imposition of sanctions reveals a high degree of antagonism. Notably, Judge Bellis admonished counsel for Defendants for conduct that had a minimal impact on the above captioned matters and then subsequently shielded Counsel for plaintiffs for similar conduct that had a far more substantial effect. This is evidence of actual bias. However, without even considering whether the record in this case contains evidence of actual bias, it is clear that there is an appearance of impropriety that would make an objective observer conclude it is not possible for Defendants to receive fair judgment.

Fair judgment requires a willingness to hear and evaluate the arguments of each side before executing judgment. She has repeatedly failed to do so. Therefore, Judge Bellis must be disqualified from this matter.

## CONCLUSION

For all these reasons, Defendants respectfully requests that the Court disqualify Judge Bellis from this matter and substitute another judge to hear it.

## CERTIFICATION OF COUNSEL

The undersigned Counsels for Defendants hereby certify that this motion is made in good faith.

Respectfully Submitted,

By: /s/ Jay M. Wolman /s/
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103 P: 702-420-2001
F: 305-437-7662
jmw@randazza.com

*Counsel for Defendants Alex E. Jones, Free*

28

*Speech Systems, LLC, Infowars, LLC,
Infowars Health, LLC, and Prison Planet
TV, LLC*

And

BY: /s/ Norman A. Pattis /s/
Norman A. Pattis,
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017 F: 203-393-9745
npattis@pattisandsmith.com

*Counsel for Defendants Free Speech
Systems, LLC, Infowars, LLC, Infowars
Health, LLC, and Prison Planet TV, LLC*

## ORDER

The foregoing motion having been heard, it is hereby ordered: GRANTED/DENIED

_____ , J.

## CERTIFICATION

I hereby certify that a copy of the above was mailed or electronically delivered on this day to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
mcerame@brignole.com
*Attorneys for Defendant*
*Genesis Communications Network, Inc*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT H

ORDER   421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

11/4/2021

ORDER

ORDER REGARDING:
10/20/2021 519.00 MOTION FOR ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

The request for a hearing is denied. Practice Book § 1-23 does not mandate that a hearing be held on a motion to disqualify. Where there is a factual dispute involved in a claim for disqualification, however, an evidentiary hearing may be required. Szypula v. Szypula, 2 Conn. App. 650, 655-56 (1984). Here, there is no dispute as to the underlying facts that give rise to this motion, as the evidence submitted by the defendants primarily consists of transcripts and orders contained in the official court file. "Vague and unverified assertions of opinion, speculation and conjecture cannot support a motion to recuse. . . . In addition, it is clear that adverse rulings by the judge do not amount to evidence of bias sufficient to support a claim of judicial disqualification." (Internal quotation marks omitted.) Rule 1.2 of the Code of Judicial Conduct states as follows: A judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." "The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . [A] judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned . . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all of the circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) Papa v. New Haven Federation of Teachers, 186 Conn. 725, 745-46 (1982); see also State v. Rizzo, 303 Conn. 71, 118-19, cert. denied, 133 S. Ct. 133 (2012); Bonelli v. Bonelli, 214 Conn. 14, 18-19 (1990) (totality of circumstances test). The burden of establishing judicial bias, partiality, or impropriety rests on the movants. The motion is denied as the movants have not met their burden.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT I

| Docket No. FBT-CV-18-6076475-S | : | **JUDICIAL DISTRICT** |
| :--- | :--- | :--- |
| : | | |
| **ERICA LAFFERTY, et al.** | : | **OF FAIRFIELD** |
| : | | |
| **v.** | : | **AT BRIDGEPORT** |
| : | | |
| **ALEX JONES, et al.** | : | **JANUARY 24, 2019** |

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO ALEX JONES

**1. Identify:**

**a. All business organizations and/or other entities in which you have ownership and/or control**
**b. The officers or members of all organizations and/or entities responsive to part (a)**
**c. The shareholders or other owners of all organizations and/or entities responsive to part (a)**
**d. The employees of all organizations and/or entities responsive to part (a)**

ANSWER:
a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other entities: Free Speech Systems LLC, InfoWars LLC, InfoWars Health LLC, and PrisonPlanet TV LLC

b. I am the sole officer and member of all the organizations and/or entities responsive to part (a).

c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

d. The employees of all organizations and/or entities responsive to part (a) are attached hereto as Exhibit 1. Free Speech Systems has the employees listed in Exhibit 1, and the Department heads/managers are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:
Infowars.com, PrisonPlanet.com, prisonplanet.tv

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_____ Dated: 3-29-19
Alex Jones

Subscribed and Sworn before me:

_____ Dated: 3-29-19
Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791388

| | | |
|---|---|---|
| Docket No. FBT-CV-18-6076475-S | : | **JUDICIAL DISTRICT** |
| | : | |
| **ERICA LAFFERTY, et al.** | : | **OF FAIRFIELD** |
| | : | |
| **v.** | : | **AT BRIDGEPORT** |
| | : | |
| **ALEX JONES, et al.** | : | **JANUARY 24, 2019** |

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO FREE SPEECH SYSTEMS LLC, INFOWARS, LLC, PRISON PLANET TV LLC and INFOWARS HEALTH. LLC

**1. Identify:**
**a. Your officers**
**b. Your members**
**c. Your shareholders or other owners**
**d. Your employees**
**e. All business organizations and/or other entities in which you have ownership and/or control**

ANSWER:
a. b. & c . I, Alex Jones, am the sole owner, officer and member of each of the above named LLCs.

d. Only Free Speech Systems LLC has employees those employees are attached hereto as Exhibit 1. The Department heads/managers of Free Speech Systems LLC are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

**2. Identify employees responsible for marketing data, research, and/or analytics concerning Infowars, Infowars.com, The Alex Jones Radio Show, and Alex Jones. If such responsibilities were outsourced our contracted out, identify the individual and/or entities to whom they were contracted.**

Shooting, Sandy Hook Investigation, Non-Governmental Investigation, Sandy Hook Families, or Sandy Hook Hoax Theory, or otherwise contain content concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:
As to Free Speech Systems LLC only: Infowars.com, PrisonPlanet.com, prisonplanet.tv. There are dozens of other URLs, but those are either not active or are set up to act as pointer (redirect) site to the main Info Wars website. A list can be assembled, there are no such URLs referencing Sandy Hook or mass shootings.

The other entities have no URLs.

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_____ Dated: 3-29-19

Alex Jones as member of Infowars LLC, Free Speech Systems LLC, Infowars Health LLC, Prison Planet TV LLC

Subscribed and Sworn before me:

_____ Dated: 3-29-19

Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT J

```
NO. X06-UWY-CV-18-6046436S    )   SUPERIOR COURT
                              )
ERICA LAFFERTY, ET AL,        )   COMPLEX LITIGATION DOCKET
                              )
VS.                           )   AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL,      )   JUNE 24, 2021
                              )
_____ )
                              )
NO. X-06- UWY-CV18-6046437-S  )   SUPERIOR COURT
                              )
WILLIAM SHERLACH,             )   COMPLEX LITIGATION DOCKET
                              )
VS.                           )   AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL.      )   JUNE 24, 2021
                              )
_____ )
                              )
NO. X06-UWY-CV-18-6046438S    )   SUPERIOR COURT
                              )
WILLIAM SHERLACH, ET AL.,     )   COMPLEX LITIGATION DOCKET
                              )
VS.                           )   AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL.      )   JUNE 24, 2021
```

-----------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF
FREE SPEECH SYSTEMS, LLC
BY
MICHAEL ZIMMERMANN
JUNE 24, 2021

-----------------------------------

        ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL ZIMMERMANN,

   produced as a witness at the instance of the PLAINTIFF, and

   duly sworn, was taken in the above-styled and -numbered cause

   on JUNE 24, 2021, from 9:00 a.m. to 4:10 p.m., before

1   Rosalind Dennis, Notary in and for the State of Texas, reported

2   by machine shorthand, appearing remotely from Dallas, Texas,

3   pursuant to the Federal Rules of Civil Procedure and the

4   provisions stated on the record or attached hereto.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4        CHRISTOPHER M. MATTEI, ESQ.
          MATTHEW S. BLUMENTHAL, ESQ.
 5        KOSKOFF KOSKOFF & BIEDER, PC
          350 Fairfield Avenue, Suite 501
 6        Bridgeport, Connecticut 06604
          Cmattei@koskoff.com
 7        mblumenthal@koskoff.com
          (203) 336-4421
 8

 9   FOR THE DEFENDANTS:

10        JAY MARSHALL WOLMAN, ESQ.
          RANDAZZA LEGAL GROUP
11        100 Pearl Street
          14th Floor
12        Hartford, Connecticut 06103
          jmw@randazza.com
13        (702) 420-2001

14
     ALSO PRESENT:
15        Joel Raguso - Videographer

16

17

18

19

20

21

22

23

24

25
```

```
 1    10-minute break, that'd be --

 2               THE WITNESS:  Yeah.  We can do 10, roll for

 3    another hour or so, and then do that.

 4               MR. MATTEI:  Great.  Thank you.

 5               THE WITNESS:  Okay.

 6               THE VIDEOGRAPHER:  We are off the record.  The

 7    time to 16:13 UTC.

 8          (Break taken from 11:13 a.m. to 11:25 a.m.)

 9               THE INTERPRETER:  We are on the record.  The

10    time is 16:25 UTC.

11                        EXAMINATION

12    BY MR. MATTEI:

13       Q.   Mr. Zimmermann, did anybody provide you with any

14    information during the break?

15       A.   No.

16       Q.   Okay.  All right.  So, Mr. Zimmermann

17    Free Speech Systems is owned and operated by Alex Jones,

18    correct?

19       A.   That's correct.

20       Q.   And does he have authority over all Free Speech

21    Systems operations?

22       A.   That's correct.

23       Q.   Okay.  He is the CEO and owner?

24       A.   That's correct.

25       Q.   And does he have the authority to hire and fire
```

Case 22-05012960-DOC 150-2 Filed 08/08/22 Entered 08/08/22 16:44:00 Page 238 of
Michael Zimmerman 30(b)(6), Confidential
280
June 24, 2021

Case 22-05012960-DOC 150-2 Filed 08/08/22 Entered 08/08/22 16:44:00 Page 238 of 280
Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

1    anybody of his choosing?

2        A.    That's correct.

3        Q.    And does he have authority to overrule any decision

4    made by a subordinate?

5        A.    That's correct.

6        Q.    And he has ultimate authority over Free Speech

7    finances?

8        A.    That's correct.

9        Q.    And he is not accountable to a board of directors or

10   any governing authority, correct?

11       A.    Correct.

12       Q.    When did Free Speech Systems hire its first employee?

13       A.    The company maintains records.  I don't have

14   information on that with me today?

15       Q.    Can Free Speech Systems approximate the year that it

16   first hired an employee?

17       A.    Approximately 2007, 2008.

18       Q.    How many people are employed by Free Speech Systems

19   presently?

20       A.    Presently, approximately 80.

21       Q.    Who within Free Speech Systems reports directly to

22   Alex Jones?

23       A.    Would be Blake Roddy for e-commerce.  Melinda Flores

24   for, accounting, Michelle Fruge for customer service.  Rob Dew

25   as the news director.

```
1   NO. X06-UWY-CV-18-6046436S      )   SUPERIOR COURT
                                    )
1   ERICA LAFFERTY, ET AL,          )   COMPLEX LITIGATION DOCKET
                                    )
1   VS.                             )   AT WATERBURY
                                    )
1   ALEX EMRIC JONES, ET AL,        )   JUNE 24, 2021
                                    )
1   _____)
                                    )
1   NO. X-06- UWY-CV18-6046437-S    )   SUPERIOR COURT
                                    )
1   WILLIAM SHERLACH,               )   COMPLEX LITIGATION DOCKET
                                    )
1   VS.                             )   AT WATERBURY
                                    )
1   ALEX EMRIC JONES, ET AL.        )   JUNE 24, 2021
                                    )
1   _____)
                                    )
1   NO. X06-UWY-CV-18-6046438S      )   SUPERIOR COURT
                                    )
1   WILLIAM SHERLACH, ET AL.,       )   COMPLEX LITIGATION DOCKET
                                    )
1   VS.                             )   AT WATERBURY
                                    )
1   ALEX EMRIC JONES, ET AL.        )   JUNE 24, 2021
```

15                  REPORTER'S CERTIFICATION

16            DEPOSITION OF MICHAEL ZIMMERMANN

17                       JUNE 24, 2021

18

19       I, Rosalind Dennis, Notary in and for the State of Texas,

20   hereby certify to the following:

21       That the witness, MICHAEL ZIMMERMANN, was duly sworn by

22   the officer and that the transcript of the oral deposition is a

23   true record of the testimony given by the witness;

24       That the original deposition was delivered to Mr. Mattei.

25       That the amount of time used by each party at the

```
 1  deposition is as follows:

 2  MR. MATTEI      .....05 HOUR(S): 23 MINUTE(S)
    MR. WOLMAN      .....00 HOUR(S): 26 MINUTE(S)
 3

 4      That pursuant to information given to the deposition

 5  officer at the time said testimony was taken, the following

 6  includes counsel for all parties of record:

 7  Mr. Mattei                    Attorney for the Plaintiff.

 8  Mr. Wolman                    Attorney for the Defendant.

 9      I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14      Certified to by me this 12th day of July, 2021.

15

16

17                          ROSALIND DENNIS
                            Notary in and for the
18                          State of Texas
                            Notary:  129704774
19                          My Commission Expires:  10/8/2022
                            US LEGAL SUPPORT
20                          8144 Walnut Hill Lane
                            Suite 120
21                          Dallas, Texas 75231
                            214-741-6001
22                          214-741-6821 (FAX)
                            Firm Registration No. 343
23

24

25
```

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

IN RE:                              §           Case No. 22-60043
                                    §
FREE SPEECH SYSTEMS, LLC,           §           Chapter 11 (Subchapter V)
                                    §
        Debtor.                     §

# EXHIBIT K

NO. XO6-UWY-CV-18-6046436-S

_____
ERICA LAFFERTY, ET AL.,              )SUPERIOR COURT
                                     )COMPLEX LITIGATION
                                     )AT WATERBURY
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____  )
NO. X06-UWY-CV-18-6046437-S          )SUPERIOR COURT
                                     )COMPLEX LITIGATION
WILLIAM SHERLACH                     )DOCKET AT WATERBURY
                                     )
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____  )
NO. X06-UWY-CV-18-6046438-S          )SUPERIOR COURT
                                     )COMPLEX LITIGATION
WILLIAM SHERLACH, ET AL.             )DOCKET AT WATERBURY
                                     )
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____  )

            VIDEOTAPED DEPOSITION OF ALEX EMRIC JONES

                        (CONFIDENTIAL)

DATE:            April 5, 2022

TIME:            9:37 a.m.

HELD AT:         Koskoff Koskoff & Bieder
                 350 Fairfield Avenue
                 Bridgeport, Connecticut

    By:          Sarah J. Miner, RPR, LSR #238

Alex Emric Jones  Confidential
April 05, 2022

```
 1  A P P E A R A N C E S:

 2  For the Plaintiffs:

 3  Christopher M. Mattei, Esq.
    Matthew S. Blumenthal, Esq.
 4  Alinor Sterling, Esq.
    Koskoff Koskoff & Bieder
 5  350 Fairfield Avenue, Suite 501
    Bridgeport, Connecticut  06604
 6

 7  For Alex Emric Jones, Infowars, LLC, Free Speech
    Systems, LLC, Infowars Health, LLC and Prison
 8  Planet TV, LLC:

 9  Norman A. Pattis, Esq.
    Pattis & Smith, LLC
10  383 Orange Street, First Floor
    New Haven, Connecticut  06511

11

12  For Genesis Communications Network, Inc.:
     (Appearing via Zoom)
13
    Mario Kenneth Cerame, Esq.
14  Brignole, Bush & Lewis
    73 Wadsworth Street
15  Hartford, Connecticut  06106

16  Also Present:

17  Pritika Seshadri

18

19

20

21

22

23

24

25
```

```
 1        A   Yes.

 2        Q   You were previously married to Kelly

 3   Jones?

 4        A   Yes.

 5        Q   I understand that you arrived at our

 6   building today with somebody who was operating a

 7   digital camera device.  Is that right?

 8        A   You mean a phone?

 9        Q   Well, did you arrive at our building with

10   somebody who was filming you?

11        A   Yes, with a phone, yes.

12        Q   Who is that?

13        A   That is just one of the crew members.

14        Q   What is his name?

15        A   He is a new guy.  I forget his name.  It

16   is Reese something.  If you want, I can call him

17   and find out who.

18        Q   He traveled with you from Texas?

19        A   Yes.

20        Q   For the purpose of filming you?

21        A   Just documenting in case anything

22   happened, yeah.

23        Q   Do you ever intend to publish the footage

24   that he shoots on one of your broadcasts after this

25   deposition?
```

Alex Emric Jones   Confidential
April 05, 2022

```
 1        A    I don't know.

 2        Q    Okay.

 3        A    Probably not.

 4        Q    But you wanted to be prepared to do that?

 5        A    Yes.

 6        Q    And part of the reason you want to be

 7   prepared to do that is because you have been

 8   raising money from your audience and you advised

 9   them that you need their funds to help finance your

10   litigation.  Correct?

11        A    Yes.

12        Q    You didn't tell them that you sold the

13   house in November, did you?

14             MR. PATTIS:  Objection as to form.

15             THE WITNESS:  Them?

16   BY MR. MATTEI:

17        Q    Your audience?

18        A    I did, yes.

19        Q    You told them how much you sold it for?

20        A    I believe I told them what I was able to

21   get from it, $3 million.  I know that was the money

22   we got from it.  I don't know the exact amount

23   after all the realty stuff.

24             MR. MATTEI:  Bring up Exhibit 1.

25   BY MR. MATTEI:
```

Alex Emric Jones   Confidential
April 05, 2022

 1              C E R T I F I C A T E

 2      I hereby certify that I am a Notary Public, in

 3   and for the State of Connecticut, duly commissioned

 4   and qualified to administer oaths.

 5      I further certify that the deponent named in

 6   the  foregoing deposition was by me duly sworn and

 7   thereupon testified as appears in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13      I further certify that I am neither of counsel

14   nor related to either of the parties to said suit,

15   nor of either counsel in said suit, nor am I

16   interested in the outcome of said cause.

17      Witness my hand and seal as Notary Public the

18   10th day of April, 2022.

19

20

21   _____
     Sarah J. Miner, RPR, LSR #238
22   Notary Public

23   My Commission Expires:

24   November 30, 2022

25

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT L

NO. XO6-UWY-CV-18-6046436-S

_____
ERICA LAFFERTY, ET AL.,              )SUPERIOR COURT
                                     )COMPLEX LITIGATION
                                     )AT WATERBURY
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____        )
NO. X06-UWY-CV-18-6046437-S          )SUPERIOR COURT
                                     )COMPLEX LITIGATION
WILLIAM SHERLACH                     )DOCKET AT WATERBURY
                                     )
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____        )
NO. X06-UWY-CV-18-6046438-S          )SUPERIOR COURT
                                     )COMPLEX LITIGATION
WILLIAM SHERLACH, ET AL.             )DOCKET AT WATERBURY
                                     )
v.                                   )
                                     )
ALEX EMRIC JONES, ET AL.             )
_____        )

            CONTINUED VIDEOTAPED DEPOSITION OF
                    ALEX EMRIC JONES
                       VOLUME II
                     (CONFIDENTIAL)

DATE:              April 6, 2022

TIME:              9:37 a.m.

HELD AT:           Koskoff Koskoff & Bieder
                   350 Fairfield Avenue
                   Bridgeport, Connecticut

     By:           Sarah J. Miner, RPR, LSR #238

```
 1              successful.

 2    BY MR. MATTEI:

 3         Q    You are the -- well, they are the reason

 4    that you can, right, because you take their money.

 5    Right?

 6              MR. PATTIS:  Objection.

 7              MR. CERAME:  Objection.

 8              THE WITNESS:  I think when you air to

 9         this audience they are more supportive

10         because they understand who you are and

11         what you are.

12    BY MR. MATTEI:

13         Q    Well, you have already been using this

14    litigation to raise as much money from them as

15    possible.  Correct?

16              MR. PATTIS:  Objection.

17              MR. CERAME:  Objection.

18    BY MR. MATTEI:

19         Q    And you are going to continue to do that?

20         A    I am going to continue to fight tyranny

21    for the rest of my life.

22              MR. CERAME:  Objection.  And I find

23         this question to be a violation of 13-30.

24              MR. MATTEI:  I look forward to your

25         motion with the Court, Mario.
```

```
 1              MR. CERAME:  I am noting it so you

 2         can perhaps take notice.

 3   BY MR. MATTEI:

 4       Q   Mr. Jones, let's go to --

 5              MR. CERAME:  13-30 requires me to

 6         give you notice.  I am giving you notice.

 7              MR. MATTEI:  Thank you, Mario.

 8   BY MR. MATTEI:

 9       Q   Let's go to -- in 2016, you decided to --

10              MR. PATTIS:  I didn't hear the

11         predicate for the question, Chris.  I'm

12         sorry.

13   BY MR. MATTEI:

14       Q   2016.

15              MR. PATTIS:  Thank you.

16   BY MR. MATTEI:

17       Q   Mr. Jones, does all the money that you

18   raise -- well, let me ask it this way.  When you

19   raise money from your audience for your legal

20   defense, does all the money you raise from that go

21   to your lawyers?

22       A   The specific accountant we had for that,

23   100 percent of it has gone to that, yes.

24       Q   You have an account for Genesis

25   Communications Network.  Right?
```

```
1       A    Yes.

2       Q    You set that up so that your audience

3   could fund Genesis defense?

4       A    And that goes to them.

5            MR. CERAME:  Objection.

6   BY MR. MATTEI:

7       Q    And there is a specific link for that that

8   goes directly to an account controlled by Ted

9   Anderson.  Right?

10      A    Uh-huh.

11           MR. CERAME:  Objection.

12  BY MR. MATTEI:

13      Q    Then you separately raised money from your

14  audience for your own -- what you claim is

15  defensive InfoWars.  Right?

16      A    Yes.

17      Q    And people can give to that -- is there a

18  specific link for that for InfoWars legal defense?

19      A    There is a website.

20      Q    There's a specific website.  And when

21  people give to that website, where does it go?

22      A    It is put in an account and accounted for

23  as an account.

24      Q    It is a Free Speech Systems account?

25      A    Yes, it is spent on legal.
```

```
1          Q    Who set it up?

2          A    That is how we set it up, the legal

3    accountant, again.  One goes to Ted (phonetic) and

4    the other one Witt (phonetic), and that's put in

5    the ledger as that.  And the last time I checked, I

6    think it has been spent on legal.

7          Q    When is the last time you checked?

8          A    I checked it last week.

9          Q    Your sworn testimony here is that every

10   penny that was deposited into the account you just

11   described for me went to your lawyers?

12         A    I mean, I can't -- I haven't done the

13   accounting myself, but that's my general belief.

14   That's what the money is for.

15         Q    There's also a link on your website just

16   for people to donate.  Right?

17         A    Yes.

18         Q    And that money just goes right into the

19   Free Systems General Fund?

20         A    Absolutely.  It goes into the War Fund.

21         Q    Are you at war with somebody?

22              MR. CERAME:  Objection.

23              THE WITNESS:  With the globalists and

24         all the crime syndicates.

25   BY MR. MATTEI:
```

```
 1

 2        A    Everybody knows about the new world order.

 3        Q    You are enlisting your audience in that

 4   battle as well?

 5        A    Absolutely.

 6        Q    They are foot soldiers in the war against

 7   the globalists.  Right?

 8        A    In the information war against people that

 9   have destroyed this country.

10        Q    Are my clients globalists?

11        A    Most Sandy Hook parents, the ones you

12   have, you are using them and HBO, they were

13   globalists conglomerate to try to silence the

14   populous voices.  They are just being used as pawns

15   by you.

16        Q    The Sandy Hook families that have decided

17   to sue you are just pawns in a much larger battle.

18   Is that what you are saying?

19        A    I am not going to speak for them.  In my

20   view, they are being used by you and Senator

21   Blumenthal and others.

22        Q    By me, their lawyer?

23        A    You are a well-known ambulance chaser,

24   Democrat anti-free speech, anti-gun tyrant.

25        Q    I am a tyrant and so I need to be stopped.
```

```
 1                C E R T I F I C A T E

 2        I hereby certify that I am a Notary Public, in

 3   and for the State of Connecticut, duly commissioned

 4   and qualified to administer oaths.

 5        I further certify that the deponent named in

 6   the  foregoing deposition was by me duly sworn and

 7   thereupon testified as appears in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13        I further certify that I am neither of counsel

14   nor related to either of the parties to said suit,

15   nor of either counsel in said suit, nor am I

16   interested in the outcome of said cause.

17        Witness my hand and seal as Notary Public the

18   12th day of April, 2022.

19

20

21   _____

22   Notary Public

23   My Commission Expires:

24   November 30, 2022

25
```

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT M

4/6/2022 1:43 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-001610
Ruben Tamez

D-1-GN-22-001610

CAUSE NO. _____

| | | |
|---|---|---|
| NEIL HESLIN, SCARLETT LEWIS, LEONARD POZNER, VERONIQUE DE LA ROSA, MARCEL FONTAINE | § § § § | IN THE DISTRICT COURT |
| **Plaintiffs** | § § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, PQPR HOLDINGS LIMITED LLC, JLJR HOLDINGS, LLC, PLJR HOLDINGS, LLC, CAROL JONES, DAVID JONES, PQPR HOLDINGS, LLC, JLJR HOLDINGS LIMITED, LLC, AEJ HOLDINGS, LLC, AEJ TRUST 2018 | § § § § § § § § § § § | 200TH, DISTRICT COURT |
| **Defendants.** | § § | _____ **DISTRICT COURT** |

## PLAINTIFFS' ORIGINAL PETITION

### Introduction

1.    After Alex Jones was sued for claiming the massacre at Sandy Hook Elementary was a hoax, the infamous conspiracy theorist conspired to divert his assets to shell companies owned by insiders like his parents, his children, and himself. Since being sued, Jones transferred millions of dollars from his fortune to these insiders—whom he apparently thought were beyond reach. But the Texas Uniform Fraudulent Transfer Act prohibits defendants from playing shell games to shield assets from their creditors. And it allows creditors like the Sandy Hook Families to void fraudulent transfers that defendants like Alex Jones make to their insiders. The Sandy Hook Families and Fontaine therefore assert TUFTA claims against Jones and his insiders to foil this scheme.

## Parties

**The Sandy Hook Families**

2.     Plaintiff Neil Heslin is an individual who resides in Connecticut.

3.     Plaintiff Scarlett Lewis is an individual who resides in Connecticut.

4.     Plaintiff Leonard Pozner is an individual who resides in Florida.

5.     Plaintiff Veronique De La Rosa is an individual who resides in Florida.

**Fontaine**

6.     Plaintiff Marcel Fontaine is an individual who resides in Massachusetts.

**The Jones Debtors**

7.     Defendant Alex E. Jones is a resident of Austin, Texas. He hosts radio and web-based news programing, including "The Alex Jones Show," and he owns Free Speech Systems, LLC, which operates the website infowars.com. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

8.     Defendant InfoWars, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

9.     Defendant Free Speech Systems, LLC is a Texas limited-liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Ave., 18th Floor, Austin, TX 78701.

10.     At all times relevant to this petition, these Jones Debtors operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

**The Jones Transferees**

11.      Defendant PQPR Holdings Limited LLC is a Nevada limited-liability company. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

12.      Defendant JLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

13.      Defendant PLJR Holdings, LLC is a Nevada limited-liability company. It directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. It may be served at the address of its registered agent, Registered Agents Inc., at 401 Ryland St., Suite 200-A, Reno, NV 89502.

14.      Defendant Carol Jones is a resident of Austin, Texas. She is Alex Jones's mother and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. She can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever she can be found.

15.      Defendant David Jones is a resident of Austin, Texas. He is Alex Jones's father and directly and indirectly owns, operates, and receives income from PQPR Holdings Limited LLC. He can be served personally at 3402 Clawson Road, Austin, Texas 78704 or wherever he can be found.

16.      Defendant PQPR Holdings, LLC is an entity that has been previously identified by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

3

17.     Defendant JLJR Holdings Limited, LLC is an entity listed as a member of PQPR Holdings Limited, LLC and PLJR Holdings, LLC. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

18.     Defendant AEJ Holdings, LLC is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

19.     Defendant AEJ Trust 2018 is an entity that has been identified previously by the Jones Debtors as a party to transfers or obligations that Plaintiffs contend are fraudulent. To date, Plaintiffs have found no entity by this name and no registered agent to receive service. They will amend this pleading accordingly when a registered agent has been ascertained.

20.     At all times relevant to this petition, the Jones Transferees and Defendant Alex Jones operated as a joint venture, joint enterprise, single-business enterprise, or alter ego.

## Discovery-Control Plan

21.     Discovery should be conducted under Level 3 case of the Texas Rules of Civil Procedure.[1] Plaintiffs seek monetary relief over $1,000,000.[2]

## Jurisdiction and Venue

22.     The amount in controversy exceeds the Court's minimum jurisdictional requirements.

---

[1] *See* Tex. R. Civ. P. 190.

[2] *See* Tex. R. Civ. P. 47. Plaintiffs may also seek injunctive relief, in which case they may request expedited discovery. *See* Tex. R. Civ. P. 680.

23.     Venue is proper in Travis County because that's where certain Defendants resided when the cause of action accrued and because all or a substantial part of the events or omissions giving rise to the claims occurred in Travis County.[3]

## Background

24.     Alex Jones, through his media companies Free Speech Systems and InfoWars, became a national figure by peddling bizarre conspiracy theories. Followers tune in to hear him and his guests ramble about unsubstantiated claims—like how the September 11th attacks were an inside job by the U.S government. They can also hear him tout the various products available to buy on his InfoWars website. And they can then navigate to that website, where they have a host of products available for purchase.

25.     They can buy, for example, bumper stickers echoing the types of conspiracy theories they hear on Jones's programming:



_____

[3] *See* Tex. Civ. Prac. & Rem. Code § 15.002.

[4] InfoWars Store, at "Stickers and Decals", https://www.infowarsstore.com/gear/stickers-and-decals (last visited April 4, 2022).

5

26.     They can even buy various "preparedness" kits ranging from seeds to storable food to survival gear to nuclear and biological supplies:



27.     The sale of these types of products on the InfoWars website and elsewhere enabled the Jones Debtors to earn a fortune.

28.     But after the Jones Debtors aimed their conspiracy theories at Sandy Hook Elementary—claiming the tragic shooting there was staged—that all changed.

---

[5] InfoWars Store, at "Preparedness", https://www.infowarsstore.com/preparedness (last visited April 4, 2022).

**The Sandy Hook Families and Fontaine sue the Jones Debtors for defamation.**

29.     In April 2018, the Sandy Hook Families and Fontaine sued the Jones Debtors for defamation, among other claims, based on various lies and conspiracy theories Alex Jones espoused through his media outlet (the Defamation Cases).[6] The claims of the Sandy Hook Families—parents of children slain at Sandy Hook—stem from conspiracy theories the Jones Debtors disseminated that the mass shooting was a hoax.[7] Similarly, Fontaine's claims arose from falsehoods the Jones Debtors spread that he was the shooter responsible for murdering 17 people at a high school in Parkland, Florida.[8]

30.     Rather than accept responsibility for propagating these lies, however, the Jones Debtors continued to deflect the truth. The Jones Debtors first tried to dismiss the Defamation Cases. But the trial courts denied those attempts in part because the Jones Debtors refused to cooperate in the cases' truth-finding phase of discovery. Instead of accepting blame then, the Jones Debtors appealed the trial courts' denials of their dismissal motions. Each time, the appellate court declined the Jones Debtors' requests to dismiss the cases. The appellate court

---

[6] Cause No.: D-1-GN-18-001835; *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001842; *Leonard Pozner and Veronique De La Rosa v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 345th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-19-004651; *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 261st Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-006623; *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*; In the 98th Judicial District Court of Travis County, Texas; Cause No.: D-1-GN-18-001605; *Marcel Fontaine v Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*; In the 459th Judicial District Court of Travis County, Texas.

[7] *See e.g., Jones v. Heslin*, No. 03-20-00008-CV, 2020 WL 4742834, at *1 (Tex. App.—Austin Aug. 14, 2020, pet. denied); *Jones v. Heslin*, No. 03-19-00811-CV, 2020 WL 1452025, at *1 (Tex. App.—Austin March 25, 2020, pet. denied); *Jones v. Pozner*, No. 03-18-00603-CV, 2019 WL 5700903, at *9 (Tex. App.—Austin Nov. 5, 2019, pet. denied); *Jones v. Lewis*, No. 03-19-00423-CV, 2019 WL 5090500, at *4 (Tex. App.—Austin October 11, 2019, pet. denied).

[8] *Infowars, LLC v. Fontaine*, No. 03-18-00614-CV, 2019 WL 5444400, at *1 (Tex. App.—Austin Oct. 24, 2019, pet. denied).

even sanctioned the Jones Debtors for raising a frivolous appeal that misrepresented the underlying facts and the governing law.[9]

31.     Even after the appellate court allowed the Defamation Cases to proceed, the Jones Debtors continued to obstruct discovery. Their repeated discovery abuses even culminated in the trial court granting default judgments for the Sandy Hook Families and against the Jones Debtors on liability in September 2021. The first trial against the Jones Debtors on damages commences at the end of April 2022. The next will follow soon after. In other words, judgments against the Jones Debtors are imminent.

**During the Defamation Cases, the Jones Debtors doomsday prepped for these eventual judgments by diverting assets.**

32.     After the Sandy Hook Families and Fontaine filed their Defamation Cases, the Jones Debtors started diverting their assets. From 2018 to 2021, for example, Alex Jones personally drew about $18 million from his InfoWars company, Free Speech Systems. These draws were in addition to his yearly salary, which exceeded $600,000, and taken while Free Speech Systems operated at a net loss in the millions each of those years.

33.     Jones apparently drew these $18 million while his company, Free Speech Systems, was insolvent. Just three months after the last appellate-court decision allowing the Defamation Cases to proceed, a company named PQPR filed a UCC Financing Statement claiming a security interest in essentially everything Free Speech Systems owns. The claimed security interest covers an alleged $54 million debt Free Speech Systems owes to PQPR. The supposed debt began accruing years earlier as part of an arrangement where Free Speech Systems sells PQPR's products on the InfoWars website. Under this alleged arrangement, PQPR was to be reimbursed for the costs of the products and receive 70% of the sales revenue while

---

[9] *Heslin*, 2020 WL 1452025, at *6.

Free Speech Systems retained the other 30%. In practice, however, Free Speech Systems supposedly kept 100% of the revenue for about seven years and didn't pay for the goods PQPR provided—to the point where a $54 million debt had accumulated. All the while, PQPR not only supplied Free Speech Systems with more products to sell but also paid Free Speech Systems millions of dollars a year to advertise on the InfoWars website. PQPR still supplies the Jones Debtors with products to sell and pays for advertising on the website.

34.     So why would an independent business like PQPR continue to engage in such questionable transactions?

35.     Because PQPR is not actually an independent business. It's an insider of the Jones Debtors. It is owned and operated directly or indirectly by Jones, his parents, and his children through an alphabet soup of shell entities like JLJR Holdings Limited LLC; JLJR Holdings, LLC; PLJR Holdings, LLC; PQPR Holdings, LLC; AEJ Holdings, LLC; and AEJ Trust 2018. And the income PQPR receives—including from sources like the Jones Debtors—goes to Alex Jones and these Jones Transferees.

36.     And after the Defamation Cases began, the Jones Debtors started transferring large sums of money to the Jones Transferees. These sums include money the Jones Debtors started regularly transferring from Free Speech Systems to PQPR *the same month that the default judgments were rendered*. In fact, the month the default judgments were rendered, Free Speech Systems started transferring to PQPR between $11,000 per day and $11,000 per week plus 60–80% of Free Speech Systems' sales revenue—supposedly just to pay the interest on the alleged $54 million debt. Free Speech Systems claims these payments are part of a "financial disentanglement between the two companies[.]" In reality, they're transfers designed to siphon off the Jones Debtors' assets to make them judgment-proof.

37.     This fact is only confirmed by the jaw-dropping amount in transfers the Jones Debtors made during the Defamation Cases. In 2021 alone, the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate that year. These transfers started just four months after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

## Causes of Action

38.     The Sandy Hook Families and Fontaine assert fraudulent-transfer claims under the Texas Uniform Fraudulent Transfer Act to void transfers between the Jones Debtors and the Jones Transferees. Texas enacted TUFTA to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach.[10] Through TUFTA's statutory scheme, creditors may seek recourse for fraudulent transfers of assets or property.[11] The Sandy Hook Families and Fontaine are creditors entitled to recourse under TUFTA because the Jones Debtors engaged in fraudulent transfers and conspired to commit fraudulent transfers.[12]

**Count 1—Fraudulent Transfer with actual intent to hinder, delay, or defraud under § 24.0005(a)(1)**

39.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

---

[10] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016).

[11] *Sargeant v. Al Saleh*, 512 S.W.3d 399, 411–12 (Tex. App.—Corpus Chrisi-Edinburg 2016, no pet.) (citing cases).

[12] *See* Tex. Bus. & Com. Code § 24.002 (defining "creditor" as a person who has a "claim" and "claim" as a right to payment including whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, or undisputed); *see also Bank of Am., N.A. v. Fulcrum Enterprises, LLC*, 20 F. Supp. 3d 594, 601 (S.D. Tex. 2014) (explaining that a person my bring a TUFTA action as a creditor of the transferor by virtue of a legal action, pending and unliquidated at the time of transfer).

40.     The Jones Debtors are liable for engaging in fraudulent transfers as to present and
future creditors under § 24.0005(a)(1).[13] A transfer made or obligation incurred by a debtor is
fraudulent as to a creditor under this section if the debtor made the transfer or incurred the
obligation with the actual intent to hinder, delay, or defraud any creditor of the debtor.[14] Such
transfers or obligations are fraudulent whether the creditor's claim arose before or within a
reasonable time after the transfers were made or obligations incurred.[15]

41.     The Jones Debtors engaged in fraudulent transfers under this standard. During the
Defamation Cases—while the Sandy Hook Families and Fontaine were creditors—the Jones
Debtors transferred millions of dollars from Free Speech Systems for reasons unrelated to Free
Speech Systems' business operations. In 2021 alone, they transferred from Free Speech Systems
tens of millions more than it cost to operate that year. These transfers started just four months
after the last appellate-court decision was issued that allowed the Defamation Cases to proceed.

42.     Transfers by the Jones Debtors while the Defamation Cases were pending also
include payments to insiders, like Jones himself. From 2018 to 2021, for example, Jones
apparently drew $18 million from Free Speech Systems, even though it was insolvent and
operating at a net loss each of those years. These draws were in addition to (and about 30 times
greater than) Jones's yearly salary.

43.     And since the Defamation Cases began, the Jones Debtors also transferred large
sums to other insiders, like the Jones Transferees. These sums include money the Jones Debtors

---

[13] Tex. Bus. & Com. Code § 24.005(a)(1) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor;").

[14] *Id.*

[15] *Id.*

11

started regularly transferring from Free Speech Systems to insider PQPR the same month that default judgments in the Defamation Cases were rendered. Specifically, PQPR started receiving as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. These payments are allegedly to pay just the interest on the questionable $54 million obligation to PQPR the Jones Debtors decided that Free Speech incurred just three months after the appellate court allowed the Defamation Cases to proceed. All the while the Jones Debtors retained possession and control of these money transfers and obligations, as the money PQPR receives from Free Speech Systems goes directly and indirectly to insiders like Jones, his parents, and his children through the shell entities included as Jones Transferees.

44.     These transfers and obligations that the Jones Debtors made and incurred were done with the actual intent to hinder, delay, or defraud their creditors—including the Sandy Hook Families and Fontaine. That truth becomes especially glaring considering the badges of fraud surrounding these transfers and obligations.[16] Those badges include, for example, that the transfers and obligations were made to insiders who retained possession and control over the property; the transfers and obligations were concealed and made while the Defamation Cases were pending and while the Jones Debtors were insolvent; and that past and future transfers to PQPR will eliminate substantially all of the Jones Debtors' assets—as these essential assets paid

---

[16] Tex. Bus. & Com. Code § 24.005(b) ("(b) In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.").

to insider and supposed secured creditor PQPR will be subsequently transferred to insiders like Jones, his parents, and his children through the Jones Transferees.

45.     The Jones Debtors are thus liable under § 24.0005(a)(1) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies the Sandy Hook Families and Fontaine seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[17]

## Count 2—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0005(a)(2)

46.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

47.     The Jones Debtors are liable for engaging in fraudulent transfers as to present and future creditors under § 24.0005(a)(2).[18] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor under this section if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and either (1)  the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to

---

[17] Tex. Bus. & Com. Code § 24.008.

[18] Tex. Bus. & Com. Code § 24.005(a)(2) "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or the transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.").

the business or transaction; or (2) the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[19] Such transfers or obligations are fraudulent whether the creditor's claim arose before or within a reasonable time after the transfers were made or obligations incurred.[20]

48.     Under these standards the Jones Debtors committed fraudulent transfers as to the Sandy Hook Families and Fontaine. While the Defamation Cases were pending—that is, while the Sandy Hook Families and Fontaine were creditors—the Jones Debtors transferred millions of dollars from Free Speech Systems without receiving reasonably equivalent value in exchange, and while the Jones Debtors' assets were unreasonably small. Moreover, the Jones Debtors incurred millions of dollars in obligations they intended or reasonably should have believed they would be unable to pay as they became due.

49.     For instance, in 2021 the Jones Debtors transferred from Free Speech Systems tens of millions more than it cost to operate the company. These transfers were unrelated to operating the business and thus weren't in exchange for reasonably equivalent value. And these transfers far exceeded Free Speech Systems' assets—and any of the Jones Debtors' for that matter—which were unreasonably small compared to the millions transferred away.

50.     And from 2018 to 2021, the Jones Debtors also transferred from Free Speech Systems to Jones about $18 million on top of the already substantial salary he received. Of course these $18 million in draws weren't for reasonably equivalent value, especially given that Free Speech Systems was operating at a loss at that time and allegedly had other substantial debts to insider PQPR it hadn't been paying for years. And these $18 million in transfers

---

[19] *Id.*

[20] *Id.*

virtually eliminated Free Speech Systems' remaining assets, which were already unreasonably small compared to the $18 million that had been transferred.

51. And around the time that default judgments were rendered against the Jones Debtors in the Defamation Cases, the Jones Debtors incurred an obligation to insider PQPR to pay only the interest on the supposed $54 million debt to PQPR that Free Speech Systems hadn't been paying as it became due. Under this obligation to pay only the interest, Free Speech Systems agreed to pay as much as $11,000 per day plus 60–80% of its sales revenue. Incurring such a hefty obligation to cover only the interest on an alleged debt to an insider is not for reasonably equivalent value. And the Jones Debtors intended to incur or believed or reasonably should have believed that Free Speech Systems was incurring, debts beyond its ability to pay as they became due. After all, given that 100% of Free Speech Systems' sales revenue was already too little to cover its operating expenditures, counting on only 20–40% of sales revenue to cover operating expenditures would be quixotic. The Jones Debtors knew or should have known their new obligation to insider PQPR—which is directly and indirectly run by and benefits Jones, his parents, and his children through the Jones Transferees—is beyond their ability to pay.

52. This of course rests against the backdrop of the dubious $54 million obligation Free Speech Systems now claims it owes PQPR. Free Speech Systems apparently did not recognize any obligation to PQPR before the Defamation Cases. Only after the appellate court allowed the cases to proceed, did any evidence of an obligation by Free Speech Systems to PQPR surface. That Free Speech Systems needlessly agreed to take on a $54 million obligation to an insider is not an obligation in exchange for reasonably equivalent value. And it's an obligation the Jones Debtors apparently intended to incur or believed or reasonably should have believed they would incur and would be beyond their ability to pay as they became due.

53.     The Jones Debtors are thus liable under § 24.0005(a)(2) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[21]

**Count 3—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(a)**

54.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

55.     The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(a).[22] A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[23]

56.     The Jones Debtors also committed fraudulent transfers under this standard. While the Sandy Hook Families and Fontaine were creditors and while the Jones Debtors were insolvent, the Jones Debtors transferred millions of dollars without receiving reasonably

---

[21] Tex. Bus. & Com. Code § 24.008.

[22] Tex. Bus. & Com. Code § 24.006(a) ("(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.").

[23] *Id.*

16

equivalent value. These transfers include the tens of millions transferred from Free Speech Systems in 2021 that were unrelated to its operation. They also include $18 million that Jones drew from his business, Free Speech Systems. And they include the Jones Debtors' payments on just the interest on an alleged $54 million debt Free Speech Systems owes insider PQPR— payments that include as much as $11,000 per day plus 60–80% of Free Speech Systems' sales revenue. As explained in prior sections, none of these transfers and obligations were in exchange for reasonably equivalent value. And all were apparently made and incurred while the Jones Debtors were insolvent—or they became insolvent as a result of these transfers and obligations.

57.     The Jones Debtors are thus liable under § 24.0006(a) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[24]

## Count 4—Fraudulent Transfer without receiving reasonably equivalent value under § 24.0006(b)

58.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

59.     The Jones Debtors are liable for engaging in fraudulent transfers as to present creditors under § 24.0006(b).[25] A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent

---

[24] Tex. Bus. & Com. Code § 24.008.

[25] Tex. Bus. & Com. Code § 24.006(b) ("(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.").

debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[26]

60.     The Jones Debtors engaged in fraudulent transfers under this standard. After the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose, the Jones Debtors started repaying an alleged debt to insider PQPR, which is owned directly and indirectly by Jones, his parents, and his children through various entities—the Jones Transferees. Moreover, income that PQPR receives from Free Speech Systems, for example, is directly and indirectly paid to Jones, his parents, and his children though the Jones Transferees. The Jones Debtors made these transfers to pay off this antecedent debt to insider PQPR directly (and Jones and the Jones Transferees indirectly) while they were insolvent. And the Jones Transferees, including PQPR, had reasonable cause to believe that the Jones Debtors were insolvent at the time. After all, the Jones Debtors allegedly failed to the pay the supposed debt to PQPR for years to the point where the debt reached $54 million and exceeded the Jones Debtors' assets.

61.     And to the extent that the $18 million Jones drew from Free Speech Systems between 2018 and 2021 were payments for antecedent debts, such payments are also fraudulent transfers under this section. These transfers were made after the Sandy Hook Families' and Fontaine's claims against the Jones Debtors arose. As Free Speech Systems' sole owner, Jones was its insider. And as its sole owner, Jones had reasonable cause to believe that Free Speech Systems was insolvent—and in fact was insolvent—when these transfers to him were made.

62.     The Jones Debtors are thus liable under § 24.0006(b) and the Sandy Hook Families and Fontaine seek the remedies available under TUFTA against not only the Jones Debtors as transferors but also Jones and the Jones Transferees as transferees. Among the remedies they seek is to void the transfers made by the Jones Debtors to Jones and the Jones

---

[26] *Id.*

18

Transferees or to recover from Jones and the Jones Transferees the value of the transfers they received from the Jones Debtors.[27]

**Count 5—Conspiracy to commit fraudulent transfers**

63.     The Sandy Hook Families and Fontaine reallege and incorporate by reference the prior facts alleged in this pleading.

64.     The Jones Debtors and the Jones Transferees are liable for conspiracy to commit fraudulent transfers.[28] The elements of a civil conspiracy are: (1) two or more persons; (2) an end to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more overt unlawful acts; and (5) proximately resulting in injury.[29]

65.     Here, the Jones Debtors and the Jones Transferees conspired to commit fraudulent transfers. As the prior paragraphs establish, the Jones Debtors and the Jones Transferees conspired to siphon the Jones Debtors' assets away to avoid paying the Sandy Hook Families and Fontaine in the Defamation Cases. The Jones Debtors and the Jones Transferees then proceeded with the course of action of transferring millions of dollars in assets away from the Jones Debtors and having the Jones Debtors incur millions of dollars in obligations to its insider Jones Transferees, who weren't sued in the Defamation Cases. These overt acts are unlawful fraudulent transfers under TUFTA. And they proximately resulted in injury to the Sandy Hook Families and Fontaine. Diverting assets away from the Jones Debtors to the Jones Transferees impairs the Sandy Hook Families' and Fontaine's ability to collect on their judgments.

---

[27] Tex. Bus. & Com. Code § 24.008.

[28] *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 743 (Bankr. S.D. Tex. 2020) (citing *Ramirez v. Rodriguez (In re Ramirez),* 413 B.R. 621, 629 (Bankr. S.D. Tex. 2009) and *Biliouris v. Sundance Res., Inc.*, 559 F. Supp. 2d 733, 740 (N.D. Tex. 2008)).

[29] *Id.* at 743–44.

## Conditions Precedent

66.     All conditions precedent to the Sandy Hook Families' and Fontaine's claims for relief have been performed or have occurred or have been waived.

## Attorney's Fees and Interest

67.     The Sandy Hook Families and Fontaine seek costs and attorney's fees under § 24.013 of the Texas Uniform Fraudulent Transfer Act.[30]

68.     The Sandy Hook Families and Fontaine further seek pre- and post-judgment interest on the amount of any judgment as allowed by law.

## Request for Disclosure

69.     Defendants are requested to disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## Trial by Jury

70.     The Sandy Hook Families and Fontaine respectfully request a trial by jury.

## Notice of Intent

71.     Under Rule 193.7, Plaintiffs intend to use any documents produced in response to written discovery requests at trial and in any pretrial matters in the litigation.[31]

## Prayer

For these reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that judgment be awarded to Plaintiffs for the following:

1) avoidance of transfers or obligations to the extent necessary to satisfy Plaintiffs' claims;

---

[30] Tex. Bus. & Com. Code § 24.013.

[31] Tex. R. Civ. P. 193.7.

2) an attachment or any other provisional remedy against the assets transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings;

3) an injunction—including temporary and permanent injunctive relief—against further disposition by the debtors or transferees, or both, of the assets transferred or of other property;

4) an appointment of a receiver to take charge of the assets transferred or of other property of the transferees;

5) to levy execution on assets transferred or their proceeds;

6) actual damages, including direct, indirect, special, incidental, and consequential damages;

7) exemplary damages;

8) costs and reasonably attorney's fees as are equitable and just;

9) pre- and post-judgment interest;

10) any other relief the circumstances may require.

Dated: April 6, 2022

Respectfully submitted

**MCDOWELL HETHERINGTON LLP**

By: */s/ Avi Moshenberg*
    Avi Moshenberg
    Texas Bar No. 24083532
    Nick Lawson
    State Bar No. 24083367
    Matthew Caldwell
    State Bar No. 24107722
    1001 Fannin Street, Suite 2700
    Houston, TX 77002
    Phone: (713) 337-5580
    Fax: (713) 337-8850
    Email: avi.moshenberg@mhllp.com
    Email: nick.lawson@mhllp.com
    Email: matthew.caldwell@mhllp.com

**KASTER LYNCH FARRAR & BALL, LLP**

By: /s/ Mark D. Bankston
    Mark D. Bankston
    State Bar No. 24071066
    William R. Ogden
    State Bar No. 24073531
    1117 Herkimer
    Houston, Texas 77008
    (713) 221-8300 Telephone
    (713) 221-8301 Fax
    Email: mark@fbtrial.com
    Email: bill@fbtrial.com

**THE AKERS FIRM PLLC**

By: /s/ Cordt Akers
    Cordt Akers
    State Bar No. 24080122
    3401 Allen Parkway, Suite 101
    Houston, TX 77019
    Phone: (713) 877-2500
    Fax: (713) 583-8662
    Email: cca@akersfirm.com

**ATTORNEYS FOR PLAINTIFFS**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

## ORDER GRANTING
## EMERGENCY MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Upon the motion (Motion) of David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, Sandy Hook Movants) for entry of an order (this Order): (1) granting relief from the automatic stay to allow the Sandy Hook Movants to pursue their claims to judgment in the Connecticut Action; and (2) allowing the relief from the automatic stay to take effect immediately under Bankruptcy Rule 4001(a)(3) upon the entry of this Order; and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and appropriate notice having been provided under the circumstances of the Motion and the opportunity for a hearing on the Motion, and that no other or further notice is required; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The automatic stay provision of 11 U.S.C. § 362(a) be and hereby is immediately modified solely for the purpose of allowing the Connecticut Action to continue to proceed to judgment.

3.      This Court shall retain sole and exclusive jurisdiction with respect to the automatic stay and its application to any actions other than those expressly provided for in this Order.

Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE